UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MASTER CASE NO. 09-2106-MD-GOLD/BANDSTRA

In re:

FONTAINEBLEAU LAS VEGAS
CONTRACT LITIGATION

　　　MDL NO. 2106

This document relates to Case Numbers:

　　　09-CV-23835-ASG
　　　10-CV-20236-ASG
_____/


**DEFENDANTS' JOINT MOTIONS
TO DISMISS THE TERM LENDER COMPLAINTS
AND SUPPORTING MEMORANDUM OF LAW**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................................ 1

BACKGROUND ........................................................................................................................... 3

ARGUMENT ............................................................................................................................... 8

I.   The Term Lenders Lack Standing to Enforce the Revolving Lenders' Promises to
     Fontainebleau ...................................................................................................................... 9

II.  The Term Lenders Cannot State a Breach of Contract Claim Based on
     Fontainebleau's March 2 and 3 Notices of Borrowing ......................................................... 12

     A.   Breach of Contract Claims That Contradict Unambiguous Contract
          Language Fail as a Matter of Law ............................................................................ 13

     B.   Fontainebleau's March Notices of Borrowing Were Improper Under
          Credit Agreement Section 2.1(c)(iii) ...................................................................... 14

          1.   The Credit Agreement, Read as a Whole, Makes Clear That "Fully
               Drawn" Means "Fully Funded" ...................................................................... 14

          2.   The Term Lenders' In Balance Test Argument Does Not Alter the
               Plain Meaning of "Fully Drawn" ..................................................................... 16

III. Material Breaches of the Credit Agreement, as Alleged in the Complaints, Are Fatal
     to the Term Lenders' Claims ............................................................................................... 20

     A.   Plaintiffs' Allegations of Material Breaches Defeat Their Claims ....................... 20

     B.   Section 2.1(c) Does Not Eliminate the Due Performance Requirement ............. 22

IV.  Plaintiffs Fail to Allege a Breach of Contract Concerning Termination of
     Commitments ...................................................................................................................... 25

V.   The Avenue Plaintiffs Fail to State a Claim For Breach of the Implied Covenant of
     Good Faith .......................................................................................................................... 26

CONCLUSION ............................................................................................................................ 28

# TABLE OF AUTHORITIES

Page(s)

## Cases

*AIG Centennial Ins. Co. v. Fraley-Landers*, 450 F.3d 761 (8th Cir. 2006) ...................................................................................... 24

*Alexander v. U.S.*, 640 F.2d 1250 (Ct. Cl. 1981) ........................................ 9

*All States Warehousing, Inc. v. Mammoth Storage Warehouses, Inc.*, 180 N.Y.S.2d 118 (N.Y. App. Div. 1958)...................................... 25

*Ari & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518 (S.D.N.Y. 2003) ...................................................................................... 26

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................. 8

*Atwater & Co. v. Panama R.R. Co.*, 159 N.E. 418 (N.Y. 1927)............... 14

*Bank of N.Y. v. Sasson*, 786 F. Supp. 349 (S.D.N.Y. 1992) ..................... 27

*Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283 (S.D.N.Y. 2005) ............................................... 24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................... 8

*Berry Harvester Co. v. Walter A. Wood Mowing & Reaping Mach. Co.*, 46 N.E. 952 (N.Y. 1897)......................................................9, 10, 11

*Biltmore Bank of Ariz. v. First Nat'l Mortgage Sources*, No. CV-07-936-PHX-LOA, 2008 WL 564833 (D. Ariz. Feb. 26, 2008)........... 24

*Brooke Group v. JCH Syndicate 488*, 663 N.E.2d 635 (N.Y. 1996)......... 16

*CIBC Bank & Trust Co. v. Banco Central do Brasil*, 886 F. Supp. 1105 (S.D.N.Y. 1995) ................................................................ 27

*Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384 (N.Y. 1995) ..................... 27

*Day v. Taylor*, 400 F.3d 1272 (11th Cir. 2005) ....................................... 3

*First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162 (2d Cir. 1998) ................................................................................. 20

*Furia v. Furia*, 498 N.Y.S. 2d 12 (N.Y. App. Div. 1986) ....................... 20

*Greiner v. A. Rosenblum, Inc.*, 207 N.Y.S.2d 75 (N.Y. Sup. Ct. 1959) ...................................................................................... 25

*Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73 (2d Cir. 2002) ...................................................................................... 26

*Helmsley-Spear, Inc. v. New York Blood Ctr., Inc.*, 687 N.Y.S.2d 353 (N.Y. App. Div. 1999)....................................................... 16

*Hubbard v. BankAtlantic Bancorp Inc.*, 625 F. Supp. 2d 1267 (S.D. Fla. 2008) ........................................................................................................... 3

*In re Adelphia Commc'n's Corp.*, No. 02-41729 (REG), 2007 WL 2403553 (Bankr. S.D.N.Y. 2007) ...................................................................... 22

*In re Fontainebleau Las Vegas Holdings, LLC*, 417 B.R. 651 (S.D. Fla. 2009) .................................................................................................. passim

*In re Ionosphere Clubs, Inc.*, 147 B.R. 855 (Bankr. S.D.N.Y. 1991) ......................................... 17

*Instead, Inc. v. ReProtect, Inc.*, No. 08 Civ. 5236 (DLC), 2009 WL 274154 (S.D.N.Y. Feb. 5, 2009) ................................................................... 13, 14

*Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96 (2d Cir. 1989) ................................................. 17

*InterDigital Commc'ns Corp. v. Nokia Corp.*, 407 F. Supp. 2d 522 (S.D.N.Y. 2005) ................................................................................................. 19

*Kass v. Kass*, 696 N.E.2d 174 (N.Y. 1998) ......................................................................... 14

*Long v. Marubeni Am. Corp.*, No. 05 Civ. 0639, 2006 WL 1716878 (S.D.N.Y. June 20, 2006) .......................................................... 26

*M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134 (2d Cir. 1990) ............................................ 27, 28

*Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337 (11th Cir. 2005) ..................................................................................................... 13

*Merit Group, LLC v. Sint Maarten Int'l Telecomms. Servs., NV*, No. 08-cv-3496 (GBD), 2009 WL 3053739 (S.D.N.Y. Sept. 24, 2009) .................................................................................................... 13, 14

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007) .......................................................................................... 24

*Merritt Hill Vineyards Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077 (N.Y. 1984) ................................................................................ 24

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884 (2d Cir. 1990) ..................................................................................................... 17

*Perlbinder v. Bd. of Managers of the 411 E. 53rd Street Condo.*, 886 N.Y.S.2d 378 (N.Y. App. Div. 2009) ............................................................ 19

*R.H. Damon & Co., Inc. v. Softkey Software Prods., Inc.*, 811 F. Supp. 986 (S.D.N.Y. 1993) ........................................................................ 22, 25

*Slatt v. Slatt*, 477 N.E.2d 1099 (N.Y. 1985) ......................................................................... 17

*Superb Gen. Contracting Co. v. City of N.Y.*, 833 N.Y.S.2d 64 (N.Y. App. Div. 2007) ........................................................................... 19

*UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485 (S.D.N.Y. 2003) ................................................................... 11

*Uphoff v. Wachovia Secs., LLC*, No. 09 CIV 80420 (KAM), 2009
    WL 5031345 (S.D. Fla. Dec. 15, 2009) ................................................................................ 8

*Zullo v. Varley*, 868 N.Y.S.2d 290 (N.Y. App. Div. 2008) ...................................................... 15

## Other Authorities

13 Williston on Contracts § 38:5 (4th ed. 2009) ....................................................................... 24

13 Williston on Contracts § 63:3 (4th ed. 2009) ....................................................................... 24

22 N.Y. Jur. 2d Contracts § 260 (2008) ..................................................................................... 9

Defendants[1] jointly move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Amended Complaints filed in *Avenue CLO Fund, Ltd., et al. v. Bank of America, N.A., et al.* (the "Avenue Action") and *ACP Master, Ltd., et al. v. Bank of America, N.A., et al.,* (the "Aurelius Action") (collectively, the "Term Lender Actions" maintained by the "Term Lenders" or "Plaintiffs") for failure to state a claim upon which relief can be granted. Defendants also respectfully submit this memorandum of law and the Declaration of Thomas C. Rice ("Rice Decl.") in support of their joint motions.

## PRELIMINARY STATEMENT[2]

The Avenue and Aurelius Actions arise out of the same Credit and Disbursement Agreements (as defined below) and substantially the same circumstances that were the subject of this Court's August 26, 2009 Decision and Order (the "August 26 Decision")[3] denying partial summary judgment to Fontainebleau Las Vegas LLC ("Fontainebleau") in its lawsuit against the same Revolving Lenders named herein (the "Fontainebleau Action"). The Plaintiffs in the Avenue Action (the "Avenue Plaintiffs") are a group of lenders that participated in Initial and/or Delay Draw Term Loans under the Credit Agreement with Fontainebleau. The Plaintiffs in the Aurelius Action (the "Aurelius Plaintiffs") claim to be successors in interest to other institutions that were Initial Term and/or Delay Draw Lenders under the Credit Agreement.

The Amended Complaints are predicated on the same two flawed theories on which Fontainebleau based its motion for partial summary judgment that this Court rejected in

---

[1]   Bank of America, N.A., Merrill Lynch Capital Corporation, JPMorgan Chase Bank, N.A., Barclays Bank PLC, Deutsche Bank Trust Company Americas, The Royal Bank of Scotland plc, Sumitomo Mitsui Banking Corporation, Bank of Scotland plc, HSH Nordbank AG, MB Financial Bank, N.A., and Camulos Master Fund, L.P. (collectively, the "Revolving Lenders" or "Defendants").

[2]   Unless otherwise indicated, capitalized terms have the same meaning as in the Credit Agreement and/or Disbursement Agreement. *See* Rice Decl. Exs. A (Credit Agreement) & B (Disbursement Agreement).

[3]   The August 26 Decision has been published as *In re Fontainebleau Las Vegas Holdings, LLC*, 417 B.R. 651 (S.D. Fla. 2009).

the August 26 Decision. These theories—that "fully drawn" means "fully requested" rather than "fully funded" and that Fontainebleau's prior material breaches of the Credit Agreement did not relieve the Revolving Lenders of their obligation to loan money under the Credit Agreement— are even less viable here than they were in the Fontainebleau Action. The Amended Complaints fail to state a claim for relief and should be dismissed.

First, Plaintiffs allege that the Revolving Lenders breached the Credit Agreement by not honoring a March 2, 2009 Notice of Borrowing delivered by Fontainebleau, which was amended on March 3 and which simultaneously requested $350 million in Delay Draw Term Loans and $656.5 million in Revolving Loans (the "March 2 and 3 Notices of Borrowing"). As a threshold matter, Plaintiffs lack standing to assert a claim against the Revolving Lenders for breach of any lending commitment to Fontainebleau. Furthermore, Fontainebleau's March 2 and 3 Notices of Borrowing did not comply with the Credit Agreement, which provides that the outstanding balance under the revolving loan facility (the "Revolver") cannot exceed $150 million "unless the Total Delay Draw Commitments have been fully drawn." Plaintiffs contend—as did Fontainebleau in the Fontainebleau Action—that "fully drawn" means "fully requested" and that Fontainebleau satisfied the Credit Agreement's sequential funding requirements by simply requesting all of the Delay Draw funds and the remainder available under the Revolver in the same notice.

This Court rightly rejected Plaintiffs' strained interpretation in the August 26 Decision, ruling that "in the context of the entire agreement, the unambiguous meaning of 'fully drawn' in section 2.1(c)(iii) means 'fully funded.'"[4] The "fully requested" argument is even less convincing in this action, because, as alleged in the Aurelius Action, certain of the Delay Draw

---

[4]    August 26 Decision, 417 B.R. at 660.

Lenders also declined to honor the March 2 and 3 Notices of Borrowing.

Second, Plaintiffs allege that the Revolving Lenders were obligated to fund the March 2 and 3 Notices of Borrowing despite pre-existing material breaches of the Credit Agreement by Fontainebleau.  In rejecting this argument in the August 26 Decision, this Court recognized that the Credit Agreement and established New York law relieved the Revolving Lenders of their funding obligations if Fontainebleau materially breached the Credit Agreement before March 2.  Furthermore, here Plaintiffs affirmatively allege that Events of Default occurred prior to March 2009, based, *inter alia*, on defaults by Lehman Brothers Holdings, Inc. ("Lehman Brothers") and First National Bank of Nevada under certain Material Agreements, as defined in the Credit Agreement.  These allegations, taken as true for purposes of the present motion, are fatal to Plaintiffs' claims.

Finally, the claim by the Avenue Plaintiffs for breach of the covenant of good faith and fair dealing is facially deficient.  This claim is duplicative of the Avenue Plaintiffs' breach of contract claim and seeks to impose obligations beyond those contained in the Credit Agreement.  Under well-settled New York law, this claim should also be dismissed.

## **BACKGROUND**[5]

### A.    **The Loans**

On June 6, 2007, Fontainebleau and a number of sophisticated financial institutions (the "Lenders," or individually, a "Lender") entered into an agreement that provided for $1.85 billion in financing (the "Credit Agreement") for the construction of the Fontainebleau

---

[5]    The following background facts are taken from the Amended Complaints (the "Avenue Compl." and the "Aurelius Compl.") and from the Credit Agreement and Disbursement Agreement, which the Court may consider on this motion to dismiss.  *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (a court may consider a document on a motion to dismiss "if the document's contents are alleged in a complaint and no party questions those contents" and the document is "central to the plaintiff's claim"); *see also Hubbard v. BankAtlantic Bancorp Inc.*, 625 F. Supp. 2d 1267, 1279 (S.D. Fla. 2008) (same).

Las Vegas Resort and Casino (the "Project").  The Credit Agreement created three credit facilities: (i) a $700 million initial term loan facility (the "Initial Term Loan"); (ii) a $350 million delay draw term facility (the "Delay Draw Term Loan," and with the Initial Term Loan, the "Term Loan Facility"), and (iii) an $800 million revolving loan facility (the "Revolver").[6]  The Avenue Plaintiffs were participants in either the Initial Term Loan and/or the Delay Draw Term Loan.[7]  The Aurelius Plaintiffs purport to be successors in interest to Initial Term and/or Delay Draw Lenders.[8]  Defendants were Lenders under the Revolver.[9]  In addition, defendant Bank of America, N.A. ("Bank of America") acted as Administrative Agent under the Credit Agreement.[10]

Construction of the Project was to be funded by, among other sources, the three facilities established under the Credit Agreement, the proceeds from a $675 million Second Mortgage Note offering (the "Second Lien Facility") and a $350 million Retail Facility Agreement.[11]  In addition to the Credit Agreement, on June 6, 2007, Fontainebleau, Bank of America, as Disbursement Agent, Wells Fargo Bank, N.A., as Trustee for the Second Mortgage Notes and Lehman Brothers, as Agent for the Retail Facility Agreement, entered into an agreement governing the disbursement of the funds loaned to Fontainebleau under each of the Credit Agreement, the Second Lien Facility, and the Retail Facility Agreement (the "Disbursement Agreement").

Together, the Credit Agreement and the Disbursement Agreement governed the

---

[6]     Aurelius Compl. ¶¶ 23-24; Avenue Compl. ¶ 115.

[7]     Avenue Compl. ¶¶ 115, 117.

[8]     Aurelius Compl. ¶ 25.

[9]     Aurelius Compl. ¶¶ 11-22; Avenue Compl. ¶¶ 102-12.

[10]    Aurelius Compl. ¶ 11; Avenue Compl. ¶ 102.

[11]    Aurelius Compl. ¶ 28; Avenue Compl. ¶ 114.

Fontainebleau Project lending relationships and established a two-step funding process.[12]  First, following Fontainebleau's submission of a notice of borrowing specifying the requested loans and a designated borrowing date (a "Notice of Borrowing"), the Lenders were required, subject to Fontainebleau's satisfaction of the Credit Agreement's terms, to fund loans made pursuant to their respective commitments into a Bank Proceeds Account.[13]  Second, to access funds in the Bank Proceeds Account, Fontainebleau was required to submit an advance request pursuant to the Disbursement Agreement (an "Advance Request"), and upon the satisfaction of certain conditions, Fontainebleau could obtain funds from this account under an Advance Request to pay Project Expenses.[14]

Most pertinent to the present motions, the making of loans under the Revolver was governed by, *inter alia*, Section 2.1(c) of the Credit Agreement.  That provision reads:

> ***Subject to the terms and conditions [of the Credit Agreement], and in reliance upon the applicable representations and warranties set forth herein and in the Disbursement Agreement***, each Revolving Lender severally agrees to make Revolving Loans . . . to Borrowers . . . <u>provided</u> that . . . (iii) unless the Total Delay Draw Commitments have been fully drawn, the aggregate outstanding principal amount of all Revolving Loans . . . shall not exceed $150,000,000.[15]

As Section 2.1(c) makes clear and as this Court determined in the August 26 Decision, the Revolving Lenders' obligation to make loans was subject to Fontainebleau's compliance with the terms and conditions of the Credit Agreement, and an Event of Default under the Credit Agreement would relieve the Revolving Lenders of their funding obligation. Section 8 of the Credit Agreement sets forth various circumstances that would constitute an Event of Default.

---

[12]   Aurelius Compl. ¶ 33; Avenue Compl. ¶ 119.

[13]   Aurelius Compl. ¶ 33; Avenue Compl. ¶ 119; Credit Agmt. §§ 2.1(c), 2.4(c).

[14]   Aurelius Compl. ¶ 37; Avenue Compl. ¶ 120.

[15]   Credit Agmt. § 2.1(c) (emphasis added).

B.      **The March 2009 Notices of Borrowing**

On March 2, 2009, Fontainebleau submitted a Notice of Borrowing that requested $350 million under the Delay Draw Term Loan and $679 million under the Revolver (the "March 2 Notice of Borrowing").[16]  On March 3, 2009, citing a purported "scrivener's error," Fontainebleau issued an amended Notice of Borrowing, reducing the amount requested under the Revolver to $656.5 million (the "March 3 Notice of Borrowing").[17]

On March 3, 2009, the Administrative Agent, Bank of America, informed Fontainebleau that the March 2 Notice of Borrowing did not comply with Section 2.1(c)(iii) of the Credit Agreement because the notice contained a simultaneous request for loans under the Delay Draw Term Loan, which had not yet been "fully drawn."[18]  In a March 4, 2009 message posted on Intralinks and available to all Lenders, Bank of America reported that a Steering Committee, which included both Term and Revolving Lenders, "unanimously supports the position that the [March 3 Notice] does not comply with the terms of the Credit Agreement."[19] Bank of America further advised that Lenders who disagreed with that position should "immediately contact Bank of America . . . to make operational arrangements for funding their portion of the requested borrowing."[20]  The Aurelius Plaintiffs allege that certain of their predecessors in interest participating as Delay Draw Term Lenders did not fund the March 2 or 3 Notices of Borrowing.[21]

Several days later, on March 9, 2009, Fontainebleau issued a new Notice of

---

[16]    Aurelius Compl. ¶ 44 (referencing Ex. C, Rice Decl. (March 2 Notice of Borrowing)); Avenue Compl. ¶ 141.

[17]    Aurelius Compl. ¶ 56 (referencing Ex. D, Rice Decl. (March 3 Notice of Borrowing)); Avenue Compl. ¶ 141.

[18]    Aurelius Compl. ¶¶ 50-51; Avenue Compl. ¶¶ 144-45.

[19]    Aurelius Compl. ¶ 57 (referencing Ex. E, Rice Decl. (March 4 Intralinks posting)); *accord* Avenue Compl. ¶ 143.

[20]    Aurelius Compl. ¶ 57 (referencing Ex. E, Rice Decl.).

[21]    *Id.* ¶ 53.

Borrowing to the Delay Draw Lenders alone for the full amount of the $350 million Delay Draw Term Loan (the "March 9 Notice of Borrowing").[22]  The Term Lenders allege that they (or their predecessors in interest, as applicable) funded $337 million of the $350 million sought under the March 9 Notice of Borrowing on March 10, 2009.[23]

> ### C.    Termination of The Revolving Lenders' Commitments and the April 21 Notice of Borrowing

Section 8 of the Credit Agreement allows a majority of the Revolving Lenders to terminate the Revolver upon the occurrence of an Event of Default.[24]  In accordance with this section, on April 20, 2009, Bank of America, in its capacity as Administrative Agent, sent a letter to Fontainebleau, the Lenders, and others advising that the Revolving Lenders had determined that "one or more Events of Default have occurred and are continuing" (the "April 20 Termination Letter").[25]  This letter followed a number of disclosures by Fontainebleau indicating that numerous Events of Default had occurred, some of which may have pre-dated the March 2 Notice of Borrowing.[26]

According to the Avenue and Aurelius Complaints, at least two such Events of Default had taken place prior to March 2009.  The first arose out of the bankruptcy of Lehman Brothers and its ensuing breach of the Retail Facility Agreement.[27]  The second arose out of the failure of First National Bank of Nevada, which went into receivership in July 2008, and thereafter repudiated its obligations as a Lender.[28]  Plaintiffs allege that these events constituted

---

[22]    Aurelius Compl. ¶ 65; Avenue Compl. ¶ 151 (referencing Ex. F, Rice Decl. (March 9 Notice of Borrowing)).

[23]    Aurelius Compl. ¶ 66; Avenue Compl. ¶ 154.

[24]    Credit Agmt. § 8.

[25]    Aurelius Compl. ¶ 73; Avenue Compl. ¶ 167 (referencing Ex. G, Rice Decl. (April 20 Termination Letter)).

[26]    *See, e.g.*, Avenue Compl. ¶¶ 139, 157-59.

[27]    Aurelius Compl. ¶¶ 99-106; Avenue Compl. ¶ 128.

[28]    Aurelius Compl. ¶¶ 118-21; Avenue Compl. ¶¶ 133-35.

breaches of Material Agreements under the Credit Agreement, and thus constituted an Event of Default under Section 8(j) and other provisions of the Credit Agreement.

  The April 20 Termination Letter further notified its recipients that pursuant to Section 8 of the Credit Agreement, the Revolver was "terminated effectively immediately."[29] Despite the Revolving Lenders' termination of their obligations, one day later, on April 21, 2009, Fontainebleau submitted a Notice of Borrowing (the "April 21 Notice of Borrowing") to Bank of America, requesting $710 million under the Revolver.[30]  The Revolving Lenders did not fund that request.

## ARGUMENT

  Plaintiffs fail to allege the essential elements of a cognizable claim for relief.[31] As a threshold matter, Plaintiffs lack standing to pursue claims based on contractual promises made by the Revolving Lenders to Fontainebleau.  Even if Plaintiffs had standing, they do not allege facts that constitute a breach of the Credit Agreement by the Revolving Lenders.  Nor do Plaintiffs allege due performance of the Credit Agreement by Fontainebleau or themselves; rather, Plaintiffs allege material breaches of the Credit Agreement that relieved the Revolving Lenders of any funding obligation.  Finally, the Avenue Plaintiffs' claim for breach of the covenant of good faith and fair dealing fails to state a claim because it is duplicative of the

---

[29] Aurelius Compl. ¶ 73; Avenue Compl. ¶¶ 167-68 (referencing Ex. G, Rice Decl.).

[30] Aurelius Compl. ¶ 71; Avenue Compl. ¶ 169 (referencing Ex. H, Rice Decl. (April 21 Notice of Borrowing)).

[31] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citation omitted).  As the Supreme Court has confirmed, the plausibility test applies to "'all civil actions,'" including, but not limited to breach of contract cases.  *Id.* at 1953 (citing Fed. R. Civ. P. 1 and 8 and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *see Uphoff v. Wachovia Secs., LLC*, No. 09 CIV 80420 (KAM), 2009 WL 5031345, at *2 (S.D. Fla. Dec. 15, 2009) (dismissing breach of contract claim and citing *Iqbal* instruction that "only a complaint that states a plausible claim for relief survives a motion to dismiss").

contract claims asserted and seeks to impose obligations beyond those contained in the Credit Agreement.

## I.    THE TERM LENDERS LACK STANDING TO ENFORCE THE REVOLVING LENDERS' PROMISES TO FONTAINEBLEAU

The mere fact that Plaintiffs as Term Lenders are parties to the Credit Agreement does not give them standing to enforce every obligation set forth in the Credit Agreement. Rather, as New York courts[32] have recognized for more than a century, a party to a multi-party contract can enforce only those promises expressly intended for that party's benefit and supported by mutual consideration.[33]

In *Berry Harvester*, the court considered a tripartite contract in which (i) plaintiff Berry Harvester agreed to license to defendant Wood Mowing certain patented machine designs; (ii) Wood Mowing agreed to pay Berry Harvester a license fee plus a royalty for every machine sold; and (iii) Wood Mowing agreed to employ Mr. Berry (the machine's inventor) for three years to develop new machines, which Wood Mowing would then sell subject to its royalty agreement with Berry Harvester.[34]  After unsuccessful development efforts, Wood Mowing withdrew its support for Mr. Berry's research, and Berry Harvester sued Wood Mowing for breach of contract.

The court identified the intended beneficiary of each individual promise in the

---

[32]   New York law governs both the Credit Agreement and the Disbursement Agreement.  Credit Agmt. § 10.11; Disbursement Agmt. § 11.6.

[33]   *Berry Harvester Co. v. Walter A. Wood Mowing & Reaping Mach. Co.*, 46 N.E. 952, 955 (N.Y. 1897) ("Whether the right or privilege conferred by the promise of one party to a tripartite contract belongs to one or both of the other parties depends upon the intention of the parties; the mere fact that there are three parties to the contract does not enlarge the effect of any promise"); *accord Alexander v. U.S.*, 640 F.2d 1250, 1253 (Ct. Cl. 1981) ("[T]he mere fact that [a party] signed the agreement is not controlling; they may have enforceable rights under some of its provisions and not have enforceable rights under other provisions.  The critical inquiry is whether the parties to the agreement intended to give the [party] the right to enforce . . . [the] obligation." (citing *Berry Harvester* as a "leading case")); *see also* 22 N.Y. Jur. 2d Contracts § 260 (2008).

[34]   *Berry Harvester*, 46 N.E. at 954.

contract and concluded that while Wood Mowing was "interested in every stipulation, the interests of the others are mainly severed.  [Wood Mowing] covenanted with [Berry Harvester] as to certain things, with Mr. Berry as to others, and with both as to others still."[35]  The court found this structure unambiguous because "the covenants in favor of [Berry Harvester] were supported by a consideration furnished by it only, while those in favor of [Mr.] Berry rest upon a consideration flowing from him only."[36]  Thus, it held that "[w]here a several right is conferred upon [Berry Harvester], Mr. Berry is not interested in it, and where a several right is conferred upon Mr. Berry, [Berry Harvester] has no interest in that."[37]  The court then affirmed the trial court's judgment for Wood Mowing because the covenant that Wood Mowing allegedly breached "was, by the form of the agreement, confined to [Mr. Berry] . . . [and, thus,] would be immaterial in this controversy between the other parties to the contract."[38]

Here, Plaintiffs do not identify any provision in the Credit Agreement that gives them standing to assert breach of contract claims based on the Revolving Lenders' alleged failure to fund Revolver commitments.  As with the *Berry Harvester* contract, the Credit Agreement's unambiguous terms reflect separate promises between the various parties.  Credit Agreement Section 2.1 provides that each Lender "*severally agrees* to make [either Term or Revolving] loans to *Borrowers*,"[39] and further provides separate conditions precedent for each of the Initial Term Loans, Delay Draw Term Loans, and Revolving Loans.  Credit Agreement Section 2.23(g) reiterates that the Revolving and Term Lenders' individual funding obligations "are *several and*

---

[35]   *Id.*

[36]   *Id.* at 955.

[37]   *Id.*

[38]   *Id.*

[39]   Credit Agmt. § 2.1(a)-(c) (emphasis added); *Berry Harvester*, 46 N.E. at 955 (observing that contractual promise introduced with words specifically limiting the promise to two of a tripartite contract's three parties showed intent that the provision should only apply to two of the three contracting parties).

*not joint*" (emphasis added).  Moreover, each Lender's funding commitment was supported by separate consideration received from Fontainebleau, including, among other things, Fontainebleau's obligations to repay the loans "for the account of the appropriate [Lender]"[40] and to pay each Lender a commitment fee.[41]

In contrast, there is no provision in the Credit Agreement that permits the Term Lenders to enforce the Revolving Lenders' commitments.  Indeed, no Lender received consideration from any other Lender for its funding commitment.[42]  As this Court has previously recognized, the Credit Agreement "did not impose *any shared obligations* on lenders to ensure the absence of a financing gap."[43]

The Term Lenders' attempt to manufacture new inter-Lender obligations is unavailing and is undermined by the clear terms of the Credit Agreement.  For example, the Term Lenders allege that they entered into the Credit Agreement in reliance on their ability to enforce the Revolving Lenders' funding obligations.[44]  But each Term Lender expressly acknowledged, in Credit Agreement Section 9.7, that it had not relied "on any other Lender . . . [in making the] decision to enter into this Agreement," and "will . . . *without reliance* upon . . . any other Lender . . . make its own decisions in taking or not taking action under or based upon this Agreement." (Emphasis added.)[45]  In a related vein, in Section 2.1(a), the Term Lenders

---

[40]   Credit Agmt. § 2.7(a).

[41]   *Id.* § 2.2.

[42]   *See Berry Harvester*, 46 N.E. at 955 ("The covenants in favor of plaintiff were supported by a consideration furnished by it only, while those in favor of Berry rest upon a consideration flowing from him only.").

[43]   *See* August 26 Decision, 417 B.R at 661 (emphasis added).

[44]   Aurelius Compl. ¶ 76 (alleging Term Lenders "relied upon their ability to enforce loan commitments made by the Revolving Lenders"); Avenue Compl. ¶ 118 (alleging Term Lenders "relied upon the obligation of the other lenders to comply with their funding obligations").

[45]   *See also UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 499 (S.D.N.Y. 2003) (contract provision in which plaintiff lenders agreed to "make their own credit decisions and would not rely on the Defendant banks" barred plaintiffs from arguing they relied on the banks).

agreed to lend to Fontainebleau in "*reliance* upon the representations and warranties" in the Credit Agreement—none of which was made by the Revolving Lenders or concern any Revolving Lender obligations (emphasis added).[46]

Similarly unavailing is the Term Lenders' allegation that the Credit Agreement reflects some vague, unstated inter-Lender agreement to "share the risks of the lending transaction ratably."[47]  The Term Lenders ignore the Credit Agreement's structure, which, as this Court held, "reflects the parties' intent to employ a sequential borrowing and lending process" that did not permit Fontainebleau access to the entire Revolver until the Term and Delay Draw Lenders fully funded their commitments.[48]  Thus, the Term Lenders always bore the risk that Fontainebleau would not receive the Revolver funds.  Contrary to the Term Lenders' assertions, Credit Agreement Section 2.4(b) says nothing about the allocation of risk between Term and Revolving Lenders—it simply establishes procedures for the Lenders to meet their several funding obligations.[49]  Therefore, the Term Lenders lack standing to assert the alleged breaches on which they sue, and the Amended Complaints should be dismissed on that basis alone.

## II.   THE TERM LENDERS CANNOT STATE A BREACH OF CONTRACT CLAIM BASED ON FONTAINEBLEAU'S MARCH 2 AND 3 NOTICES OF BORROWING

Even if Plaintiffs had standing to sue for breach, the Revolving Lenders did not breach the Credit Agreement by rejecting Fontainebleau's March 2 and 3 Notices of Borrowing. The notices were improper under the Credit Agreement's unambiguous terms because they

---

[46]   *See* Credit Agmt. § 4 ("Each Borrower hereby represents and warrants to . . . each Lender that . . . .").

[47]   Aurelius Compl. ¶ 77.

[48]   August 26 Decision, 417 B.R. at 660.

[49]   *See* Aurelius Compl. ¶¶ 78-79; Credit Agmt. § 2.4(b) ("Upon receipt of each Notice of Borrowing . . . such [L]ender will make the amount of its pro rata share of each borrowing available.").  The Aurelius Complaint's reliance on the March 9 Notice of Borrowing is improper because such parol evidence cannot be used to alter the Credit Agreement's unambiguous terms.  *See infra* at II.B.2.

simultaneously requested the full amounts available under both the Delay Draw Term Loan and the Revolver. Credit Agreement Section 2.1(c)(iii) forbids Fontainebleau to borrow more than $150 million under the Revolver "unless the Total Delay Draw Commitments have been fully drawn." As this Court has already held, the plain meaning of "fully drawn" in Section 2.1(c)(iii) is fully funded.[50] Thus, the Revolving Lenders properly rejected Fontainebleau's $656.5 million Revolver request, and the Term Lenders' claims based on the March 2 and 3 Notices of Borrowing (Avenue Compl. Counts II, IV, and VI; Aurelius Compl. Count I) must be dismissed.[51]

### A.   Breach of Contract Claims That Contradict Unambiguous Contract Language Fail as a Matter of Law

A breach of contract claim "cannot withstand a motion to dismiss if the express terms of the contract contradict plaintiff's allegations of breach."[52] Under New York law, courts must enforce a contract that is "complete, clear and unambiguous on its face" according to "the plain meaning of its terms."[53] A contract is unambiguous if its language has "a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion."[54] The Court "is not required to accept the allegations of the complaint as to how to construe the

---

[50]   August 26 Decision, 417 B.R. at 662.

[51]   Separate and apart from the question of what "fully drawn" means, neither the March 2 Notice of Borrowing nor the March 3 Notice of Borrowing complied with all of the conditions set forth in the Credit Agreement. As Fontainebleau has acknowledged, the March 2 Notice of Borrowing failed to take into account outstanding letters of credit, which reduced the amount available under the Revolver to less than the $670 million requested. The March 3 Notice of Borrowing, which sought $656.5 million under the Revolver, did not comply with Section 2.4(d) of the Credit Agreement (or the condition set forth in Section 5.2(a) that the Notice of Borrowing be in compliance with Section 2), which required that the requested amount under the Revolver be a multiple of $5 million.

[52]   *Merit Group, LLC v. Sint Maarten Int'l Telecomms. Servs., NV*, No. 08-cv-3496 (GBD), 2009 WL 3053739, at *2 (S.D.N.Y. Sept. 24, 2009) (granting motion to dismiss breach of contract claim).

[53]   *See Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1342 (11th Cir. 2005) (affirming dismissal of complaint based on contract's plain meaning and applying New York law); *Instead, Inc. v. ReProtect, Inc.*, No. 08 Civ. 5236 (DLC), 2009 WL 274154, at *5 (S.D.N.Y. Feb. 5, 2009) (granting motion to dismiss based on plain language); *accord* August 26 Decision, 417 B.R. at 662.

[54]   *Maxcess*, 433 F.3d at 1342.

parties' agreement."[55]   Rather, the Court "'should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.  Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.'"[56]  The fact that the Term Lenders and the Revolving Lenders "urge different interpretations" of Section 2.1(c)(iii) does not create an ambiguity or prevent the Court from enforcing the Credit Agreement according to its terms.[57]

      **B.**    **Fontainebleau's March Notices of Borrowing Were Improper Under Credit Agreement Section 2.1(c)(iii)**

          *1.*     *The Credit Agreement, Read as a Whole, Makes Clear That "Fully Drawn" Means "Fully Funded"*

In the August 26 Decision, this Court held that "the unambiguous meaning of the term 'fully drawn' is 'fully funded.'"[58]  As the Court explained,

> The structure of the lending facilities, as discerned from the Credit Agreement itself, reflects the parties' intent to employ a sequential borrowing and lending process that places access to Delay Draw Term Loans ahead of Revolving Loans when the amount sought under the Revolving Loan facility was in excess of $150 million. The most persuasive interpretive approach is to read section 2.1(b), which governs Delay Draw Term Loans, and section 2.1(c), which governs Revolving Loans, together.[59]

The Court correctly observed that Section 2.1(b)(iii) provides that "the proceeds of each Delayed [sic] Draw Term Loan will be applied <u>first</u> to *repay in full* any then outstanding Revolving Loans . . . and <u>second</u>, *to the extent of any excess*, be credited to the Bank Proceeds Account."[60]

---

[55]   *Merit Group*, 2009 WL 3053739, at *2 (citations omitted).

[56]   *Kass v. Kass*, 696 N.E.2d 174, 180-81 (N.Y. 1998) (finding contractual language unambiguous in context of the entire agreement) (quoting *Atwater & Co. v. Panama R.R. Co.*, 159 N.E. 418 (N.Y. 1927)); *accord* August 26 Decision, 417 B.R. at 559 ("[T]he court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.").

[57]   *ReProtect*, 2009 WL 274154, at *5.

[58]   August 26 Decision, 417 B.R. at 660.

[59]   *Id.*

[60]   *Id.*

(underscore in original, italics added).  Thus, the Credit Agreement's plain terms require that the proceeds of a Delay Draw Term Loan—*i.e.*, the money that is actually provided to the Borrower—first be used to repay in full any outstanding Revolving Loans before the remainder is deposited into the Bank Proceeds Account.[61]

      To ensure that a Delay Draw Term Loan would be sufficient "to repay in full" any outstanding Revolving Loans, Section 2.1(b)(i) sets the minimum Delay Draw Term Loan amount at $150 million—which, as the Court observed, is the same as the maximum amount that Section 2.1(c)(iii) permits Fontainebleau to "borrow[] 'freely' under the Revolving Loan facility without [the] conditions associated with the Delay Draw Term Loans."[62]  Permitting Fontainebleau simultaneously to request a Delay Draw Term Loan and a Revolving Loan exceeding $150 million would render Section 2.1(b)(iii)'s "repay in full" requirement meaningless.  In order for "section 2.1(b)(iii) to be given effect, all of the proceeds from the Delay Draw [Term Loan] must *first* be made available and used to repay outstanding Revolving Loans, which would be under $150 million, before the rest of the Revolving Loan facility could be made available."[63]  Accordingly, as the Court concluded, "'fully drawn' must mean 'fully funded.'"[64]

---

[61]  *Id.*

[62]  *Id.*

[63]  *Id.* (emphasis in original) (citing *Zullo v. Varley*, 868 N.Y.S.2d 290, 291 (N.Y. App. Div. 2008) ("a court should not adopt an interpretation which would leave any provision without force and effect") (citation omitted)).

[64]  August 26 Decision, 417 B.R. at 660.  This conclusion is further supported by examining what would have happened had Lenders honored the March 2 Notice of Borrowing.  Fontainebleau simultaneously requested $350 million under the Delay Draw Term Loan and $670 million under the Revolver, with the loans to fund on the same day.  Therefore, on the day Fontainebleau would have received the Delay Draw Term Loan proceeds, the then-outstanding Revolving Loans would have been $738 million (Fontainebleau had borrowed $68 million in Revolving Loans in February 2009).  This means that Fontainebleau could not have complied with Section 2.1(b)(iii)'s mandate because the Delay Draw Term Loan's proceeds ($350 million) were insufficient to "repay in full any then outstanding Revolving Loans."  Thus, Plaintiffs' "fully requested" interpretation would render Section 2.1(b)(iii) superfluous.  Under New York law, it is "a fundamental rule of contract interpretation [that] . . . when interpreting a contract, the entire contract must be considered so as to give each part meaning."  *Brooke*

The Revolving Lenders were not the only ones who determined that the March 2 and 3 Notices of Borrowing did not comply with the Credit Agreement.  As acknowledged in the Aurelius Complaint, most Delay Draw Lenders refused to fund the March 2 and 3 Notices and did not provide funds to Fontainebleau until the company issued a March 9 Notice of Borrowing that sought to borrow funds through only the Delay Draw Term Loan and no monies under the Revolver.[65]  Indeed, the Delay Draw Lenders did not honor the March 3 Notice of Borrowing despite a March 4, 2009 message from Bank of America to all Lenders explaining that a Steering Committee of Lenders, including Term and Revolving Lenders, "unanimously supports the position that the [March 3 Notice] does not comply with the terms of the Credit Agreement" and advising that Lenders who disagreed with that position should "immediately contact Bank of America . . . to make operational arrangements for funding their portion of the requested borrowing."[66]

Because Section 2.1 does not permit the outstanding Revolver balance to exceed $150 million until the Delay Draw Term Loan has been fully funded, the claims based on the March 2 and 3 Notices of Borrowing must be dismissed.

> 2. *The Term Lenders' In Balance Test Argument Does Not Alter the Plain Meaning of "Fully Drawn"*

The Term Lenders incorrectly assert that the contract parties' alleged course of dealing with respect to the In Balance Test calculation somehow establishes that "drawn" means

---

*Group v. JCH Syndicate 488*, 663 N.E.2d 635, 637 (N.Y. 1996) (citations omitted); *Helmsley-Spear, Inc. v. New York Blood Ctr., Inc.*, 687 N.Y.S.2d 353, 357 (N.Y. App. Div. 1999) (contract must be interpreted to "give meaning to all of its language and avoid an interpretation that effectively renders meaningless a part of the contract").

[65] Aurelius Compl. ¶ 68.

[66] *Id.* ¶ 57 (referencing Ex. E, Rice Decl.).

"requested" under Section 2.1(c)(iii).[67]  As an initial matter, the Term Lenders' argument must

be rejected because it improperly attempts to use parol evidence to alter an unambiguous

contract's meaning.[68]  This includes evidence concerning the parties' conduct during the contract

term.[69]  Thus, the Term Lenders' course-of-dealing allegations are simply not relevant to this

motion.

        Moreover, the Term Lenders' tortured interpretation of the In Balance Test

provisions set forth in the Disbursement Agreement (an argument not previously raised in their

prior complaints or amicus filing on Fontainebleau's summary judgment motion) does not alter

the plain meaning of "fully drawn" and would result in a palpably unreasonable construction of

the operative documents.  Under the Disbursement Agreement, the "In Balance Test is 'satisfied'

when Available Funds equal or exceed the Remaining Costs."[70]  "Remaining Costs" are those

costs needed to complete the Project.[71]  Among the components of "Available Funds" is "Bank

---

[67]    Avenue Compl. ¶¶ 146-49; Aurelius Compl. ¶¶ 62-63.

[68]    "It is a fundamental principle of contract interpretation that, in the absence of ambiguity, the intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible." *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 100 (2d Cir. 1989) (applying New York law); *see also Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (applying New York law and holding that an unambiguous contract's meaning must "be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed").  This is especially true where, as here, the contracts at issue contain an integration clause. *See* Credit Agmt. § 10.10 ("[T]here are no promises, undertaking, representations or warranties by the Administrative Agent, any Arranger, any Manager or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents."); Disbursement Agmt. § 11.5 ("[The Loan Documents] integrate all the terms and conditions mentioned herein or incidental hereto and supersede all oral negotiations and prior writings in respect to the subject matter hereof, all of which negotiations and writings are deemed void and of no force and effect.").

[69]    *Int'l Klafter*, 869 F.2d at 100 ("Since the language of the contracts is unambiguous, there is no need here to examine the conduct of the parties over the intervening years to ascertain their intent.") (citation omitted); *In re Ionosphere Clubs, Inc.*, 147 B.R. 855, 863 (Bankr. S.D.N.Y. 1991) ("Having determined that the language chosen by the parties is clear and unambiguous on its face, extrinsic evidence, such as the parties' subsequent course of conduct, may not properly be received in evidence"); *Slatt v. Slatt*, 477 N.E.2d 1099, 1100 (N.Y. 1985) ("There is no need here to examine the conduct of the parties over the intervening years to ascertain their intent in respect to the application of the cost of living increase.  Such an inquiry might be appropriate in the instance of an ambiguity or where the contract is of 'doubtful meaning' . . . none of which is present").

[70]    Disbursement Agmt. Ex. A at 15.

[71]    Disbursement Agmt. Ex. A at 26; Disbursement Agmt. Ex. C-1 at Appendix VIII.

Revolving Availability *minus* $40,000,000."[72]  "Bank Revolving Availability" means "as of each determination, the aggregate principal amount available to be drawn on that date under the Bank Revolving Facility."[73]

 The Term Lenders allege that prior to March 2009, the parties calculated the In Balance Test using the total unfunded Revolver commitment (minus $40 million) as the "amount available to be drawn on that date."[74]  The Term Lenders claim that this somehow proves that the parties interpreted "drawn" to mean "requested" rather than "funded" because otherwise "the [Revolver] amount 'available to be drawn on th[e] date' of each In Balance Test . . . could not have exceeded $150 million unless and until the Delay Draw Loans were fully funded" and the In Balance Test would not have been satisfied.[75]  These verbal gymnastics are unavailing.

 The Term Lenders' In Balance Test argument turns on an unjustifiable construction of the words "on that date."  The Term Lenders ask the Court to read those words as limiting the phrase "amount available to be drawn" to funds that could be borrowed *without condition* on the In Balance Test date.  This limitation is inconsistent with the In Balance Test's undisputed purpose of ensuring that "the remaining available financing is sufficient to cover the remaining anticipated costs required to *complete* the Project."[76]  It would be nonsensical to weigh the anticipated costs to complete the Project against anything other than the total financing available through completion.

 Indeed, the Term Lenders' suggested "on that date" limitation would lead to the

---

[72] Disbursement Agmt. Ex. A at 3 (emphasis in original).

[73] *Id.* at 4.

[74] Avenue Compl. ¶ 147; Aurelius Compl. ¶ 61.

[75] Avenue Compl. ¶¶ 148-49; Aurelius Compl. ¶¶ 61, 92.

[76] Avenue Compl. ¶ 146 (emphasis added); *see also* Aurelius Compl. ¶ 87 (the In Balance Test "was used to ensure that the project was on track [and] weighed the Borrowers' available financing against expected costs necessary to complete construction").

absurd conclusion that the Credit Agreement's original closing conditions were not met. Satisfaction of the In Balance Test was a condition precedent to the Credit Agreement's closing.[77]  Credit Agreement Section 2.1(b)(ii) provides that Fontainebleau cannot request any Delay Draw Term Loans before the "date upon which the amount on deposit in the Second Mortgage Proceeds Account is disbursed."  But the full amount of the Second Mortgage Proceeds Account was not to be disbursed until after closing.[78]  Consequently, Fontainebleau could not request a Delay Draw Term Loan on the closing date, and could only request a Revolver Loan of up to $150 million.  Thus, even if the Term Lenders were correct that "drawn" means "requested," the Term Lenders' "on that date" limitation would mean that the In Balance Test was not satisfied at closing and the Credit Agreement's closing conditions were not met.[79]

The only construction of "Bank Revolving Availability" that avoids absurd results and is consistent with the provision's text and the In Balance Test's purpose is that "aggregate principal amount available to be drawn on that date" simply refers to the total unfunded Revolver commitment as of that date.[80]  In any event, the "Bank Revolving Availability" definition does not depend on—and thus has no bearing on—whether "drawn" means "funded" or "requested."

---

[77]  Credit Agmt. § 5.1; Disbursement Agmt. § 3.1.29.

[78]  *See* Disbursement Agmt. Ex. T (Flow of Funds Memo) at 10-12 (requiring that Fontainebleau confirm satisfaction of conditions precedent to closing before the funds are transferred to the Second Mortgage Proceeds Account), 14 (listing disbursements from the Closing Date Advance); *see also* Disbursement Agmt. §§ 2.1.1 (stating that the Closing Date Advance will be conducted in accordance with the disbursements in the Flow of Funds Memo), 2.1.2 (stating that all other advances shall be made after the Closing Date).

[79]  The Term Lenders' interpretation would lead to a similarly absurd result in that it would also have precluded Fontainebleau from treating any available Revolver balances as Available Funds when the date of the In Balance Test representation was less than 30 days after a Notice of Borrowing.  That is because under Section 5.2(c) of the Credit Agreement, Fontainebleau must wait 30 days after a borrowing request before submitting a new Notice of Borrowing.

[80]  *InterDigital Commc'ns Corp. v. Nokia Corp.*, 407 F. Supp. 2d 522, 529 (S.D.N.Y. 2005) ("It is hornbook law that a contract should be interpreted so as not to render its terms nonsensical."); *Perlbinder v. Bd. of Managers of the 411 E. 53rd Street Condo.*, 886 N.Y.S.2d 378, 381 (N.Y. App. Div. 2009) ("In construing a contract, [a]n interpretation that gives effect to all the terms of agreement is preferable to one that . . . accords them an unreasonable interpretation."); *Superb Gen. Contracting Co. v. City of N.Y.*, 833 N.Y.S.2d 64, 67 (N.Y. App. Div. 2007) ("A contract should not be interpreted to produce a result that is absurd").

Accordingly, the Term Lenders' convoluted In Balance Test argument does not alter the plain meaning of "fully drawn" in Section 2.1(c)(iii), and cannot salvage their breach of contract claims.

### III.   MATERIAL BREACHES OF THE CREDIT AGREEMENT, AS ALLEGED IN THE COMPLAINTS, ARE FATAL TO THE TERM LENDERS' CLAIMS

To state a claim for breach of contract, a plaintiff must allege that the counterparty fully performed its obligations under the operative contract.[81] As this Court correctly observed in the August 26 Decision, even if the Revolving Lenders otherwise had an obligation to honor the March 2 or 3 Notices of Borrowing, that obligation would be excused if Fontainebleau materially breached the Credit Agreement prior to the March 2 and 3 Notices of Borrowing.[82] Nonetheless, the Term Lenders do not—because they cannot—allege that Fontainebleau fully performed its obligations under the Credit Agreement prior to the March 2 and 3 Notices of Borrowing. To the contrary, Plaintiffs affirmatively allege the existence of material breaches of the Credit Agreement prior to March 2009. These allegations are fatal to Plaintiffs' claims.

### A.   Plaintiffs' Allegations of Material Breaches Defeat Their Claims

The Term Lenders allege that Lehman Brothers breached its obligations under the Retail Facility Agreement following its bankruptcy. For example, the Aurelius Plaintiffs allege that "Lehman Brothers breached the Retail Facility Agreement by declaring bankruptcy and failing to honor advance requests made by the Borrower in September 2008, December 2008, January 2009, February 2009 and March 2009. In total, Lehman Brothers failed to honor its

---

[81]   *See, e.g., First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998); *Furia v. Furia*, 498 N.Y.S. 2d 12, 13 (N.Y. App. Div. 1986) .

[82]   August 26 Decision, 417 B.R. at 663-66.

obligations under the Retail Facility Agreement in the amount of $14,259,409.47."[83]   The Avenue Plaintiffs also allege that Lehman's breach of the Retail Facility Agreement was a breach of a Material Agreement that had a Material Adverse Effect, as those terms are defined in the Credit Agreement and, thus, constituted an Event of Default under Section 8(j) of the Credit Agreement.[84]   Plaintiffs further allege that the Lehman Brothers Event of Default violated the representation and warranty contained in Section 4.9 of the Disbursement Agreement that "[t]here is no default or event of a default under any of the Financing Agreements," which includes the Retail Facility Agreement.[85]   Such a materially inaccurate representation under the Disbursement Agreement constitutes an additional Event of Default under Section 8(b) of the Credit Agreement.[86]   Accordingly, these allegations, deemed true for purposes of the present motion, establish the existence of an Event of Default under the Credit Agreement prior to the March 2 and 3 Notices of Borrowing that excused any performance by the Revolving Lenders.

The Term Lenders similarly allege that the July 25, 2008 collapse of First National Bank of Nevada, a Term Lender and a Revolving Lender under the Credit Agreement, resulted in the breach of another Material Agreement and constituted another Event of Default that occurred prior to the March 2 and 3 Notices of Borrowing.  Specifically, the Term Lenders allege that the Federal Deposit Insurance Company, as receiver for the First National Bank of Nevada,

> [R]epudiated the [bank's] commitments under the Credit Agreement.  As a result,

---

[83]   Aurelius Compl. ¶ 99; *see also* Avenue Compl. ¶ 128 ("[B]eginning in September 2008 and on four occasions thereafter, Lehman failed to honor 'its obligation to fund a total of $14, 259,409.74 under the Retail Facility,' and thereby defaulted in its lending obligations under the Retail Facility Agreement.").

[84]   Avenue Compl. ¶ 128.

[85]   *Id.*; *accord* Aurelius Compl. ¶ 106.

[86]   *See* Credit Agmt. § 8(b) (stating that an inaccurate representation or warranty creating a Disbursement Agreement Event of Default shall also constitute an Event of Default under the Credit Agreement).

beginning in January 2009, the Borrower's calculation of Available Funds under the In Balance Test was therefore reduced by the amount of the total commitment by First National Bank of Nevada . . . Such a breach by a party to a Material Agreement (which the Credit Agreement was) was a Default, based upon Section 8(j) of the Credit Agreement.[87]

Plaintiffs also allege that the First National Bank of Nevada Event of Default violated the "no default" representation in Section 4.9 of the Disbursement Agreement, which, as stated above, resulted in an Event of Default under Section 8(b) of the Credit Agreement.[88] These allegations, deemed true for purposes of the present motion, establish the existence of another Event of Default prior to the March 2 and 3 Notices of Borrowing that defeats Plaintiffs' breach of contract claims.[89]

### B.    Section 2.1(c) Does Not Eliminate the Due Performance Requirement

Despite their inability to allege due performance under the Credit Agreement, Plaintiffs nonetheless allege that "the [Revolving Lenders] were, and continue to be, obligated to honor the [March 2 and 3] Notices of Borrowing."[90]  In support of this contention, Plaintiffs cite the following language in Section 2.1(c):

The making of Revolving Loans which are Disbursement Agreement Loans to the Bank Proceeds Account shall be subject **only** to the fulfillment of the applicable

---

[87]    Avenue Compl. ¶¶ 133-34; *accord* Aurelius Compl. ¶¶ 118-19.

[88]    Avenue Compl. ¶ 134; Aurelius Compl. ¶ 121.

[89]    Notably, Plaintiffs also do not allege that each of them or their predecessors in interest, many of whom were Delay Draw Term Lenders, honored the March 2 or 3 Notices of Borrowing.  As discussed in Point II *supra,* each of the Lenders was given the opportunity to fund its share of the Notices of Borrowing if it believed that those Notices complied with the Credit Agreement.  Indeed, the Aurelius Plaintiffs allege that certain of their predecessors in interest breached the Credit Agreement by not funding the March 2 or 3 Notices of Borrowing. Aurelius Compl. ¶¶ 53, 68.  Both sets of Plaintiffs are precluded by their failure to perform their own obligations from seeking to pursue a contract claim for the same alleged breach against the Revolving Lenders. *See In re Adelphia Commcn's Corp.*, No. 02-41729 (REG), 2007 WL 2403553, at *4 (Bankr. S.D.N.Y. 2007) ("The failure to allege all four elements required under New York law to state a breach of contract claim [including the plaintiff's performance under the contract] will result in dismissal."); *R.H. Damon & Co., Inc. v. Softkey Software Prods., Inc*., 811 F. Supp. 986, 991 (S.D.N.Y. 1993) ("[W]hen pleading a claim for the breach of an express contract…the complaint must contain some allegation that the plaintiffs actually performed *their* obligations under the contract.") (emphasis added).

[90]    Avenue Compl. ¶ 183; Aurelius Compl. ¶ 136.

conditions set forth in Section 5.2, and shall thereafter be disbursed from the Bank Proceeds Account subject only to the conditions set forth in Section 3.3 of the Disbursement Agreement.[91]

Plaintiffs also point to Section 5.2, which states that the "agreement of each Lender to make Disbursement Agreement Loans . . . is subject only to the satisfaction of the following conditions precedent."[92]  Plaintiffs presumably contend, much like Fontainebleau did on its motion for partial summary judgment, that whether any of the other terms of the Credit Agreement were breached is irrelevant, so long as the March 2 and 3 Notices of Borrowing complied with the conditions set forth in Sections 2.1 and 5.2.

As noted in Point II above, the March 2 and 3 Notices of Borrowing did not comply with the conditions set forth in Sections 2.1 and 5.2 of the Credit Agreement.  Moreover, even if the Notices of Borrowing had complied, the pre-existing material breaches that Plaintiffs themselves affirmatively allege would excuse any funding obligation on the part of the Revolving Lenders.  As this Court rightly observed in its August 26 Decision, Section 5.2 expressly requires compliance with "applicable provisions of Section 2" of the Credit Agreement which, in turn:

> [I]ndicates that the making of [Revolving] loans is "[s]ubject to the terms and conditions hereof, and in reliance upon the applicable representations and warranties set forth herein and in the Disbursement Agreement."  Consequently, while [the] word "only" is emphasized in section 2.1 as one of only two terms that are in boldface in the entire Credit Agreement, by the plain language of the relevant provisions, the word "only" is intended to make clear that other than applicable provisions of sections 2 and 5.2 of the Credit Agreement, no other provisions shall control the Revolver Bank's obligation to make their share of the loans to the Bank Proceeds Account.  It cannot be read to disregard the requirement that the terms and conditions set forth in the Credit Agreement and

---

[91]   Aurelius Compl. ¶ 34; Credit Agmt. § 2.1(c).

[92]   Aurelius Compl. ¶¶ 34-36; Avenue Compl. ¶ 119.

representations and warranties under the Credit Agreement and Disbursement Agreement be satisfied.[93]

Indeed, contractual conditions are distinguishable from other contractual terms or covenants.[94]  A condition precedent is an event that must occur to trigger performance by one or more parties to a contract.  If a condition does not occur, there is no breach, but there is no obligation to perform unless and until the condition precedent is satisfied.[95]  Thus, while Sections 2.1 and 5.2 set forth the conditions precedent to the Revolving Lenders' funding obligations, those obligations were also dependent on Fontainebleau's substantial performance of the other terms of the Credit Agreement, both as a matter of New York contract law and the terms of the of the Credit Agreement.

New York law makes clear that one party's material breach of a contractual term or covenant relieves a counterparty of its obligation to perform.[96]  Where, as here, Plaintiffs do not and cannot allege due performance and, to the contrary, affirmatively allege the existence of material breaches of the Credit Agreement, a claim against the Revolving Lenders for failure to

---

[93]   August 26 Decision, 417 B.R. at 664.

[94]   *See, e.g.*, 13 Williston on Contracts § 38:5 (4th ed. 2009) ("A **promise** is a manifestation of an intention to act or refrain from acting in a specified way, so made as to justify the promisee in understanding that a commitment has been made, while a **condition** is an event, not certain to occur, which must occur, unless its nonoccurrence is excused, before performance under a contract becomes due.") (emphasis added).

[95]   *See Merritt Hill Vineyards Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077, 1081 (N.Y. 1984); *see also AIG Centennial Ins. Co. v. Fraley-Landers*, 450 F.3d 761, 764 (8th Cir. 2006) ("Unlike a mere contract term, the breach of which must be material before it excuses another party from performing, one party's failure to fulfill a condition precedent entirely excuses any remaining obligations of the other party."); *Biltmore Bank of Ariz. v. First Nat'l Mortgage Sources*, No. CV-07-936-PHX-LOA, 2008 WL 564833, at *7-8 (D. Ariz. Feb. 26, 2008) (same).

[96]   *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186-87 (2d Cir. 2007); *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283, 291 (S.D.N.Y. 2005); *see also* 13 Williston on Contracts § 63:3 (4th ed. 2009) ("A party who first commits a material breach cannot enforce the contract. Otherwise stated, a party who has materially breached a contract is not entitled to recover damages for the other party's subsequent nonperformance of the contract, since the latter party's performance is excused.").

lend fails as a matter of law to state a claim on which relief can be granted.[97]

## IV. PLAINTIFFS FAIL TO ALLEGE A BREACH OF CONTRACT CONCERNING TERMINATION OF COMMITMENTS

Plaintiffs' half-hearted claims for breach based on the April 20, 2009 termination are woefully deficient.  Pursuant to Section 8 of the Credit Agreement, if one or more Events of Default occur, then "with the consent of the Required Facility Lenders for the respective Facility, the Administrative Agent shall, by notice to Borrowers, declare the Revolving Commitments and/or the Delay Draw Commitments, as the case may be, to be terminated forthwith, whereupon the applicable Commitments shall immediately terminate."[98]  Pursuant to this provision, on April 20, 2009, after receiving information that indicated the occurrence of numerous Events of Default and with the consent of the Revolving Lenders, Bank of America, as Administrative Agent, delivered the April 20 Termination Letter.  While Plaintiffs allege that the Revolving Lenders' termination under the April 20 Termination Letter was improper or ineffective, neither alleges any facts to support this claim.

Plaintiffs do not assert the absence of Events of Default prior to April 20, 2009.  To the contrary, Plaintiffs affirmatively allege that several Events of Default occurred prior to March 2009.[99]  The Aurelius Plaintiffs further allege that the Revolving Lenders "did not identify or set forth the Events of Default upon which they were relying to terminate their

---

[97]   *See R.H. Damon*, 811 F. Supp. at 991 (S.D.N.Y. 1993) (dismissing breach of contract claims because plaintiffs failed to allege due performance); *All States Warehousing, Inc. v. Mammoth Storage Warehouses, Inc.*, 180 N.Y.S.2d 118 (N.Y. App. Div. 1958) (same); *Greiner v. A. Rosenblum, Inc.*, 207 N.Y.S.2d 75, 76 (N.Y. Sup. Ct. 1959) (dismissing breach of contract action where "[p]laintiff has failed to plead, as he must, the necessary facts showing compliance on his part or due performance").

[98]   "Required Facility Lenders" means "with respect to any Facility at any time, Non-Defaulting Lenders holding more than 50% of the Obligations outstanding under such Facility."  Credit Agmt. § 1.1.

[99]   *See supra* Point III.A.

commitment."[100]  There is, however, nothing in Section 8 or in any other part of the Credit Agreement that required the Revolving Lenders to identify the Events of Default in the notice of termination.  In short, Plaintiffs do not allege any facts or contractual provisions or theory of any kind that even remotely suggests a basis for a breach of contract claim arising out of the April 20 Termination Letter.

### V.  THE AVENUE PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH.

The Avenue Plaintiffs allege that the Revolving Lenders breached a duty of good faith and fair dealing under the Credit Agreement.[101]  This allegation fails to state a claim because it is duplicative of Plaintiffs' breach of contract claim and seeks to impose obligations beyond those set forth in the governing agreement.

Under New York law, a claim for breach of the implied covenant of good faith and fair dealing fails where "a breach of contract claim, based upon the same facts, is also pled."[102]  Claims for breach of the implied covenant of good faith that seek to recover damages "intrinsically tied to the damages allegedly resulting from the breach of contract" must be dismissed as redundant.[103]

Here, the allegations underlying the Avenue Plaintiffs' breach of the implied covenant of good faith claim against all Revolving Lenders (Count IV) are identical to those underlying their breach of contract claim against the same defendants (Count II).  The Avenue Plaintiffs allege that the Revolving Lenders breached the implied covenant "by adopting a

---

[100]   Aurelius Compl. ¶ 73.

[101]   Avenue Compl. ¶¶ 194-200.

[102]   *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002).

[103]   *Ari & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522-23 (S.D.N.Y. 2003); *see also Long v. Marubeni Am. Corp.*, No. 05 Civ. 0639, 2006 WL 1716878, at *1 (S.D.N.Y. June 20, 2006) (dismissing plaintiffs' breach of good faith claim where "the claims clearly arise from the same contract and the same breach, and seek essentially the same relief").

contrived construction of the Credit Agreement in order to justify their refusal to fund the March

2 Notice and the March 3 Notice,"[104] an allegation that mirrors their earlier contentions that

"[t]he March 2 Notice and March 3 Notice complied with all applicable conditions under the

Credit Agreement" and that the Revolving Lenders "breached the Credit Agreement" by

"fail[ing] to honor [those] Notices of Borrowing."[105]  Moreover, the damages asserted for the

alleged breach of the implied covenant are the same as those requested for the alleged breach of

the Credit Agreement.[106]

        Furthermore, as New York's highest court has explained, the obligation of good

faith cannot be employed to imply an "obligation . . . that would be inconsistent with other terms

of the contractual relationship."[107]  Accordingly, "[t]he parties' contractual rights and liabilities

may not be varied, nor their terms eviscerated, by a claim that one party has exercised a

contractual right but has failed to do so in good faith."[108]  In particular, a party cannot be found

liable for breach of the implied covenant of good faith and fair dealing for merely exercising its

own rights under a contract, even if doing so "may incidentally lessen the other party's

anticipated fruits from the contract."[109]

        As demonstrated in Point II *supra*, the Revolving Lenders simply exercised their

---

[104]  Avenue Compl. ¶ 198.

[105]  *Id.* ¶¶ 181-86.

[106]  *Compare id.* ¶ 188 *with* ¶ 200 (alleging injury suffered as a result of each breach because "the amount and value of Plaintiffs' collateral has been and continues to be diminished.").

[107]  *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 396-97 (N.Y. 1995) (citations omitted).

[108]  *CIBC Bank & Trust Co. v. Banco Central do Brasil*, 886 F. Supp. 1105, 1118 (S.D.N.Y. 1995) (defendants' exercise of their rights under a debt restructuring agreement was not actionable as a breach of the implied covenant of good faith) (citation omitted).

[109]  *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) ("[T]he implied covenant does not extend so far as to undermine a party's general right to act in its own interests."); *see also Bank of N.Y. v. Sasson*, 786 F. Supp. 349, 353 (S.D.N.Y. 1992) (implied covenant of good faith did not require bank to extend a line of credit to the borrower because an event of default under the loan agreement had occurred).

contractual rights under the Credit Agreement when they declined to fund the March 2 and 3

Notices of Borrowing.  Therefore, even if the Revolving Lenders' conduct "incidentally

lessened" the Avenue Plaintiffs' "anticipated fruits from the contract," such conduct is not

actionable.[110]

## CONCLUSION

For all of the foregoing reasons, the Revolving Lenders respectfully submit that

the Term Lenders' Complaints should be dismissed.


Respectfully Submitted,

Dated: February 18, 2010                    By:    /s/ John B. Hutton

                                            GREENBERG TRAURIG, P.A.
                                            John B. Hutton
                                            Florida Bar No. 902160
                                            Mark D. Bloom
                                            Florida Bar No. 303836
                                            1221 Brickell Avenue
                                            Miami, FL 33131
                                            Telephone: (305) 579-0500
                                            Facsimile: (305) 579-0717
                                            E-mail:  huttonj@gtlaw.com
                                                     bloomm@gtlaw.com

                                                        -and-

                                            SIMPSON THACHER & BARTLETT LLP
                                            Thomas C. Rice (*pro hac vice*)
                                            David Woll (*pro hac vice*)
                                            425 Lexington Avenue
                                            New York, New York 10017
                                            Telephone: (212) 455-2000
                                            Facsimile: (212) 455-2502
                                            E-mail:  trice@stblaw.com
                                                     dwoll@stblaw.com

---

[110]   *Galesi*, 904 F.2d at 136.

28

ATTORNEYS FOR DEFENDANTS
JPMORGAN CHASE BANK, N.A.,
BARCLAYS BANK PLC, DEUTSCHE
BANK TRUST COMPANY AMERICAS,
and THE ROYAL BANK OF SCOTLAND
PLC

By:    /s/ Craig V. Rasile

HUNTON & WILLIAMS LLP
Craig V. Rasile
Kevin M. Eckhardt
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Telephone:  (305) 810-2500
Facsimile:  (305) 810-1669
E-mail:  crasile@hunton.com
        keckhardt@hunton.com

            -and-

O'MELVENY & MYERS LLP
Bradley J. Butwin (*pro hac vice*)
Jonathan Rosenberg (*pro hac vice*)
Daniel L. Cantor (*pro hac vice*)
William J. Sushon (*pro hac vice*)
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
E-mail: bbutwin@omm.com
        jrosenberg@omm.com
        dcantor@omm.com
        wsushon@omm.com

ATTORNEYS FOR BANK OF AMERICA,
N.A. and MERRILL LYNCH CAPITAL
CORPORATION

By:    /s/ Harold D. Moorefield, Jr.

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, PA
Harold D. Moorefield, Jr.
Drew M. Dillworth
Museum Tower

By:    /s/ Arthur Halsey Rice

RICE PUGATCH ROBINSON &
SCHILLER, P.A.
Arthur Halsey Rice
101 Northeast Third Avenue, Suite 1800
Fort Lauderdale, Florida 33301
Telephone:  (954) 462-8000
Facsimile:  (954) 462-4300

            -and-

KAYE SCHOLER LLP
Aaron Rubinstein (*pro hac vice*)
Phillip A. Geraci (*pro hac vice*)
425 Park Avenue
New York, New York 10022
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

ATTORNEYS FOR DEFENDANT HSH
NORDBANK AG, NEW YORK BRANCH


By:    /s/ Robert Fracasso

SHUTTS & BOWEN LLP
Robert Fracasso
1500 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6300
Facsimile: (305) 347-7802
E-mail: fracasso@shutts.com

            -and-

MAYER BROWN LLP
Jean-Marie L. Atamian (*pro hac vice*)
Jason I. Kirschner (*pro hac vice*)
1675 Broadway

150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395

-and-

KATTEN MUCHIN ROSENMAN LLP
Kenneth E. Noble (*pro hac vice*)
Anthony L. Paccione (*pro hac vice*)
575 Madison Avenue
New York, New York 10022
Telephone: (212) 940-8800
Facsimile: (212) 940-8776

ATTORNEYS FOR DEFENDANT BANK
OF SCOTLAND PLC

By: _____/s/ Bruce J. Berman_____
MCDERMOTT WILL & EMERY LLP
Bruce J. Berman, Esq.
201 South Biscayne Boulevard
Suite 2200
Miami, Florida 33131-4336
(305) 358-3500 (tel)
(305) 347-6500 (fax)
E-mail: bberman@mwe.com

Andrew B. Kratenstein (*limited appearance*)
Michael R. Huttenlocher (*limited appearance*)
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York 10173
(212) 547-5400 (tel)
(212) 547-5444 (fax)
E-mail: akratenstein@mwe.com
       mhuttenlocher@mwe.com

ATTORNEYS FOR DEFENDANT
CAMULOS MASTER FUND, L.P.

New York, New York 10019-5820
Telephone: (212) 506-2500
Facsimile: (212) 262-1910

ATTORNEYS FOR SUMITOMO MITSUI
BANKING CORPORATION

By: _____/s/ Peter Roberts_____

SHAW GUSSIS FISHMAN GLANTZ
WOLFSON & TOWBIN LLC
Robert W. Glantz (*limited appearance*)
Peter J. Roberts (*limited appearance*)
321 North Clark St., Suite 800
Chicago, IL 60654
Telephone: (312) 541-0151
Facsimile: (312) 980-3888

-and-

ASTIGARRAGA DAVIS
MULLINS & GROSSMAN, PA
Gregory S. Grossman
701 Brickell Avenue, 16th Floor
Miami, Florida 33131
Telephone:  (305) 372-8282
Facsimile:  (305) 372-8202
E-mail:  ggrossman@astidavis.com

ATTORNEYS FOR DEFENDANT
MB FINANCIAL BANK, N.A.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Defendants'
Joint Motions to Dismiss the Term Lender Complaints and Supporting Memorandum of
Law was furnished via e-mail (where an e-mail address is listed) and First Class U.S.
Mail to those on the attached service list on February 18, 2010.


By:     /s/ John B. Hutton
        John B. Hutton

Service List:

**Andrew B. Kratenstein**
MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY 10017
akratenstein@mwe.com

**James B. Heaton, III**
BARTLIT BECK HERMAN PALENCHAR & SCOTT
54 West Hubbard Street
Suite 300
Chicago IL 60610
jb.heaton@bartlit-beck.com

**Jean-Marie L. Atamian**
MAYER BROWN LLP
1675 Broadway
New York, NY 10019
jatamian@mayerbrown.com

**Jed I. Bergman**
KASOWITZ BENSON TORRES & FRIEDMAN LLP
1633 Broadway
New York NY  10029
jbergman@kasowitz.com

**Daniel L. Cantor**
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
dcantor@omm.com

**Peter J. Most**
HENNIGAN BENNETT & DORMAN LLP
865 S. Figueroa Street
Suite 2900
Los Angeles, CA 90017
most@hbdlawyers.com

**Anthony L. Paccione**
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
anthony.paccione@kattenlaw.com

**Peter J. Roberts**
SHAW GUSSIS FISHMAN GLANTZ WOLFSON & TOWBIN LLC
371 North Clark Street
Suite 800
Chicago, IL 60654
proberts@shawgussis.com

**Aaron Rubinstein**
KAYE SCHOLER LLP
425 Park Avenue
12th Floor
New York, NY 10022
arubinstein@kayescholer.com