IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 09-MD-2106-CIV-GOLD/BANDSTRA

In re:

FONTAINEBLEAU LAS VEGAS
CONTRACT LITIGATION

*This document applies to:*

*Case No.: 09-CV-23835-ASG*
*Case No.: 10-CV-20236-ASG*
_____/

**AMENDED[1] MDL ORDER NUMBER EIGHTEEN;[2] GRANTING IN
PART AND DENYING IN PART MOTIONS TO DISMISS [DE 35]; [DE 36];
<u>REQUIRING ANSWER TO COMPLAINTS; VACATING FINAL JUDGMENT</u>[3]**

## I.    Introduction

THIS CAUSE is before the Court upon the Revolving Lender Defendants' Motion
to Dismiss **[DE 36]** and Bank of America's Motion to Dismiss **[DE 35]** ("the Motions").
Responses and replies were timely filed with respect to both motions, *see* **[DE 50]; [DE
52]; [DE 56]; [DE 57]**, and on May 7, 2010, oral argument was held.  I have jurisdiction
pursuant to 12 U.S.C. § 632, as it is undisputed that both actions at issue are "suits of a
civil nature at common law . . . to which [a] corporation organized under the laws of the
United States [is] a party [and which] aris[es] out of transactions involving international or
foreign banking."  Having considered the relevant submissions, the arguments of the

_____

[1] This Order corrects the inadvertent closure of the Aurelius Action.  Count III of the
Aurelius Complaint remains pending and the final judgment issued in that case must therefore
be vacated.

[2] Although not labeled as such, MDL Order Number Seventeen appears at [DE 74].

[3] All docket entry citations refer to the MDL Master Docket – i.e., Case No.: 09-MD-2106
(S.D. Fla. 2009) – unless otherwise indicated.

parties, the applicable law, and being otherwise duly advised in the Premises, I grant the

Motions in part and dismiss certain claims for the reasons that follow.

## II.     Relevant Factual and Procedural Background[4]

Although the facts giving rise to the claims at issue are detailed in my August 26,

2009 Order Denying Fontainebleau's Motion for Partial Summary Judgment in the

Southern District of Florida Action, *see generally Fontainebleau Las Vegas, LLC v. Bank*

*of America*, N.A., 417 B.R. 651 (S.D. Fla. 2009) ("August 26 Order"), I reiterate the relevant

factual background here with citations to the operative complaints[5] to ensure that the

record clearly demonstrates that the facts and inferences upon which this Order is

predicated are drawn only from the operative complaints and the referenced undisputed

central documents.

### A.     The Credit Agreement and Disbursement Agreement

On June 6, 2007, Fontainebleau Las Vegas LLC and affiliated entities

("Fontainebleau") entered into a series of agreements with a number of lenders ("the

Lenders") for loans to be used for the construction and development of the Fontainebleau

Resort and Casino in Las Vegas, Nevada ("the Project").  (Avenue Compl.[6] at ¶ ¶ 113-115);

---

[4]  For purposes of a motion to dismiss, I take as true all factual allegations in the operative complaints and limit my consideration to the four corners of the complaints and any documents referenced in the complaints which are central to the claims. *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007); *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009).  To the extent the central documents contradict the general and conclusory allegations of the pleading, the documents govern.  *See Griffin*, 496 F.3d at 1206.

[5]  *See* note 5, *infra*.

[6]  The operative complaint in the case of *Avenue CLO Fund, Ltd.,et al. v. Bank of America, N.A., et al.,* Case No.: 09-CV-23835 **[DE 84]** (S.D. Fla. 2009), will be referred to throughout as the "Avenue Complaint."  The operative complaint in the case of *ACP Master Ltd. and Aurelius Capital Master, Ltd. v. Bank of America, N.A., et al.,* Case No.: 10-CV-20236 **[DE**

(Aurelius Compl. at ¶ ¶ 2-4); *see generally* **[DE 37-1]** ("Cr. Agr."); **[DE 37-2]** ("Disb. Agr."). Among the agreements entered into by Fontainebleau and the Lenders were a Credit Agreement and a Disbursement Agreement.  (Avenue Compl. at ¶ 115); (Aurelius Compl. at ¶ ¶ 3, 27).  It is these two agreements that are the subject of the operative complaints.

In connection with the June 6, 2007 loan transaction, Fontainebleau and the Lenders entered into a Credit Agreement that provided, among other things, for a syndicate of lenders to provide three kinds of loans to Fontainebleau: (a) $700 million initial term loan facility ("the Initial Term Loan"); (b) a $350 million delay draw term loan facility ("the Delay Draw Term Loan"); and (c) an $800 million revolving loan facility ("the Revolving Loan"). (Avenue Compl. at ¶ 115); (Aurelius Compl. at ¶ ¶ 23-24); *(*Cr. Agmt. at 22, 38).  The Plaintiffs proceeding on the Avenue Complaint ("the Avenue Plaintiffs") are comprised of certain term lenders that participated in either the Initial Term Loan and/or the Delay Draw Term Loan.  (Avenue Compl. at ¶ ¶ 115, 117).  The Plaintiffs proceeding on the Aurelius Complaint ("the Aurelius Plaintiffs") are successors-in-interest to certain Term Lenders that participated in either the Initial Term Loan and/or the Delay Draw Term Loan (Aurelius Compl. at ¶ ¶ 10, 25).   Both the Avenue and Aurelius Defendants (collectively "Defendants") are lenders that agreed to fund certain amounts under the Revolving Loan. (Avenue Compl. at ¶ ¶ 102-112); (Aurelius Compl. at ¶ ¶ 11-22).  In addition to being a Revolving Lender, Defendant Bank of America also was the Administrative Agent for purposes of the Credit Agreement.  (Cr. Agr. at 8).

While the Initial Term Loan was to be made on the date of closing, (Cr. Agmt. at 22),

---

**27]** (S.D. Fla. 2010), will be referred to throughout as the "Aurelius Complaint."

the borrowing of funds under the Delay Draw and Revolving Loans prior to the Project's opening date was governed by a two-step borrowing process set forth in the Credit and Disbursement Agreements. (Aurelius Compl. at ¶ 32-33); (Avenue Compl. at ¶ 119). First, Fontainebleau was required to submit a Notice of Borrowing to the Administrative Agent (i.e., Bank of America) specifying the requested loans and the designated borrowing date. (Aurelius Compl. at ¶ 33); (Avenue Compl. at ¶ 119); (Cr. Agmt. § 2.4(a)). Upon receipt of each Notice of Borrowing, the Administrative Agent was required to notify each lender, as appropriate, so that each lender could, "subject [] to the fulfillment of the applicable conditions precedent set forth in Section 5.2 [of the Credit Agreement]" and in accordance with Section 2.1, make its *pro rata* share of the requested loans available to the Administrative Agent on the borrowing date requested by Fontainebleau. (Cr. Agr. § § 2.1(c); 2.4(b)). Then, "[u]pon satisfaction or waiver of the applicable conditions precedent specified in Section 2.1," Section 2.4(c) of the Credit Agreement called for the proceeds of the loans to be "remitted to the Bank Proceeds Account and made available to [Fontainebleau] in accordance with and upon fulfillment of conditions set forth in the Disbursement Agreement."

The second step in the borrowing process concerns Fontainbleau's access to the funds remitted to the Bank Proceeds Account and is governed by the Disbursement Agreement. To access these funds, Fontainebleau was required to fulfill certain conditions set forth in the Disbursement Agreement – including, but not limited to, the submission of an Advance Request to Defendant Bank of America as Disbursement Agent – at which point the loan proceeds would be disbursed in accordance with the Disbursement Agreement. (Avenue Compl. at ¶ 120); (Aurelius Compl. at ¶ 37); *see also* (Disb. Agr. §

4

§ 2.4, 3.3).

However, pursuant to Section 2.5.1 of the Disbursement Agreement, Fontainebleau's right to disbursements was not absolute.  That section provides that Defendant Bank of America (as Disbursement Agent) was required to issue a Stop Funding Notice "[i]n the event that (i) the conditions precedent to an Advance [set forth in Section 3.3 of the Disbursement Agreement] have not been satisfied, or (ii) [Wells Fargo, N.A. or Bank of America] notifies the Disbursement Agent [Bank of America] that a Default or an Event of Default has occurred and is continuing . . . ."  (Disb. Agr. § 2.5.1); (Aurelius Compl. at ¶ 37); (Avenue Compl. at ¶ 124).  Under the Disbursement Agreement, the issuance of a Stop Funding Notice has the effect of preventing disbursements from the accounts subject to certain waiver provisions and limited exceptions not at issue.  (Disb. Agr. § 2.5.2).

As noted, Defendants' agreement to make Revolving Loans to Fontainebleau is governed by Section 2.1(c) of the Credit Agreement.  The first sentence of Section 2.1(c) provides, in pertinent part, that "[s]ubject to the terms and conditions [of the Credit Agreement],[7] each Revolving Lender severally agrees to make Revolving Loans to [Fontainebleau] provided that . . . unless the Total Delay Draw Commitments have been fully drawn, the aggregate outstanding principal amount of all Revolving Loans and Swing Line Loans shall not exceed $150,000,000."  (emphasis in original).  The second sentence of Section 2.1(c) provides that "[t]he making of Revolving Loans which are Disbursement Agreement Loans shall be subject **only** to the fulfillment of the applicable conditions set

---

[7] The provision reads "[s]ubject to the terms and conditions hereof."  (Cr. Agr. § 2.1(c)).
Section 1.2 states that "hereof . . . shall refer to this Agreement as a whole."

5

forth in Section 5.2." (emphasis in original).  Section 5.2 provides, in pertinent part, that "[t]he agreement of each lender to *make* [the Revolving Loans at issue here] . . . is subject only to the satisfaction of following conditions precedent: (a) Borrowers shall have submitted a Notice of Borrowing specifying the amount and Type of the Loans requested, and the making thereof shall be in compliance with the applicable provisions of Section 2 of this Agreement."[8]

B.    The March 2009 Notices of Borrowing and Disbursements

On March 2, 2009, Fontainebleau submitted a Notice of Borrowing ("March 2 Notice") to Defendant Bank of America, as Administrative Agent, that simultaneously "request[ed]" the entire amount available under the Delay Draw Term Loan (i.e., $350,000,000) and the Revolving Loan (i.e., $670,000,000).[9]  (Aurelius Compl. at ¶ 44); (Avenue Compl. at ¶ 141).  At the time of the March 2, 2009 request, approximately $68 million in Revolving Loans had previously been funded and remained outstanding. (Aurelius Compl. at ¶ 45); (Avenue Compl. at ¶ 152).  On March 3, 2009, Bank of America, as Administrative Agent, wrote to Fontainebleau rejecting the March 2 Notice, stating that the March 2 Notice did not comply with Section 2.1(c)(iii) of the Credit Agreement, which does not allow the aggregate outstanding principal amount of the Revolving Loans to

---

[8] The second and third conditions precedent set forth in Section 5.2 are not relevant to the claims at bar.

[9] The Aurelius Complaint alleges that Fontainebleau issued a Notice of Borrowing "drawing" the above-referenced loans on March 2, 2009.  (Aurelius Compl. ¶ 44).  However, the Notice of Borrowing, which is reproduced in the body of the Complaint, states that Fontainebleau was "requesting a Loan under the Credit Agreement."  *Id.* at 11.  Where there is a conflict between allegations in a pleading and the central documents, the contents of the documents control.  *See* Section III, *infra*.

exceed $150,000,000 unless the Delay Draw Term Loans have been "fully drawn." (Aurelius Compl. ¶ ¶ 50-51); (Avenue Compl. at ¶ ¶ 143-45).   On March 3, 2009, Fontainebleau wrote to Bank of America articulating its position that its March 2, 2009 Notice complied with the Credit Agreement because "fully drawn" meant "fully requested," not "fully funded," as Bank of America was contending. (Aurelius Compl. at ¶ ¶ 54-55); (Avenue Compl. at ¶ 141). Thus, according to Fontainebleau, the simultaneous request for the remainder of the Delay Draw Term Loan and the Revolving Loans complied with the Credit Agreement because the Delay Draw Term Loans had been "fully drawn" by virtue of having been "fully requested."  *Id.*

On March 3, 2009, Fontainebleau issued another Notice of Borrowing ("the March 3 Notice), which was nearly identical to the March 2 Notice, but purported to correct a "scrivener's error" in the March 2 Notice by reducing the amount of Revolving Loans requested from $670,000,000 to approximately $656 million in order to account for approximately $14 million of Letters of Credit that were outstanding and had not been considered in connection with the March 2 Notice.  (Avenue Compl. at ¶ 141); (Aurelius Compl at ¶ 56).  On March 4, 2009, Defendant Bank of America rejected the March 3 Notice for the same reason it rejected the March 2 Notice (i.e., the Notice, which simultaneously requested $350,000,000 in Delay Draw Term Loans and Revolving Loans in excess of $150,000,000 in Revolving Loans, did not comply with Section 2.1(c)(iii) because the Delay Draw Term loans had not yet been "fully drawn").  (Aurelius Compl. at ¶ 57); (Avenue Comp. at ¶ 144).

In an attempt to remedy the "fully drawn" issue, Fontainebleau issued yet another Notice of Borrowing on March 9, 2009 ("the March 9 Notice").  (Aurelius Compl. at ¶ 65)

7

(Avenue Compl. at ¶ 151).  The March 9 Notice was directed solely to the Delay Draw Term Loan, requesting the full amount of the $350,000,000 commitment.  *Id.*  Despite the fact that Bank of America "received notice . . . [i]n September and October 2008 that Lehman [Brothers] fail[ed] to comply with its funding obligations under the Retail Facility" in violation of Section 3.3.3 of the Disbursement Agreement, Defendant Bank of America did not issue a "Stop Funding Notice." (Aurelius Compl. at ¶ ¶ 96-109); (Avenue Compl. at ¶ ¶ 129-133).  Instead, it processed the March 9 Notice and sent it to all the Delay Draw Term Lenders, advising them that the March Notice complied with the Credit Agreement and that the Delay Draw Lenders were required to fund.  (Aurelius Compl. at ¶ 66); (Avenue Compl. at ¶ 153).  Plaintiffs allege that Bank of America "willfully took no action in response to the notice" regarding Lehman Brothers' default, "favor[ed] its own interests over those of the Delay Draw lenders" by failing to issue a Stop Funding Notice, (Aurelius Compl. at ¶ ¶ 109, 151), and failed to act "because it wished to preserve its ongoing business relationship with the Borrower and its principal indirect owners, including Jeffrey Soffer."  (Avenue Compl. at ¶ 129-30).

On or about March 10, 2009, Plaintiffs funded their commitments under the Delay Draw Term Loans.  In all, the Delay Draw Term Loan Lenders funded approximately $337,000,000 of the $350,00,000 Delay Draw Loan.[10]  (Aurelius Compl. ¶ ¶ at 66-67); (Avenue Compl. at ¶ 154).  Of these Delay Draw Term Loan proceeds, $68,000,000 were used to repay "then outstanding" Revolving Loans in accordance with Section 2.1(b)(iii) of

---

[10] The $13 million financing gap resulted from the failure of certain Delay Draw Term Lenders to fund their respective portions of the Delay Draw Term Loans in response to the March 9 Notice.  (Avenue Compl. at ¶ 157).  This financing gap, however, is irrelevant for purposes in this Order.

the Credit Agreement, of which a twenty-five percent share was attributable to Bank of America as a Revolving Lender.  (Avenue Compl. at ¶¶ 152-53).  Then, on or about March 25, 2009, Bank of America disbursed more than $100,000,000 of the Delay Draw Term Loan proceeds to Fontainebleau pursuant to an Advance Request submitted on March 25, 2009.  (Avenue Compl. at ¶ 165); (Aurelius Compl. at ¶ 124).  In addition, on or about March 23, 2009, Bank of America sent a letter to Fontainebleau regarding the Revolving Loans; the letter stated that because "almost all of the [Delay Draw Term Loans] have funded . . . Section 2.1(c)(iii) now permits the Borrower to request Revolving Loans which result in the aggregate amount outstanding under the Revolving Commitments being in excess of $150,000,000."  (Aurelius Compl. at ¶ 89); (Avenue Compl. at ¶ 163).

C.   Events Subsequent to the March 25 Advance

On April 20, 2009, Bank of America, "in its capacity as Administrative Agent, sent a letter to [Fontainebleau], the Lenders and other parties, in which [Bank of America] advised that . . . [it has been] determined that one or more Events of Default have occurred and are occurring" and stating that the Revolving Loan commitments were being "terminated effective immediately" pursuant to Section 8 of the Credit Agreement ("the Termination Notice").   (Aurelius Compl. at ¶ 73); (Avenue Compl. at ¶ ¶ 167-68). According to Plaintiffs, Bank of America was aware of these Events of Default prior to the March 25, 2009 Delay Draw Term Loan disbursement, but failed to take appropriate action (e.g., issuing a Stop Funding Notice).  (Aurelius Compl. at ¶ 128); (Avenue Compl. at ¶ 167).

On April 21, 2009, Fontainebleau sent a Notice of Borrowing ("the April 21 Notice") requesting $710,000,000 under the Revolving Loan facility; this Notice of Borrowing was

9

not honored.  (Aurelius Compl. at ¶ ¶ 71-72); (Avenue Compl. at ¶ 169).  Subsequent to April 21, 2009, the Project was "derailed and the value of the collateral securing Plaintiffs' loans [was] substantially diminished."  (Avenue Compl. at ¶ 172); (Aurelius Compl. at ¶ 153).  Plaintiffs allege that they have been damaged by the derailment of the Project, the diminution in the value of their collateral, and the purportedly improper March 25 disbursement of Delay Draw Term Loan proceeds; it is further alleged that these damages were the result of Defendants' improper failure to fund the March 3, 2009 Notice and Bank of America's material breaches of the Credit and Disbursement Agreements.  (Aurelius Compl. at ¶ 151-53); (Avenue Compl. at ¶ 172).

Based on these allegations, the Avenue and Aurelius Plaintiffs filed the instant lawsuits in June and September 2009, respectively.  The Aurelius Complaint asserts three causes of action.  The first is a contract claim against all Defendants for breach of the Credit Agreement as a result of their failure to fund the Notices of Borrowing submitted on or about March 2 and 3, 2009.  The second is also a contract claim for breach of the Credit Agreement against all Defendants, but is predicated upon Defendants' failure to fund the April 21, 2009 Notice of Borrowing.  The third count also sounds in contract, but asserts a breach of the Disbursement Agreement against Bank of America.

The Avenue Complaint, on the other hand, asserts six causes of action: the first is for breach of the Disbursement Agreement against Bank of America; the second is for breach of the Credit Agreement against all Defendants; the third asserts that Bank of America breached the implied covenant of good faith and fair dealing by favoring its own interests and those of the Revolving Lenders (including itself) over those of the Term Lenders and failing to communicate with the Term Lenders regarding Events of Default;

10

the fourth alleges that all Defendants breached the implied covenant of good faith and fair dealing by adopting a contrived construction of the Credit Agreement in order to justify their refusal to fund the March 2 and 3 Notices; and finally, the fifth and sixth counts request declaratory relief regarding the parties' rights and obligations vis-a-vis the Credit and Disbursement Agreements.  Pursuant to Rule 12(b)(6), Defendants now request dismissal of Plaintiffs' breach of contract and implied covenant claims.  *See* **[DE 35]**; **[DE 36]**.

> D.    The Southern District of Florida Action and the Current MDL Proceedings

When Fontainebleau's project was derailed in Spring 2009, Fontainebleau filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Southern District of Florida.  On the same day that Fontainebleau filed for bankruptcy protection, it commenced an adversary proceeding against the Revolving Lenders (including Bank of America) seeking, among other things, a ruling requiring the Revolving Lenders to "turn over" the approximately $657 million requested via the March 3 Notice to the bankruptcy estate in pursuant to 11 U.S.C. § 542(b) ("the Florida Action").  On June 9, 2009, Fontainebleau filed a Motion for Partial Summary Judgment in the Bankruptcy Court as to its turnover claim, and on June 16, 2009, Defendants filed a Motion to Withdraw the Reference pursuant to 28 U.S.C. § 157(d).  On August 4, 2009, I granted Defendants' Motion to Withdraw the Reference in the Florida Action.  After permitting the Term Lenders to file an amicus brief, I denied Fontainebleau's motion for partial summary judgment, concluding as a matter of law that, for purposes of the Credit Agreement, "fully drawn" unambiguously means "fully funded." *Fontainebleau Las Vegas, LLC v. Bank of America*,

N.A., 417 B.R. 651, 660 (S.D. Fla. 2009).[11]

In December 2009, the Joint Panel on Multi-District Litigation ("the Panel") heard the Avenue Plaintiffs' motion for centralization of their lawsuit and the Florida Action in the Southern District of New York.  Defendants and the Aurelius Plaintiffs objected, requesting that the suits be transferred to the Southern District of Florida for pre-trial proceedings.  After considering the parties' positions, the Panel issued an Order finding "that centralization under Section 1407 in the Southern District of Florida will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation."  *In re: Fontainebleau Las Vegas Contract Litigation*, 657 F. Supp. 2d 1374, 1375 (J.P.M.L. 2009).  Following the issuance of the Panel's Order, the Avenue Action was transferred to me for pre-trial proceedings.  Approximately one month later, the Aurelius Action was also transferred to me as a "tag-along" action in accordance with the Panel's directive.  *Id.* at 1374 n.2.  As the MDL judge, I now consider the instant motions to dismiss.  *See* Rule 7.6, R.P.J.P.M.L. (providing that transferee district court may hear and enter judgment upon a motion to dismiss).

### III.    Standard of Review

For purposes of deciding a motion to dismiss, my review is limited to the four corners of the operative complaint and any documents referred to therein that are central

---

[11]  Alternatively, I noted that "even if my conclusion that 'fully drawn' unambiguously means 'fully funded' is in error . . . [Fontainebleau's] reasoning at best suggests that its interpretation is a reasonable one, but not the conclusive one, and requires the denial of partial summary judgment."  *Id.* at 661.  I further noted that "[e]ven if [Fontainebleau] is correct that the term 'fully drawn' unambiguously means 'fully requested,' I am persuaded by Defendants' arguments that they were entitled to reject the March 2 Notice on the basis of Plaintiffs default" and found there to be "genuine issue[s] of material fact as to whether Borrower was in default as of March 3, 2009."  *Id.* at 663-65.

to the claims at issue. *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007); *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *see also Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (noting that district courts "may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed"). Where there is a conflict between allegations in a pleading and the central documents, it is "well settled" that the contents of the documents control. *Griffin*, 496 F.3d at 1206 (quoting *Simmons v. Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940)). Thus, only the contents of the operative complaints and the undisputed central documents will be considered for purposes of this Order.

In determining whether to grant Defendants' motions to dismiss, I must accept all the *factual allegations*[12] in the complaints as true and evaluate all reasonable inferences derived from those facts in the light most favorable to the Plaintiffs. *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003)*; Hoffend v. Villa*, 261 F.3d 1148, 1150 (11th Cir. 2001). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader[s] are entitled to relief,' in order to 'give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1959 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103 (1957)). "Of course, 'a formulaic recitation of the elements of a cause of action will not do.'" *Watts v. Fla. Int'l. Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) *(*quoting *Twombly*, 550 U.S. at 555). "While Rule 12(b)(6) does not permit dismissal

---

[12] Legal conclusions, on the other hand, need not be accepted as true. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009).

13

of a well-pleaded complaint simply because it strikes a savvy judge that actual proof of those facts is improbable, the factual allegations must be enough to raise a right to relief above the speculative level." *Watts*, 495 F.3d at 1295 (citing *Twombly*, 550 U.S. at 555) (internal quotation marks omitted)). In other words, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* It follows that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n] ' – 'that the pleader is entitled to relief.' " *Id.* at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

## IV.     Analysis

A.     <u>Breach of Credit Agreement – Counts I and II of the Aurelius Complaint; Count II of the Avenue Complaint</u>

*1.     Plaintiffs Lack Standing to Assert Claims for Failure to Fund*

In support of their request for dismissal, Defendants contend that Plaintiffs lack standing to pursue claims based on Defendants' alleged breaches of the Credit Agreement. I agree. "Standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005) (quoting *Dillard v. Baldwin County Comm'rs*, 225 F.3d 1271, 1275 (11th Cir. 2000)). Absent an adequate showing of standing, "a court is not free to opine in an advisory capacity about the merits of a plaintiff's

claims." *Id.* The burden of establishing standing is on the Plaintiffs. *Id.* at 976; *see also*

*AT&T Mobility, LLC v. National Ass'n for Stock Car Auto Racing, Inc.,* 494 F.3d 1357, 1360

(11th Cir. 2007)

Pursuant to Article III of the United States Constitution, Plaintiffs "must establish that

[they] ha[ve] suffered an injury in fact" to have standing to challenge Defendants' failure

to fund under the Credit Agreement.[13]  *AT&T Mobility*, 494 F.3d at 1360 (citing *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "To establish injury in fact, [Plaintiffs]

must first demonstrate that [Defendants] ha[ve] invaded a legally protected interest derived

by [Plaintiffs] from the [Credit] Agreement between [Plaintiffs] and [Defendants]."  *Id.*

(citation and internal quotation marks omitted).  The question of whether, for standing

purposes, Plaintiffs have "a legally enforceable right" with respect to a contractual covenant

is a matter of state law. *Id.* (citation omitted); *see also Mid-Hudson Catskill Rural Migrant*

*Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d Cir. 2005) (Sotomayor, J.) (citing

various cases applying state law to determine whether parties had standing to sue for

breach of contract).  Accordingly, I must look to New York law[14] to determine whether

---

[13]  I recognize the parties' position that having "standing" to sue for a breach of a contractual promise is distinct from the concept of Article III standing.  **[MTD Hr'g Tr. 3:25 p.m., May 7, 2010]** ("I have always just thought of this as having been innocently mislabeled.  I agree with [defense counsel] that when they said standing, what they really meant was the term lenders don't have any contractual right").  While there is case law supporting this contention, the Eleventh Circuit treats the question of whether a party has a "legally enforceable right" with respect to a contractual promise as an Article III issue.  *AT&T Mobility, LLC v. National Ass'n for Stock Car Auto Racing, Inc.,* 494 F.3d 1357, 1360 (11th Cir. 2007); *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975-980 (11th Cir. 2005).  Accordingly, I treat it as such.  I emphasize, however, that this distinction has no bearing on the motions at bar, for Plaintiffs' contract claims must fail if they lack standing, regardless of how the standing issue is framed.

[14]  At oral argument, the parties agreed that the question of whether Plaintiffs have a legal right to enforce the Revolving Lenders' promise to fund the loans at issue must be determined pursuant to New York law.  **[MTD Hr'g Tr. 3:25 p.m., May 7, 2010]**.  In determining

Plaintiffs have standing to assert claims for breach of the Credit Agreement based on Defendants' failure to fund the Revolving Loans pursuant to the March and April Notices of Borrowing.  (Cr. Agr. § 10.11) (stating that "rights and obligations of the parties under this agreement shall be governed by, and construed and interpreted in accordance with the law of the State of New York").

Under New York contract law, "[a] promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty"; thus, only intended beneficiaries of a promise "ha[ve] the right to proceed against the promisor" for breach of said promise.[15]  Restatement (Second) of Contracts § 304 (1979); *Hamilton v. Hertz Corp.*, 498 N.Y.S. 2d 706, 709 (N.Y. Sup. Ct. 1986) (citing Restatement (Second) of Contracts § 304 (1979)).  This well-established rule applies with equal force to both bipartite and multipartite agreements.  *See Berry Harvester v. Walter A. Wood Mowing & Reaping Machine Co.*, 152 N.Y. 540, 547 (N.Y. 1897) (holding that a plaintiff may not enforce every promise contained in a multipartite agreement; rather, the specific promise a plaintiff seeks to enforce must have been intended for the plaintiff's benefit).  Thus, in the context of a multipartite contract, "the mere fact that [Plaintiffs] signed the agreement is not controlling; they may have enforceable

---

and applying the law of New York, I must follow the decisions of the state's highest court, and in the absence of such decisions on an issue, must adhere to the decisions of the state's intermediate appellate courts, unless there is some persuasive indication that the state's highest court would decide the issue otherwise.  *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 245 n. 9 (2d Cir. 2007).

[15] While the Plaintiffs and Defendants disagree as to whether Plaintiffs were intended beneficiaries of the Revolving Lenders' promise to fund, both sides appear to agree that one must be an intended beneficiary of a promise in order to have a legal right to enforce it.  **[MTD Hr'g Tr. 3:35 p.m. - 3:38 p.m.]**.

rights under some of its provisions and not have enforceable rights under other provisions." *Alexander v. United States,* 640 F.2d 1250, 1253 (Ct. Cl. 1981) (finding that party to agreement was not an intended beneficiary of a certain promise and therefore had no legal right to enforce that promise and noting that *Berry Harvester* is a "leading case" on the subject). In such cases, the "critical inquiry is whether the parties to the agreement intended to give [Plaintiffs] the right to enforce" the promise at issue at issue.[16] Hence, in order to have standing to sue Defendants' for failure to fund the Revolving Loans, Plaintiffs must adequately demonstrate that they are "intended beneficiaries" of Defendants' promise to fund the Revolving Loans under the Credit Agreement.

The question of whether a party is an intended or incidental beneficiary of a particular contractual promise can be determined "as a matter of law" based on the parties' intentions as expressed in the operative agreement. *See generally Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*, 66 N.Y. 2d 38 (N.Y. 1985) (affirming lower court's

---

[16] Although this argument was not raised in its opposition papers, counsel for the Aurelius Plaintiffs asserted at oral argument that Section 260 of New York Jurisprudence (Second) Contracts and Section 297 of the Restatement (Second) of Contracts support the conclusion that all parties to a multipartite agreement are presumed to have a right to enforce every promise contained therein unless a party's right to enforce "is specifically severed." **[MTD Hr'g Tr. 3:38 p.m.].** Having reviewed these sections, I reject this contention and note that Plaintiffs appear to have conflated two distinct concepts in advancing this argument: the first is whether a party has a legal right to enforce a particular promise; the second is whether the right to enforce a particular promise is held jointly or severally by multiple parties. The issue here is *not* whether Plaintiffs and Fontainebleau have a "joint" or a "several" (i.e., separately enforceable) right to enforce the Revolving Lenders' promise to fund; rather, the question is whether Plaintiffs have *any right whatsoever* to enforce that promise. With respect to this issue, it is clear that the *Berry Harvester* test controls – i.e., "[w]hether the right or privilege conferred by the promise of one party to a tripartite contract belongs to one or both of the other parties depends upon the intention of the parties; the mere fact that there are three parties to the contract does not enlarge the effect of any promise, except as it may extend the advantage to two persons instead of one where that is the intention." 22 N.Y. Jur. 2d *Contracts* § 260 (2010) (citing *Berry Harvester v. Walter A. Wood Mowing & Reaping Machine Co.*, 152 N.Y. 540 (N.Y. 1897)).

determination that, as a matter of law, party was not an intended beneficiary); *see also Berry Harvester*, 152 N.Y. at 547 ("whether the right or privilege conferred by the promise of one party to a tripartite contract belongs to one or both of the other contracting parties depend upon the intention as gathered from the words used . . .").[17]  If the contractual language is ambiguous, however, courts may consider the contractual language "in light of the surrounding circumstances" in order to discern the intention of the parties.  *Berry Harvester*, 152 N.Y. at 547.

Traditionally, New York law held that "the absence of any duty . . . to the beneficiary [vis-a-vis a particular promise]. . . negate[d] an intention to benefit" the beneficiary.  *Fourth Ocean*, 66 N.Y. 2d at 44-45.  However, as New York's highest court has noted, that requirement "has been progressively relaxed."  *Id.* (citation omitted).  Today, the rule is that a beneficiary can establish that he has standing to enforce a particular promise "*only if* no one other than the [beneficiary] can recover if the promisor breaches the [promise] or the contract language . . . clearly evidence[s] an intent to permit enforcement by the third-party."  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 172 (S.D.N.Y. 2009) (citations and internal quotation marks omitted) (emphasis added); *see also Fourth Ocean*, 66 N.Y. 2d at 45 (concluding that a third party to a promise can enforce the promise if "no one other than the third party can recover if the promisor

_____

[17] The fact that some of the cases cited involve third-party beneficiaries that were not actually "parties" to the written agreements at issue does not render the cases inapposite.  As I have already explained, it is the intent of the parties with respect to the *individual promise at issue* that is critical.  *See Berry Harvester,* 152 N.Y. at 547 ("any party . . . may insist upon the performance of every promise made to him, or for his benefit, by the party or parties who made it").  For example, in a tripartite contract setting where A makes an enforceable promise to B that is expressly intended for the benefit of C, C is a "third-party beneficiary" of that promise notwithstanding the fact that he, she, or it is technically a "party" to the written agreement.

breaches *or* that the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party") (emphasis added).

Here, there is no ambiguity with respect to the promise at issue, which states that "each Revolving Lender severally agrees to make Revolving Loans *to Borrowers* from time to time during the Revolving Commitment Period."  (Cr. Agr. § 2.1(c)) (emphasis added). This promise creates a duty on the part of Defendants to make loans *to Fontainebleau* in accordance with the Credit Agreement; it does not establish a duty to the Plaintiffs here or "clearly evidence an intent to permit enforcement by [Plaintiffs]." *Fourth Ocean*, 66 N.Y. 2d at 45.  Additionally, it is not the case that "no one other than [Plaintiffs] can recover if [Defendants] breache[d]," *id.,* as Fontainebleau would unquestionably be able to recover if it were able to prove that it suffered damages as a result of Defendants' material breach of the Credit Agreement.  While I recognize that  "the full performance of [Defendants' purported obligation to fund the Revolving Loans] might ultimately benefit [Plaintiffs]," this, at best, establishes that Plaintiffs were "incidental beneficiaries" of Defendants' promise to Fontainebleau to make Revolving Loans.  *Fourth Ocean,* 66 N.Y. 2d at 45; *see also Salzman v. Holiday Inns, Inc.*, 48 N.Y.S. 2d 258, 261 (N.Y. App. Div. 4th Dept. 1975) (finding Holiday Inns, an interim lender, to be an incidental beneficiary of financing agreement between plaintiff and permanent lender because agreement called for the permanent lender to pay money to plaintiff, not Holiday Inns, and further noting that "the typical case of an incidental beneficiary is where A promises B to pay him money for his expenses [and] Creditors of B (though they may incidentally benefit by the performance of A's promise) are not generally allowed to sue A") (citation and internal quotation marks

omitted).[18]

Because New York law requires that one be an "intended beneficiary" of a particular promise in order to have a legal right to enforce that promise, and because Plaintiffs have failed to adequately demonstrate that they were "intended beneficiaries" of Defendants' promise to fund the Revolving Loans at issue, Counts I and II of the Aurelius Complaint and Count II of the Avenue Complaint must be dismissed with prejudice.[19]

>    2.    *Even if Plaintiffs Had Standing to Enforce Defendants' Promises to Fund, Defendants Were Not Obligated to Fund the March Notices of Borrowing*

Even if Plaintiffs had standing to enforce Defendants' promises to fund the Revolving Loans at issue, Plaintiffs have not demonstrated that Defendants breached the Credit Agreement by rejecting the March Notices of Borrowing because: (1) "fully drawn," as used in Section 2.1(c)(iii) of the Credit Agreement, unambiguously means "fully funded"; and (2) the Delay Draw Term Loans had not been "fully drawn" at the time Fontainebleau submitted the March Notices of Borrowing.

Under New York law, a breach of contract claim "cannot withstand a motion to

---

[18] Plaintiffs cite to *Deutsche Bank AG v. J.P. Morgan Chase Bank,* 2007 U.S. Dist. LEXIS 71933 (S.D.N.Y. Sept. 27, 2007), in support of the contention that they have a legally enforceable right in Defendants' promise to fund the Revolving Loans.  This case fails to buttress Plaintiffs' position regarding standing, as it involved claims for declaratory relief, not breach of contract – claims that have different requirements with respect to standing than the contract claims at bar.  *Deutsche Bank*, 2007 U.S. Dist. LEXIS 71933, * 5 (noting that parties were only seeking "declaration[s]"); *compare Fieger v. Ferry*, 471 F.3d 637, 643 (6th Cir. 2006) (discussing standing requirements in declaratory relief actions) *with Alexander v. United States,* 640 F.2d 1250, 1253 (Ct. Cl. 1981) (discussing standing requirements in context of multi-party contracts). Thus, contrary to Plaintiffs' contention, the *Deutsche Bank* court did not *sub silentio* conclude that lenders are intended beneficiaries of other lenders' promises to fund a borrower's loans.

[19] *See* Section V, *infra* (explaining why the dismissal is with prejudice).

dismiss if the express terms of the contract contradict plaintiff[s'] allegations of breach." *Merit,* No. 08-CV-3496, 2009 WL 3053739, *2 (S.D.N.Y. Sept. 24, 2009) (citing *805 Third Ave. Co. v. M.W. Realty Assocs.*, 58 N.Y. 2d 451, 447 (N.Y. 1983)).  Thus, courts are not required to "accept the allegations of the complaint as to how to construe" the agreement at issue.  *Merit,* 2009 WL 3053739, *2.  Instead, courts must enforce written agreements according to the "plain meaning" of their terms.  *Greenfield v. Philles Records*, 98 N.Y. 2d 562, 569 (N.Y. 2002).  When interpreting the meaning of contractual provisions, courts are generally required to "discern the intent of the parties to the extent their intent is evidenced by their written agreement."  *Int'l Klafter Co. v. Cont. Cas. Co.*, 869 F.2d 96, 100 (2d Cir. 1989) (citing *Slatt v. Slatt*, 64 N.Y. 2d 966, 967 (N.Y. 1985)).  Thus, "[i]n the absence of ambiguity, the intent of the parties *must* be determined from their final writing and no parol evidence or extrinsic evidence is admissible."  *Id.* (emphasis added) (citation omitted). However, "[e]xtrinsic evidence of the parties' intent may be considered . . . if the agreement is ambiguous, which is an issue of law for the courts to decide."  *Greenfield*, 98 N.Y. 2d at 569.

Whether an agreement is "ambigu[ous] is determined by looking within the four corners of the document, not to outside sources."  *Kass v. Kass*, 91 N.Y. 2d 554, 556 (N.Y. 1998) (citation omitted).[20]  "Consequently, any conceptions or understandings any of the

---

[20] Plaintiffs urge me to consider the manner in which the word "drawn" is generally used in New York statutory and case law in order to discern the intended meaning of the phrase "fully drawn," citing to *Hugo Boss Fashions, Inc. v. Fed Ins. Co.*, 252 F.2d 608, 617-18 (2d Cir. 2001) for the proposition that "an established definition provided by state law or industry usage will serve as a default rule . . . unless the parties explicitly indicate, on the face of their agreement, that the term is to have some other meaning."  However, as the Second Circuit noted in the sentence preceding the quote excerpted by Plaintiffs, "widespread custom or usage serves to determine the meaning of a *potentially vague term*," not an unambiguous one.  *Id.* (emphasis

parties may have had during the duration of the contracts is immaterial and inadmissible." *Int'l Klafter Co.,* 869 F.2d at 100.  Under New York law, "[t]he test for ambiguity is whether an objective reading of a term could produce more than one reasonable meaning." *McNamara v. Tourneau, Inc.*, 464 F. Supp. 2d 232, 238 (S.D.N.Y. 2006) (citing *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002)).  Thus, "[a] party . . . may not create ambiguity in otherwise clear language simply by urging a different interpretation." *Id.* (citing *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990)).

As I noted in my August 26 Order, a review of the Credit Agreement in its entirety reveals no ambiguity as to the meaning of the term "fully drawn"; to the contrary, an objective and plain reading of the agreement establishes that "fully drawn" in Section 2.1(c)(iii) means "fully funded," and not "fully requested" or "fully demanded," as Plaintiffs suggest.  *In re Fontainebleau Las Vegas Holdings, LLC*, 417 B.R. at 660.[21]  This

---

added).  Because the Credit Agreement unambiguously establishes that "fully drawn" means "fully funded," I decline to consider "extrinsic evidence" such as custom, industry usage, or the parties' course of dealing.  *Int'l Klafter Co. v. Cont. Cas. Co.*, 869 F.2d at 100; *see also* **[DE 50]** (noting in their opposition to Defendants' Joint Motion to Dismiss that "Term Lenders agree . . . that the parties' course of dealing is not an appropriate consideration in determining, on a motion to dismiss, whether it is reasonable to interpret "drawn" to mean "demanded").  However, it does bear mentioning that even the cases cited by Plaintiffs indicate that, in the context of term loans, "draw" means "fund," as compared to "request" or "demand." *See e.g., Destiny USA Holdings, LLC v. Citigroup Global Markets Realty Corp.*, 2009 WL 2163483, *1, *14 (N.Y. Sup. Ct. July 17, 2009) (concluding that Destiny Holdings was entitled to preliminary injunction requiring Citigroup to fund "pending draw requests," thus indicating that draw means "fund" or "funding" and not "request" or "demand"), *aff'd as modified on other grounds*, 889 N.Y.S. 2d 793 (N.Y. App. Div. 4th Dept. 2009).

[21] While it could be argued that the doctrine of "nonparty preclusion" should apply to preclude Plaintiffs from relitigating the meaning of "fully drawn" given that they filed an amicus brief in the Florida Action regarding the very same issue, this doctrine was not raised by the Plaintiffs and I decline to apply it *sua sponte*.  *See Griswold v. County of Hillsborough*, 598 F.3d 1289, 1292 (11th Cir. 2010) (clarifying doctrine of nonparty preclusion in light of recent Supreme Court decisions on the subject).

conclusion comports not only with the plain language of the Credit Agreement, but also with the "structure of the lending facilities, as discerned from the Credit Agreement itself, [which] reflects the parties' intent to employ a sequential borrowing and lending process that places access to Delay Draw Term Loans ahead of Revolving Loans when the amount sought under the Revolving Loan facility was in excess of $150 million." *Id.* at 660.

To support their argument that my prior ruling regarding the unambiguous meaning of "fully drawn" was erroneous, Plaintiffs proffer various hypotheticals purporting to demonstrate that interpreting "fully drawn" to mean "fully funded" would lead to patently unreasonable results that could not have been intended by the parties to the Credit Agreement.  Such arguments are not relevant or proper, for "[a]n ambiguity does not exist by virtue of the fact that one of a contract's provisions could be ambiguous under some other circumstances."  *Bishop v. National Health Ins. Co.*, 344 F.3d 305, 308 (2d Cir. 2003).  To the contrary, contract law is clear insofar as "a court must look to the situation before it, and not to other possible or hypothetical scenarios" when considering a contract in order to determine whether an ambiguity exists. *Id.*; *Donoghue v. IBC USA (Publications), Inc.*, 70 F.3d 206, 215-16 (1st Cir. 1995) (noting that "a party claiming to benefit from ambiguity . . . must show ambiguity in the meaning of the agreement with respect to the very issue in dispute . . .  [because] courts consider contentions regarding ambiguity or lack of ambiguity not in the abstract and not in relation to hypothetical disputes that a vivid imagination may conceive but instead in relation to concrete disputes about the meaning of an agreement as applied to an existing controversy").[22]

---

[22] Even if I were to consider Plaintiffs' hypotheticals, it would not alter my conclusion regarding the meaning of "fully funded," as the proffered hypotheticals fail to account for critical

In sum, having considered the arguments of the parties regarding the meaning of "fully drawn," I conclude, for the reasons set forth above, as well as those set forth in my August 26 Order – which I expressly incorporate by reference into this Order – that the plain language, purpose, and structure of the Credit Agreement leads to the inexorable conclusion that "fully drawn" unambiguously means "fully funded" *for purposes of Section 2.1(c)(iii)* of the Credit Agreement.[23]  Accordingly, even if my conclusion that Plaintiffs lack standing is in error, Plaintiffs' claims for failure to fund the March Notices of Borrowing fail as a matter of law because Defendants had no obligation to make Revolving and Swing

---

provisions of the Credit Agreement.  For example, the hypothetical set forth in Paragraph 43 of the Aurelius Complaint ignores the existence of Section 5.2(c), entitled "Drawdown Frequency," which vests the Administrative Agent (i.e., Bank of America) with broad discretion to permit Disbursement Agreement loans to be made more frequently than once every calendar month. If Bank of America were to arbitrarily withhold its consent in such a scenario, it would be exposing itself to a potential claim for breach of the implied covenant of good faith and fair dealing.  *Dalton v. Educational Testing Service*, 87 N.Y. 2d 384, 389 (N.Y. 1995) (noting that where a "contract contemplates the exercise of discretion, [the implied covenant of good faith] includes a promise not to act arbitrarily or irrationally in exercising that discretion").

[23]  While I recognize that "[i]t is reasonable to assume that the same words used in different parts of the instrument are used in the same sense," it is beyond dispute that the very same terms can have different meanings for purposes of a single agreement where "a different meaning is indicated" by the agreement itself.  *Johnson v. Colter*, 297 N.Y.S. 345 (N.Y. App. Div. 4th Dept. 1937) (citation omitted).  This is especially true in the context of agreements spanning hundreds of pages that cover varying topics.  For example, the word "draw" might have a different meaning when used to refer to "drawing" on a letter of credit than when used in reference to "drawing" on different sources of information, "drawing" on a chalkboard, or having "drawn" on a revolving credit facility.  Thus, I emphasize that I am not concluding that "draw" must *always* mean "fund" for purposes of the Credit and Disbursement Agreements.  Instead, my conclusion is limited to the meaning of "fully drawn" for purposes of Section 2.1(c)(iii). However, I note that a review of other relevant provisions appears to buttress my conclusion that, in the context of Term Loans and Revolving Loans, "fully drawn" unambiguously means "fully funded."  For example, Section 5.2(c), entitled "Drawdown Frequency," provides that Disbursement Agreement loans "shall be *made* no more frequently than once every calendar month."  (emphasis added).  Thus, this provision, which regulates the frequency of "drawdowns" vis-a-vis Revolving and Term Loans, indicates that a "drawdown" is the equivalent of "making" (i.e., funding) a Revolving or Delay Draw Term Loan, and not a "request" or "demand" for such a loan.

Line Loans in excess of $150,000,000 until: (a) the Delay Draw Term Loans were fully

funded; or (b) the provisions of Section 2.1(c)(iii) were validly waived.

     **B.**    <u>Breach of the Disbursement Agreement Against Bank of America – Count</u>
<u>I of the Avenue Complaint and Count III of the Aurelius Complaint</u>

In addition to the Credit Agreement claim discussed above, Plaintiffs have each

asserted a contract claim against Bank of America for breach of the Disbursement

Agreement.  In order to state a claim for breach of contract under New York law,[24] a

Plaintiff must adequately allege: (1) the existence of a contract, (2) the plaintiff's

performance under the contract, (3) the defendant's breach of that contract, and (4)

resulting damages. *JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 893 N.Y.S. 2d 237,

239 (N.Y. App. Div. 2d Dept. 2010).  Here, Defendant Bank of America does not dispute

the existence of a contract, Plaintiffs' performance, or resulting damages.  Instead, Bank

of America argues that Plaintiffs have failed to adequately allege a breach of the

Disbursement Agreement.

In considering Bank of America's argument, I start with Section 2.5.1 of the

Disbursement Agreement, which requires Bank of America to issue a Stop Funding Notice

"[i]n the event that [] the conditions precedent to an Advance have not been satisfied."  The

conditions precedent to an Advance are set forth in Section 3.3 of the Disbursement

Agreement.  One of the conditions set forth in Section 3.3 is that "[n]o Default or Event of

Default shall have occurred and be continuing."  (Disb. Agr. § 3.3.3).  The term "Default"

is specifically defined in the Disbursement Agreement as "(i) any of the events specified

---

     [24] Like the Credit Agreement, the Disbursement Agreement also contains a New York choice-of-law clause.  (Disb. Agr. § 11.6).

in Article 7 . . . and (ii) the occurrence of any 'Default' under any Facility Agreement." (Disb. Agr., Ex. A at 10). "Facility Agreement" is also specifically defined in the Agreement as "the Bank Credit Agreement, the Second Mortgage Indenture and the Retail Facility Agreement."  *Id.* at 12.

In Paragraphs 129-132 of the Avenue Complaint and Paragraphs 103-111 of the Aurelius Complaint, Plaintiffs allege specific facts supporting the reasonable inference that Bank of America, as Disbursement Agent, received notice from a lender in Fall 2008 that Lehman Brothers defaulted under the Retail Facility Agreement and yet failed to issue a Stop Funding Notice.  Defendant Bank of America does not dispute this.  Instead, Bank of America argues that: (1) the claim is insufficient because the Plaintiffs' "fail[ed] to attach th[e] purported 'notice' or even identify the lender who sent the alleged communications"; and (2) pursuant to Section 9.3.2 of the Disbursement Agreement, Bank of America was "entitled to rely on certifications from [Fontainebleau] as to satisfaction of any requirements and/or conditions imposed by th[e] [Disbursement Agreement]." **[DE 35, pp. 10, 13]**.  I reject Bank of America's first argument, for at the Rule 12(b)(6) stage, I must accept all of Plaintiffs' factual allegations in the complaints as true – i.e., Plaintiffs need not support their factual allegations with documentary evidence at this stage of the proceedings.  *See Hill*, 321 F.3d at 1335.  Bank of America's second argument also fails, as there are no allegations on the face of the operative complaints establishing that Fontainebleau "certif[ied]" that Lehman Brothers had not defaulted under the Retail Facility Agreement.[25]

---

[25] At oral argument, I asked whether there is "anything that anyone could point to in the complaint one way or the other that refers to Fontainebleau affirmatively certifying that there was no default"; counsel for Bank of America was unable to reference any such allegation. **[MTD Hr'g Tr. 04:19 p.m.]**.

While it can certainly be inferred that such representations were made given that Fontainebleau submitted various Advance Requests subsequent to the Fall of 2008, inferences of this nature are not appropriately drawn at this stage.  To the contrary, it is well-settled that I must evaluate all reasonable inferences *in favor of the Plaintiffs*.  *Wilson v. Strong*, 156 F.3d 1131, 1133 (11th Cir. 1998).  Because Plaintiffs' complaints adequately allege facts indicating that Bank of America knew of Lehman Brothers' default under the Retail Financing Agreement and failed to issue a Stop Funding Notice in violation of the Disbursement Agreement, Count III of the Aurelius Complaint and Count I of the Avenue Complaint will not be dismissed.

      C.      <u>Breach of the Implied Covenant of Good Faith and Fair Dealing Against Bank of America – Count III of the Avenue Complaint</u>

Count III of the Avenue Complaint asserts that Bank of America breached the implied covenant of good faith and fair dealing when it "improperly approved Advance Requests, issued Advance Confirmation Notices, failed to issue Stop Funding Notices, [] caused the disbursement of funds from the Bank Proceeds Account; and [] fail[ed] to communicate information to the Term Lenders regarding Events of Default that were known o[r] should have been known to [Bank of America]."  (Avenue Compl. at ¶ 192).

While it is well-settled that breach of the implied covenant of good faith gives rise to a stand-alone cause of action under New York law, *see Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 305 (S.D.N.Y. 1998) (noting that "[b]reach of the [good faith] covenant gives rise to a cognizable claim"), it is equally settled that "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts,

27

is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). In their opposition papers, the Avenue Plaintiffs acknowledge this rule, but contend that it does not apply because its implied covenant claim is predicated, in part, upon the factual allegation that Bank of America "failed to communicate information regarding defaults," while its Disbursement Agreement claim is not. **[DE 52]**. This argument is not a novel one, and has been roundly rejected by New York courts. *Alter v. Bogoricin*, No. 97-CV-0662, 1997 WL 691332, *1, *7-*8 (S.D.N.Y. Nov. 6, 1997) (rejecting similar argument, dismissing implied covenant claim, and noting that it has been observed that "every court faced with a complaint brought under New York law and alleging both breach of contract and breach of a covenant of good faith and fair dealing has dismissed the latter claim as duplicative").

The critical inquiry in this respect is not whether the two claims are founded upon identical facts, but whether the relief sought by Plaintiffs "is intrinsically tied to the damages allegedly resulting from [the] breach of contract." *Id.* (quoting *Canstar v. J.A. Jones Constr. Co.*, 622 N.Y.S. 2d 730, 731 (App. Div. 1st Dept. 1995)); *Deer Park Enterprises, LLC v. Ail Systems, Inc.*, 870 N.Y.S. 2d 89, 90 (N.Y. App. Div. 2d Dept. 2008). Because the relief sought by Avenue Plaintiffs in connection with their implied covenant claim against Bank of America is "intrinsically tied to the damages allegedly resulting from [the] breach of contract" alleged in Count I, this claim must be dismissed. *Deer Park Enterprises*, 870 N.Y.S. 2d at 90 (reversing lower court's denial of motion to dismiss and concluding that "[a] cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is 'intrinsically tied to the damages allegedly resulting from a breach of the contract' ") (quoting *Canstar*, 622 N.Y.S.

28

2d at 731).

     D.     <u>Breach of the Implied Covenant of Good Faith and Fair Dealing Against</u>
                  <u>All Defendants – Count IV of the Avenue Complaint</u>

The final claim I must address is the Avenue Plaintiffs' claim against all Defendants for breach of the implied covenant of good faith and fair dealing in connection with the Credit Agreement.  In support of this claim, the Avenue Plaintiffs allege that Defendants "breached the implied covenant [of good faith] by adopting a contrived construction of the Credit Agreement in order to justify their refusal to fund the March 2 Notice [of Borrowing] and the March 3 Notice [of Borrowing]."  (Avenue Compl. at ¶ 198).  Under New York law, claims for breach of the implied covenant of good faith are unsustainable as a matter of law if a plaintiff  "seek[s] to imply an obligation of the defendants which [is] inconsistent with the terms of the contract" at issue.  *Fitzgerald v. Hudson Nat'l Golf Club*, 783 N.Y.S. 2d 615, 617-18 (N.Y. App. Div. 2d Dept. 2004) (affirming dismissal of implied covenant claim where plaintiff sought to imply an obligation inconsistent with the terms of the contract); *see also Dalton v. Educational Testing Service*, 87 N.Y. 2d  384, 389 (N.Y. 1995).  Because I have concluded that the purportedly "contrived construction" of "fully drawn" is, in fact, the correct interpretation, this claim fails as a matter of law, as it seeks to impose an obligation – i.e., a particular construction of the Credit Agreement's terms – that is inconsistent with the terms of the agreement.

**V.    Conclusion**

Based on the foregoing, I conclude that – with the exception of Count I of the Avenue Complaint and Count III of the Aurelius Complaint – all claims asserted by the Plaintiffs warrant dismissal.  The dismissal of these claims is *with prejudice* for two

reasons.  First, the facts, circumstances, and applicable law indicate that any attempt to amend the dismissed claims would be futile; and second, Plaintiffs have failed to state a claim despite having previously amended their complaints.[26]  *Novoneuron Inc. v. Addiction Research Institute, Inc.,* 326 Fed. Appx. 505, 507 (11th. Cir. 2009) (affirming dismissal with prejudice where Plaintiff amended as a matter of right and later decided to litigate the merits of Defendant's motion to dismiss rather than requesting leave to amend); *Butler v. Prison Health Services*, Inc., 294 Fed. Appx. 497, 500 (11th Cir. 2008) ("The district court . . . need not allow an amendment . . . where amendment would be futile.") (cites and quotes omitted).

_____I note that I would normally be inclined to afford Plaintiffs an opportunity to amend their complaints to assert claims founded upon contractual promises of which they were the intended beneficiaries (e.g., promises set forth in the Intercreditor Agreement to which the parties alluded during oral argument).  However, because the parties have indicated that the promises contained in the Intercreditor Agreement are not germane to this action, **[MTD Hr'g Tr. 3:26 p.m. - 3:28 p.m.]**, I see no reason to invite further amendments.

Based on the foregoing, it is hereby

ORDERED AND ADJUDGED that:

1.    Defendants' Motions to Dismiss **[DE 35]**; **[DE 36]** are GRANTED IN PART AND DENIED IN PART.

2.    Counts I and II of the Aurelius Complaint are DISMISSED WITH PREJUDICE.

---

[26] The Avenue Complaint was amended twice.  The Aurelius Complaint was amended once.

3.  Counts II, III, and IV of the Avenue Complaint are DISMISSED WITH PREJUDICE.

4.  Count VI of the Avenue Complaint is DISMISSED WITHOUT PREJUDICE AS MOOT.

5.  Defendant Bank of America shall Answer Paragraphs 1-178 and 201-203 of the Avenue Complaint **no later than Friday June 18, 2010**.

6.  Defendant Bank of America shall Answer Paragraphs 1-131 and 146-153 of the Aurelius Complaint **no later than Friday June 18, 2010**.

7.  **No later than Friday June 18, 2010**, the Avenue Plaintiffs shall file a Notice with this Court stating whether Count V of the Avenue Complaint seeks declaratory relief pursuant to state or federal law.

8.  The Clerk is directed to send a copy of this Amended Order to the Clerk of the Judicial Panel on Multidistrict Litigation.

9.  The Final Judgment previously issued in the Aurelius Action, *see* Case No.: 10-CV-20236, **[DE 53]** (S.D. Fla. May 28, 2010), is hereby VACATED.

DONE AND ORDERED IN CHAMBERS at Miami, Florida this 28th day of May, 2010.

THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc: Magistrate Judge Bandstra
    Counsel of record