**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 09-02106-MD-GOLD/GOODMAN**

IN RE: FONTAINEBLEAU LAS VEGAS
CONTRACT LITIGATION
_____/

## ORDER ON MOTION FOR DETERMINATION OF WAIVER OF PRIVILEGE

This matter is before the Court on the Term Lenders' Motion for Determination of Fontainebleau Resort, LLC's Waiver of Privilege (DE# 192), filed December 6, 2010. Fontainebleau filed a response in opposition to the motion on December 13, 2010 (DE# 194). I have reviewed the Motion, the response, the pertinent portions of the record, and the applicable law. Having already twice held hearings on the underlying discovery dispute that is the basis for this motion (DE# 132, 165), I will decide the motion without oral argument pursuant to Federal Rule of Civil Procedure 78(b).

As outlined below, I find that Fontainebleau Resorts, LLC ("FBR" or "Fontainebleau") waived the attorney-client privilege and work product protection, and any other applicable privileges, for the materials it produced from two of three computer servers in what can fairly be described as a data dump as part of a significantly tardy response to a subpoena and to court-ordered production deadlines. But this Order will also provide some relief to Fontainebleau: the waiver does not relate to the materials on the email server, and the Term Lenders (who issued the subpoena and who received the massive amount of data belatedly produced by Fontainebleau) shall also timely advise Fontainebleau of any clearly privileged material they may find during their review of the production on the documents and accounting servers. The specific parameters of this notice requirement will be spelled out in more detail in the body of this Order.

## DETAILED FACTUAL BACKGROUND

This controversy, which began with a seemingly routine discovery request, dates back to April 22, 2010, when the Term Lenders subpoenaed Fontainebleau for documents, including electronically stored documents, relating to the financing of the construction of the Fontainebleau Resort and Casino in Las Vegas. After waiting four

months without a responsive production from Fontainebleau, the Term Lenders filed a motion to compel (DE# 123). I held a hearing on the motion on August 30, 2010.

Before the hearing, other important events relating to the subpoena unfolded. But before outlining those events, it is helpful to first explain Fontainebleau's place in this litigation.

Although Fontainebleau has identified itself as a "third party" in connection with the Term Lenders' subpoena, this is an over-simplification of its role. Fontainebleau is the *parent* of Fontainebleau Las Vegas, LLC, the borrower who filed a bankruptcy petition in the Southern District of Florida in June 2009 (DE# 123). As I will explain in this chronology, Fontainebleau changed its explanation for continually delaying its production of documents in response to the Term Lenders' subpoena. First, FBR attributed the delay to the bankruptcy trustee's supposed possession of the servers and the trustee's position on whether the data could or should be produced by FBR. Thereafter, Fontainebleau changed its position and resisted both producing documents and conducting privilege review on the grounds that the subpoena (and later Court orders) was too burdensome.

Before the Term Lenders filed their motion to compel in connection with their April 2010 subpoena, FBR and "related" entities filed a motion to quash *other* subpoenas issued by several banks in July 2010 (DE# 93). In this motion to quash, FBR explained that different entities all had information on the three computer servers and that it needed to coordinate the removal of each entity's information. FBR explained in its motion to quash that its counsel had been in contact with the bankruptcy trustee and the trustee's counsel and that the trustee determined "that each entity will receive a full copy of each of the servers." It also explained that "each entity will then have to review all of the documents on the servers to determine which documents belong to them, which documents belong to multiple entities, which documents are privileged and which documents are responsive to any outstanding discovery requests or subpoenas." FBR predicted that "deciding which documents belong to which entities will be a time-

consuming undertaking due to the number of documents as well as anticipated disputes over ownership of the documents" (*Id.*).[1]

After noting its position that *other* (albeit potentially related) entities would need to review documents on the "shared" servers, FBR then said: "After this sorting process is complete, *if* any of the entities with information on the servers *wish* to produce documents in response to discovery requests or subpoenas, they will have to provide each entity which received a copy of the servers with *an opportunity to examine* what is being produced in order to confirm that documents belonging to the non-producing entity are not being produced" (*Id.*) (emphasis added). However, Fontainebleau's motion to quash did not explain why an entity (Corp. A) could prevent another entity (Corp. B) from producing documents (privileged or otherwise) initially belonging to Corp. A but now in Corp. B's possession (on so-called "shared servers").

In addition to its comments about the logistics surrounding the shared servers, Fontainebleau also argued that the subpoenas were overbroad. Significantly, however, FBR did **not** specifically contend that it would be too costly to review the servers for responsive documents or to analyze the servers for privileged material before it or the "other" entities produced documents and data. Fontainebleau merely raised a conclusory

---

[1] Fontainebleau did not explain in its motion to quash why the shared documents on the computer servers would still be privileged (assuming they were privileged in the first place) if they were stored together on servers presumably accessible by other entities. Fontainebleau represented in its motion that the servers "are owned by Fontainebleau Resorts, LLC (one of The FBR Entities) but [] contain documents belonging to various Fontainebleau and Turnberry Construction entities, including the Debtors" (DE# 93, at 2). Likewise, Fontainebleau did not explain in its motion why the entities would not lose privilege protection under a plan where each entity would receive "a full copy of each of the servers" (and presumably have unfettered access to all material, including information and privileged matter belonging to others).

If all of the legally separate entities are sufficiently affiliated, then they likely would be permitted to safely share privileged information without losing privilege, but Fontainebleau did not address the issue in its motion and did not discuss, let alone establish, that all of the entities having material on the servers (and which would obtain full copies of the servers) are **all** in parent-subsidiary relationships or are otherwise sufficiently affiliated. *See, e.g.*, *Roberts v. Carrier Corp.*, 107 F.R.D. 679, 687 (N.D. Ind. 1985) (explaining that privilege can extend to corporate subsidiaries). In addition, Fontainebleau did not state that it had entered into a joint defense, shared information, or common interest agreement with the separate entities.

and boilerplate objection about "an undue burden or expense" but then explained that "the servers have not even been copied yet," despite "the best efforts of counsel," and that "it is unknown how many documents are on the servers or how long it will take to complete the above described process" (DE# 93, at 3). Thus, FBR's initial objection was that logistical and coordination difficulties prevented timely compliance with the subpoena.

Not surprisingly, the banks which served the subpoenas objected to the motion to quash (DE# 114). In their objection, they noted that FBR sent an email on the day it was required to respond to the subpoenas, advising the banks that FBR would move to quash rather than comply. The banks also observed that FBR refused their offer to extend FBR's response time to respond so that it could properly coordinate its production with the bankruptcy trustee. According to the banks' objection, FBR declined the offer and filed the motion to quash.

In an Order dated August 3, 2010, Magistrate Judge Ted E. Bandstra denied the motion to quash (DE# 120), finding that the two specific requests flagged by FBR were neither overbroad nor unduly burdensome and finding further that "the FBR Entities failed to satisfy Local Rule 7.1(A)(3) by not making a good faith effort to resolve the subject issues prior to filing the instant motion."

Two days later, FBR served its formal written response to the Term Lenders' April 22 subpoena, the discovery tool at issue here. Although FBR's response described the subpoena as a "document request," it is clear that FBR was actually referring to the subpoena. Echoing its earlier motion to quash the subpoenas issued by other banks, FBR again raised the "shared server" explanation and explained that "certain information on the servers belongs *solely* to entities other than FBR" (DE# 122, at 1 n.2) (emphasis added). FBR represented that the servers "are in the process of being copied and distributed to all entities with information on them. *Once that is complete, all documents responsive to this request [sic] that belong to FBR **will be produced** to the Plaintiff Term Lenders*" (*Id.*) (emphasis added).

Again, Fontainebleau did not explain why privilege, assuming it existed, had not been previously waived by virtue of its decision to have its documents and data stored on servers shared by "entities other than FBR." Fontainebleau apparently assumed that the

4

other entities, described simply as "related entities," were all sufficiently affiliated to permit safe sharing of privileged information without risking a waiver, but this point was not raised in any way (DE# 122, at 1 n.2).

Unlike its response to the other subpoenas, FBR did not file a motion to quash the Term Lenders' subpoena, nor did it assert in its written response that it would be too costly to search the servers for responsive documents and data or that it would be unfairly expensive to review the servers for privilege. Likewise, FBR never filed a motion or pursued any written request to shift to the Term Lenders the cost of searching the servers or conducting a privilege review. In its response, FBR's repeatedly represented that "all documents responsive to this [April 22, 2010] request [sic] that are the property of FBR will be produced to the Term Lenders," but FBR's did not say *when* production would be made (DE# 93, at 1-2).

At the August 30, 2010, hearing on the Term Lenders' Motion to Compel (DE# 123), Fontainebleau's counsel conceded that she initially told the Term Lenders that Fontainebleau's bankruptcy trustee was in control of the electronic servers on which most of the data was stored and that the trustee would not allow removal of the information (DE# 196). As it turned out, this information was not entirely correct. Two of the relevant servers, the accounting server and the documents server, were in Las Vegas, while a third server, for emails, had *moved* to Miami many months earlier, in January 2010.

The Court also learned at this hearing that there were actually two copies of some of the servers. But only in August 2010, one week before the discovery hearing and four months after the initial subpoena, did all three servers finally come into FBR's possession via its South Florida counsel.

During the four-month period between the subpoena and the hearing on the motion to compel, Fontainebleau did not move to quash the subpoena because it was overly broad or too burdensome, nor did Fontainebleau seek a protective order that might have limited the scope of the subpoena. Instead, Fontainebleau's position at the hearing was that the delay was due to the logistical difficulty in obtaining the relevant servers. And further, rather than attack the subpoena itself, Fontainebleau requested an evidentiary hearing to determine how long it would take for *it* to properly review this

5

information for responsive and privileged documents. Fontainebleau's position was that it initially took four months just to gather of all the relevant materials in South Florida, and that substantial, additional time was needed to sort through the large amount of information contained on the servers now in its possession.

But it was only on August 30, 2010, more than four months after the initial subpoena, that Fontainebleau informed the Court, for the first time, and only in opposition to the motion to compel, of the alleged burdens of complying with the April 22 subpoena. Again, FBR never sought to quash the subpoena, nor did it move for a protective order limiting its scope. Instead, Fontainebleau simply discussed the status of the servers and announced the steps it would take to start complying with the subpoena, albeit belatedly.

FBR also did not ask the Court to shift to the Term Lenders the cost of locating responsive documents on the three servers or the cost of reviewing the servers for privileged material. Instead, it advised the Court that it would take less than a day to review the email server to determine which entities had relevant documents on it and an additional month for it and the other entities to complete a privilege review (DE# 196, at 17-20). Fontainebleau's counsel also explained that she hoped that "there wouldn't be as many privileged documents" on the other two servers (*Id.* at 21).

At the hearing, Fontainebleau acted as though it was also moving forward on producing documents and data from the other two servers. It did not then (four months after the subpoena was issued) complain that it lacked financial resources to review the other two servers for privilege, nor did it seek to have the Term Lenders pay all or some of the review costs. FBR simply needed more time.

Because of the lengthy delay of almost four and a half months since the Term Lenders' initial subpoena for documents and data, and in light of the District Court's trial deadlines, I denied Fontainebleau's request for an evidentiary hearing and granted the Term Lenders' motion to compel. I further ordered that Fontainebleau produce non-privileged documents covered by the subpoena by September 13, 2010, and produce a privilege log by September 20, 2010 (DE# 129).

Fontainebleau did not comply with these deadlines and in fact made no production whatsoever within the time given by the Court. In response, the Term

6

Lenders filed a motion for sanctions (DE# 153), and I held a hearing on the motion on October 18, 2010.  During this same time, Fontainebleau's counsel moved to withdraw from the case because of concerns about its client's ability to pay.

I learned at this second hearing that Fontainebleau's counsel had hired IKON, a third-party vendor specializing in e-discovery, to search the email server for relevant documents.  IKON had completed its work screening for responsive documents but Fontainebleau's counsel unilaterally ordered IKON not to begin a privilege review because of its payment concerns.[2]  But FBR did not file a motion to be excused from the August 30 discovery Order, nor did it advise the Court of other circumstances which it believed made it financially impossible or difficult to comply with the Order.  In fact, as of the October 18 hearing, **FBR had not moved forward on the production front at all**--a state of affairs which I only learned about at the hearing in response to my questioning about the production process (DE# 195, at 21-25).  Fontainebleau conceded that "the better practice" might have been to file a motion or advise the Court that all production efforts had stopped even though an order compelling production had been entered (*Id.* at 23).

During the October 18 hearing, the Term Lenders advised that the bankruptcy trustee for Fontainebleau Las Vegas had waived the attorney-client privilege and was "prepared to produce the entire servers" (*Id.* at 55-56).  The Term Lenders also advised that the bankruptcy trustee had "very patiently waited for the Fontainebleau Resorts to get its job done" (*Id.*).  FBR did not contest these representations in any way. (Fontainebleau Las Vegas is one of the entities which shared the servers with FBR.)

Thus, as of the second hearing on October 18, 2010, approximately six months after the Term Lenders' subpoena was issued, neither Fontainebleau nor its electronic discovery vendor had even started the process of reviewing the email server--or any of the servers--for privilege (*Id.* at 28-29, 36).  In fact, the Court learned at the hearing, in response to additional questions, that IKON had *returned* the email server to Fontainebleau's local counsel (*Id.* at 33-34).  Fontainebleau also represented that it did

---

[2]  Although I granted Fontainebleau's counsel's motion to withdraw on the condition that they find substitute counsel within 30 days, counsel has since informed that the Court that Fontainebleau is unable to find new counsel and so current counsel will remain in this case for the time being (DE# 166, 185).

not know how long it would take to review the email server for privilege and for the first time made an informal, *ore tenus* request that the Term Lenders assume the expense of the privilege review (*Id.* at 32-33). But Fontainebleau did not know how much a privilege review of the email server would cost (*Id.* at p. 37).

Fontainebleau then advised the Court that it would take less than a day to review the email server for privilege once it came up with a list of privilege search terms--a list primarily consisting of the names of lawyers and law firms (*Id.* at 37-40). Fontainebleau said it wanted to reach an agreement with the Term Lenders about the names on the list but conceded that *it* was supposed to carry the laboring oar and would therefore be responsible for creating the first draft of the list (*Id.* at 38-40). As of the October 18 hearing, however, Fontainebleau had not begun to prepare the list. It predicted it would take, at most, a day to prepare and circulate the draft of the privilege list (*Id.* at. 40).

I found that Fontainebleau was not in compliance with my order compelling production. I therefore extended, once again, FBR's production obligations until October 25 and November 5, and reserved ruling on the issue of monetary sanctions until the expiration of the new deadlines in order to see whether Fontainebleau complied with them (DE# 167). I further instructed the Term Lenders that they could file a "Notice of Non-Compliance" if Fontainebleau did not comply with the new Order.

Fontainebleau again did not comply with the new, Court-ordered discovery deadlines. Instead, similar to its eleventh-hour motion to quash filed in response to subpoenas from other banks, Fontainebleau filed a Friday afternoon motion, one business day before its production was due (under the already-extended Court-imposed deadlines), requesting the entry of a confidentiality order (DE# 173).[3] Now, half-a-year after being served with the subpoena, Fontainebleau sought relief because, it contended, it would be too onerous for it to conduct an adequate privilege review within the time period provided by the Court. The proposed order would have required the Term Lenders to produce back to Fontainebleau *all* of the documents which they decided to copy off the servers and to specifically pinpoint the privileged material that they found during their review. This request would have essentially forced the Term Lenders to conduct the

---

[3] This motion was filed on October 22, 2010, exactly six months after the initial subpoena was served.

8

privilege review on behalf of Fontainebleau and would potentially have revealed attorney work product by demonstrating which documents the Term Lenders' attorneys found important enough to copy. I therefore denied the last-minute motion (DE# 173).

But I did not leave FBR without recourse to protect potentially privileged materials. Instead, I provided that Fontainebleau could file a motion at a later date if it determined that it inadvertently produced privileged documents. I also ruled that Fontainebleau could file a verified motion requesting an enlargement of time to produce a privilege log. **To date, Fontainebleau has not availed itself of either option.**

Instead, Fontainebleau engaged in what the Term Lenders describe (not inaccurately) as a "document dump," *over*producing documents and data in response to the subpoena and court-ordered production. Fontainebleau simply handed over all three servers to the Term Lenders without conducting any meaningful relevancy review. Even though the parties had agreed on search terms for the email server, Fontainebleau ultimately produced a 126 gigabyte disk containing 700,000 emails. Fontainebleau also handed over the documents and accounts servers without conducting any review for responsive data. And Fontainebleau did not produce *any* privilege logs by the deadlines set forth in the October 18 Order. FBR did, however, belatedly produce a privilege log for the data on the email server after the expiration of the court-imposed deadline (though without requesting leave of the Court).

Fontainebleau did not file objections to my order denying its last-minute request, nor did it file a motion for a stay or otherwise seek to challenge my discovery rulings. Instead, it simply turned over the data from the three servers, recognizing that none of the data on the documents and accounting servers had been reviewed for privilege. In effect, Fontainebleau took the two servers, which it never reviewed for privilege or responsiveness, and said to the Term Lenders "here, you go figure it out." And, although FBR reviewed the email server for privilege and withheld materials on it, Fontainebleau turned over the remaining balance of the email server to the Term Lenders with the same implicit message of "here's everything, search away"[4]

---

[4] The Term Lenders advised the Court in an affidavit that the documents server contains more than 20 million pages of audio files, emails, image files, database

The Term Lenders filed a notice of Fontainebleau's non-compliance, indicating that Fontainebleau did not search the email server with the agreed-upon terms, did not timely provide a privilege log for the email server and produced a documents server that contained every document in Fontainebleau's servers going back a decade. This document "dump" amounts to approximately 800 gigabytes of data and 600,000 documents (DE# 180). Fontainebleau responded that it spent $25,000 to search the email server with the terms requested by the Term Lenders and that its production did incorporate the search terms, enabling it to eliminate seventy-five percent of the documents on the email server. But Fontainebleau did not contest the fact that it turned over all the data on the other two servers without either a privilege review or a substantive review for responsiveness.

In response to Fontainebleau's non-compliance, the Term Lenders have now agreed to "eat" (their term) the cost of sorting through this massive amount of data for relevant documents if they have the ability to *use* the data produced. Indeed, the Term Lenders have abandoned their request for monetary sanctions. But the Term Lenders are not prepared to bear the burden of both paying to search for relevant documents and to risk adverse consequences if they encounter (and wish to use in litigation) what would normally be privileged documents and data (DE# 182).

The Term Lenders are understandably concerned that they may well encounter privileged information on Fontainebleau's servers because of the way that they were turned over (i.e., without having been previously reviewed for privileged information). The Term Lenders therefore seek clear direction from the Court that they may review and use all of the documents produced by Fontainebleau, free of any obligation to appraise Fontainebleau of those documents that may implicate a privilege or to return such documents to Fontainebleau. At the Court's suggestion, the Term Lenders filed this motion for determination of Fontainebleau's waiver of privilege (DE# 192).

Fontainebleau opposes the motion. Fontainebleau now argues that the original subpoena from April was unduly burdensome and expensive. Fontainebleau notes that it did not obtain a copy of the documents server until August and therefore argues that it

---

files, excel files, Power Point files, Microsoft Word files, text files and video files (DE# 192-1, at 2).

could not possibly cull through twenty million pages of documents for privilege review. Citing for the first time to Federal Rule of Civil Procedure 45, which requires that a party issuing a subpoena take reasonable steps to avoid imposing an undue burden or expense of the subpoena's subject, Fontainebleau argues that it has limited resources and no employees to conduct a document review. *See* FED. R. CIV. P. 45(c)(1). FBR claims that the expense "would have been incurred by the Term Lenders" under "normal circumstances and as Rule 45 mandates" (DE# 194, at 2).[5]

Fontainebleau also points to its status as a non-party to the litigation, but, as previously noted, it is the **parent** of the debtor and appears to be affiliated with other related entities. Fontainebleau argues that the Court should not find a waiver and blames the Term Lenders for "creat[ing] this predicament by causing FBR to incur an undue burden and expense in responding to their subpoena and corresponding Court orders." Fontainebleau does not say why it waited six months to first request that the Term Lender pay the costs associated with the privilege review. Likewise, FBR does not explain why it never filed a motion to quash or a motion for a protective order. Nor does FBR indicate why it never asserted the "normal circumstances" of Rule 45 before its December 13, 2010, memorandum, nor why it never filed objections to the discovery orders.

According to the affidavit of Term Lenders' counsel, which Fontainebleau has not challenged, other banks in the coordinated MDL proceedings received the *same document server* from Fontainebleau in response to their separate subpoenas (DE# 192-1).

As outlined above, Fontainebleau's primary objection to the banks' subpoenas and its principal, initial objection to the Term Lenders' subpoena was the shared nature of the servers and the need for "other entities" to review the material. Nevertheless, none of the other entities (which presumably had privileged material on the shared servers) lodged objections to my discovery orders or to Fontainebleau's decision to turn over two

---

[5] Fontainebleau first suggested that the Term Lenders assume the cost of the privilege review at the October 18, 2010 hearing, approximately six months after the subpoena was issued. When it did so, it was an informal, oral request, and no specific motion or memorandum urging this "normal circumstances" point had been filed before the hearing.

11

servers without conducting a privilege review. None of these other entities sought to intervene in the discovery dispute which presumably affected their privileged materials too, and none of them pursued objections to the district court or otherwise joined in Fontainebleau's opposition to the motion to determine waiver.[6]

Having decided to turn over two servers without even a cursory review for privilege, Fontainebleau seeks to avoid the consequences of its review-free production.[7]

## **THE DILEMMA**

Fontainebleau argues that there is no waiver even though the documents and data have already been produced and even though the presumably privileged information from two of the three servers is already in the Term Lenders' possession. The Term Lenders, on the other hand, are reluctant to begin a meaningful review of the documents and data produced to them without obtaining specific permission from the Court that they may do so, because they do not want to confront potential adverse consequences which might flow from their review of Fontainebleau's arguably privileged information.

But Fontainebleau has not provided a workable solution to this dilemma. True, it does not want the Court to find a waiver and does not want the Term Lenders to review privileged information. Yet Fontainebleau still does not pinpoint any particular document or data as privileged and does not suggested how the Term Lenders are supposed to review the information which has been, in effect, dumped in their collective lap, without encountering material which is (or may be) privileged.

Assuming that Fontainebleau's "there-was-no-waiver" theory is correct (which it is not, as explained below), the only conceivable methods available now to prevent the

---

[6] Under one recent appellate decision, one or more of these other entities may well have been permitted to immediately appeal, on an interlocutory basis, a district court ruling against privilege (had they chosen to intervene and object in the first place). *See U.S. v. Krane*, 625 F.3d 568, 572 (9th Cir. 2010) (discovery orders adverse to the attorney-client privilege are immediately appealable when the subject materials are sought from a disinterested third party because the third party presumably lacks a sufficient stake and would likely produce the documents rather than submit to a contempt citation). *But cf. Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct. 599 (2009) (privilege determinations adverse to a *litigant* not appealable under collateral order doctrine).

[7] "Actions have consequences [] first rule of life. And the second rule is this-- you are the only one responsible for your own actions." HOLLY LISLE, FIRE IN THE MIST 61 (1992).

Term Lenders from encountering privileged information during their review of the two servers is to direct the Term Lenders to *immediately* return the servers without reviewing any of the data on them or to instruct the Term Lenders to *completely refrain* from reviewing the information produced. Neither alternative is workable. Both alternatives unduly prejudice the Term Lenders. And they would both create additional, unacceptable delay.[8]

## ANALYSIS

In the Motion For Entry of Confidentiality Order that FBR filed on the Friday afternoon before its Court-ordered production was due the following Monday, Fontainebleau represented that it would "not have an opportunity to inspect them [the three servers] *all* prior to production on October 25, 2010" (DE# 171, at 2) (emphasis added). But it appears as though Fontainebleau never reviewed *anything* on the documents or accounting servers for privilege before producing the servers. Thus, the more accurate statement would have been that Fontainebleau chose to not review *any* documents or data on the accounting and document servers, for privilege or otherwise.

In fact, Fontainebleau has not pinpointed even one document on the servers it belatedly produced which it contends is privileged. And it has not taken advantage of the opportunity to advise the court of any inadvertently produced privileged material. Fontainbleau seems to believe that the two servers must surely contain *some* type of privileged information but it has not provided even *any* specific illustration. It has not designated even one piece of paper as privileged on either the accounting or the documents server. FBR has also not advised the Court whether it engaged in a sampling technique to see whether privileged information could be found on the servers, nor has it demonstrated that the materials on servers available to multiple parties had not *already* lost their privilege by vitue of the access provided to other third parties.

Ironically, it is the *Term Lenders* who have provided the Court with additional information about whether the servers contain privileged information. Specifically, the Term Lenders, in their Motion for Determination of Waiver of Privilege (DE# 192), explain that the electronic index reveals that more than 18,000 documents contain the

---

[8] At the October 18 hearing, the Term Lenders advised the Court that April 2011 is the discovery cutoff and that "many" depositions will be taken (DE# 195, at 55).

term *legal* in either their file location or name and that more than 5,000 documents are in the folder of Fontainebleau's former general counsel. But Fontainebleau, the party seeking to protect presumably privileged information and to prevent a finding of waiver, has not proffered any information whatsoever about the specific contents of the servers it produced.

The attorney-client "privilege is not a favored evidentiary concept in the law since it serves to obscure the truth, and it should be construed as narrowly as is consistent with its purpose." *United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987). As the party seeking to assert privilege over still-not-designated materials on the two servers, Fontainebleau has the burden of proving the applicability of the attorney-client privilege. *Weil v. Investment/Indicators, Research & Mgmt., Inc.,* 647 F.2d 18, 25 (9th Cir. 1981). Because the burden is on the proponent of the privilege, a trial court may not properly shift the burden to the opponent. *Hawkins v.* Stables, 148 F.3d 379, 381, 384 (4th Cir. 1998) (trial court incorrectly assumed the privilege applied and shifted the burden of proof to the opponent of the privilege).

In determining whether a waiver has occurred, the Court applies the well-settled principle that *any* disclosure inconsistent with maintaining the confidential nature of the attorney-client privilege, including voluntary disclosure of privileged information, waives the privilege. *Suarez*, 820 F.2d at 1160; *see also In re Keeper of the Records*, 348 F.3d 16, 22 (1st Cir. 2003) ("When otherwise privileged communications are disclosed to a third party, the disclosure destroys the confidentiality upon which the privilege is premised.") (citing 2 PAUL R. RICE, ATTORNEY-CLIENT PRIVILEGE IN THE U.S. § 9:79, at 357 (2d ed. 1999)); *United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir. 1976) ("It is vital to a claim of privilege that the communication have been made *and maintained* in confidence.") (emphasis added). It also well-established that, "once waived, the attorney-client privilege cannot be reasserted." *Id.* (citing *United States v. Blackburn*, 446 F.2d 1089, 1091 (5th Cir. 1971)).

Although Fontainebleau produced the data and documents in response to a subpoena and court orders compelling production, its production was still "voluntary" because it chose to produce its entire documents and accounting servers without conducting a privilege review. But in order to preserve a privilege claim, a party "must

conduct a privilege review prior to document production." *Ciba-Geigy Corp. v. Sandoz Ltd.*, 916 F.Supp. 404, 412 (D.N.J. 1995); *see also United States Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 630 Supp. 2d 1332 (M.D. Fla. 2007) (privilege waived where attorney who sent out the production never reviewed the documents); *SEC v. Cassano*, 189 F.R.D. 83, 86 (S.D.N.Y. 1999) (attorney-client privilege waived where party makes a deliberate decision to produce without looking at the material produced beforehand).

Fontainebleau concedes that it never reviewed the materials on the document and accounting servers for privilege before turning them over. Fontainebleau's failure to conduct any meaningful privilege review prior to production accordingly resulted in a complete waiver of applicable privileges. FBR's production is also inconsistent with the notion that the effort necessary to avoid inadvertent disclosure must increase as the volume of documents increases. *New Bank of New England v. Marine Midland Realty Corp.*, 138 F.R.D. 479, 483 (E.D. Va. 1991).

Even now, when contesting the requested finding of waiver, Fontainebleau fails to pinpoint any particular document or file as privileged. It simply asks the Court to *assume* that privileged material will be found on the servers.[9] This is insufficient to prevent a finder that FBR waived the privilege. *Cf. United Nuclear Corp. v. Gen. Atomic Co.*, 629 P.2d 231, 293 (N.M. 1980) ("The bald assertion that production of the requested information would violate a privilege . . . is not enough. The party resisting discovery has the burden to clarify and explain its objections and to provide support therefore. General objections without specific support may result in waiver of the objections.") (quotations omitted).

Moreover, "voluntary compliance with a subpoena without fully exhausting attempts to defeat the subpoena or to pursue privilege claims vigorously, will generally be deemed a waiver of any privilege or work-product protection." THE ATTORNEY-

---

[9] Had Fontainebleau wished to withhold certain documents and data on the document and accounting servers on the basis or privilege, Local Rule 26.1(g)(3)(C) requires, subject to an inapplicable exception, "preparation of a privilege log with respect to all documents, electronically stored information, things and oral communications withheld on the basis of a claim of privilege or work product protection." At risk of stating the obvious, Fontainebleau never distributed a privilege log for the two remaining servers because it never reviewed the information for privilege in the first place.

15

CLIENT PRIVILEGE AND THE WORK PRODUCT DOCTRINE 62 (Edna Selan Epstein ed., 4th ed. supp. 2004); *see, e.g.*, *United States v. Philip Morris, Inc.*, No. 99-2496, 2002 U.S. Dist. LEXIS 9174 (D.D.C. May 17, 2002) (producing documents in response to a House Commerce Committee subpoena without a privilege log and without greater efforts to protect the privilege generated a waiver, and noting that the producing party should have first, at the very least, sought a ruling from the entire committee about the privilege not being recognized).

Some court have also held that to prevent a waiver the party asserting privilege must not only resist any attempt to produce privileged documents, but must generally utilize all available options to the fullest possible extent. *Anaya v. CBS Broad., Inc.,* No. CIV-06-476, 2007 U.S. Dist. LEXIS 55164 (D.N.M. Apr. 30, 2007) (involving waiver based on documents produced to Congress); *Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F. Supp. 2d 70, 77-78 (N.D.N.Y. 2000) (same).

Here, Fontainebleau hardly exhausted its privilege objections. To the contrary, FBR (1) did not even start reviewing any of its three servers for privilege until six months after the subpoena was issued, (2) belatedly and casually proffered a cost-shifting request, (3) produced two of the three servers without *any privilege review whatsoever* and (4) more than two months after production, has not flagged *even one* document as actually being privileged.

Given the delay in production, the changing explanations for the delay, the failure to timely file a motion for a protective order, the multi-month stalling of depositions caused by FBR's tardy production, the belated and informal suggestion that the Term Lenders should pay for the privilege review, and the continued failure to establish that the servers in fact contain privileged material which was not previously waived through the sharing of servers by different entities, Fontainebleau's argument against waiver is "too little, too late."[10] The privilege has been waived.[11]

---

[10] A well-known idiom meaning "inadequate as a remedy and not in time to be effective," as in "the effort to divert the stream into a corn field was too little too late [because] the houses were already flooded" Too little, too late, - Define Too little, too late, http://dictionary.reference.com/browse/too+little,+too+late (last visited Jan. 7, 2010).

16

But notwithstanding FBR's clear waiver of any applicable privileges, the Court will provide some limited relief for Fontainebleau:

First, the Court cannot force the Term Lenders to review the material produced, nor will it direct the Term Lenders on which search protocols to use should they decide to wade into the massive amount of material produced by Fontainebleau.

However, *if* the Term Lenders decide to move forward on a review of the servers, and *if* they encounter ***facially privileged information*** on the documents or accounting servers, they shall timely advise Fontainebleau by identifying, in summary fashion, the privileged information.  If the documents and data are Bates-stamped or otherwise similarly designated, then the Term Lenders shall use those identifying criteria.  If the materials are not so designated, then the Term Lenders shall, in good faith, provide a description which does not require undue effort, such as simply stating the file location or name.  Because the Court has not reviewed the indices, I do not know what type of summary description would be feasible and reasonable under the circumstances (in the absence of a document identification system such as Bates-stamping).  Therefore, I am not requiring that any particular type of description be used, and my use of "file location or name" is merely an illustration, not a requirement.

Because I am ruling that the Term Lenders may review all documents and data on the servers produced by Fontainebleau (even if they turn out to contain privileged information), the Term Lenders should not be unduly prejudiced by the requirement that they timely advise Fontainebleau of the clearly privileged materials that they encounter in their review.  The Term Lenders may provide notice in a summary fashion and may postpone notice until they determine that a logical group of materials should be listed in a notice.  In other words, the Term Lenders are not obligated to provide notice on a continuing, constantly-updating, immediate basis, every time they locate one clearly privileged document.

Thus, to provide one illustration, it might make sense for the Term Lenders to provide notice on a weekly or monthly basis (or some other logical period), rather than on

---

[11] The Term Lenders have advised the Court that FBR's failure to timely produce documents in response to the subpoena has caused a deposition discovery delay lasting "months" (DE# 192, at 3).  Fontainebleau has not contested this representation.

17

an hourly basis. Because Fontainebleau has not explained how many documents it believes are privileged or the files where they might be found, I do not know when or under what circumstances the Term Lenders might locate documents which are facially privileged. Therefore, it is impractical for me to impose a specific schedule for the Term Lenders to provide the notice that I am requiring here.

Likewise, because I cannot predict the content of the servers or the type of search that the Term Lenders may conduct, I do not know for certain what it will take for the Term Lenders to provide the notice. If it turns out that the Term Lenders conclude that it is unduly burdensome to comply with my notice requirement, then they may file an appropriate motion and I will consider rescinding or modifying this requirement. If the Term Lenders file such a motion, then it should be verified or accompanied by an affidavit.

By requiring the Term Lenders to provide a list of privileged information found on the document and accounting servers, I am not restricting the Term Lenders' ability to use those documents. Rather, the Term Lenders are permitted to use the documents during pre-trial preparations in this case, including depositions. Issues of trial admissibility, however, are not encompassed by this Order.

## **CONCLUSION**

I find that Fontainebleau's voluntary disclosure of privileged or potentially privileged information constitutes a waiver of applicable privileges, including any attorney-client privilege, in the documents and data on the documents and accounting servers. Because Fontainebleau prepared a privilege log for the email server, I do not find a privilege waiver for the material on the email server (unless such materials can also be found on one of the other two servers, where there has been a waiver).

The Term Lenders motion for adjudication that the privilege has been waived is therefore GRANTED, subject to the additional procedures for notice outlined in this Order. The Term Lenders, however, are under **no** obligation to screen for privileged documents apart from their ordinary review or conduct any special investigation to determine that a specific document would have been privileged but for FBR's waiver. Moreover, as stated above, the Term Lenders may use all documents and data on the two servers in this case.

In addition, given the magnitude of Fontainebleau's production, it is entirely possible that the Term Lenders might in good faith fail to notice that a document they reviewed was otherwise privileged (i.e., before FBR's waiver). Because the Term Lenders are not to blame for the overproduction of material and because the notice requirement is designed to help *Fontainebleau*, the Term Lenders will not be subject to sanctions or other adverse consequences should they inadvertently omit privileged material from the list or lists they provide to Fontainebleau.

DONE AND ORDERED, in Chambers, at Miami, Florida, January 7, 2011.

_____
Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
All counsel of record