**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO 09-MD-02106-CIV-GOLD/GOODMAN**

**IN RE: FONTAINEBLEAU LAS VEGAS**
**CONTRACT LITIGATION**

**MDL No. 2106**

*This document applies to:*

*Case No. 09-CV-23835 ASG.*

_____/


**MDL ORDER NUMBER 62;**
**OMNIBUS ORDER GRANTING BANK OF AMERICA'S MOTION FOR SUMMARY**
**JUDGMENT [ECF No. 255] AND DENYING TERM LENDERS' MOTION FOR**
**PARTIAL SUMMARY JUDGMENT [ECF No. 258]; CLOSING CASE**

This Cause is before the Court upon Bank of America's Motion for Summary Judgment [ECF No. 255] and Plaintiffs' Motion for Partial Summary Judgment [ECF No. 258]. I held oral argument on the Motions on November 18, 2011. While the matters involved in the remainder of this case appear complex because of the parties' cross-motions for summary judgment, in essence, based on the material facts not genuinely in dispute, the legal issues are straightforward. Even assuming all inferences in favor of the non-moving parties, Bank of America, acting as Disbursement Agent and Bank Agent under the Disbursement Agreement, did not breach the Disbursement Agreement, nor did it exercise its duties and responsibilities under the Disbursement Agent and Credit Agreement in a grossly negligent manner under New York law. The Term Lender Plaintiffs have not established otherwise. Accordingly, I grant summary judgment in favor of Defendant Bank of America.

## I.    Procedural History

This multi-district litigation ("MDL") arises out of alleged breaches of various agreements for loans to construct and develop a casino resort in Las Vegas, Nevada. On December 3, 2009, this MDL was transferred to me by order of the United States Judicial Panel on Multidistrict Litigation [ECF No. 1].[1]  Pursuant to the Panel's transfer order (and subsequent related orders, *e.g.* [ECF No. 21]), pending before me are (1) *Fontainebleau Las Vegas, LLC v. Bank of America, N.A.*, *et al.*, Case No. 09-cv-21879 (S.D. Fla.) (the "Fontainebleau Action"), (2) *Avenue CLO Fund, Ltd., et al. v. Bank of America, et al.*, Case No. 09-cv-1047 (D. Nev.) (the "Avenue Action"),[2] and (3) *ACP Master, LTD, et al. v. Bank of America, et al*, Case No. 09-cv-8064 (S.D.N.Y) (the "Aurelius Action").[3]  I discuss the procedural history of each action in turn.

### A.    The Fontainebleau Action

On June 9, 2009, Fontainebleau Las Vegas, LLC ("Fontainebleau") filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Southern District of Florida.  That same day, Fontainebleau commenced an adversary proceeding against a group of banks.  Fontainebleau is the owner and developer of a casino resort in Las Vegas (the "Project").  On June 6, 2007, Fontainebleau entered into a Credit Agreement and Disbursement Agreement with a syndicate of lenders for the

---

[1] All references to the docket refer to Case No. 09-MD-02106, unless otherwise indicated.

[2] Upon transfer to the Southern District of Florida, the Avenue Action was assigned Case No. 09-23835.

[3] Upon transfer to the Southern District of Florida, the Aurelius Action was assigned Case No. 10-20236.

development of the Project.  Under the Credit Agreement, the lenders agreed to loan $1.85 billion under three senior secured credit facilities: the Term Loan, the Delay Draw Term Loan, and the Revolver facilities.  Defendants in the adversary proceeding and the Fontainebleau Action are the banks that agreed to lend money under the Revolver facility (the "Revolver Banks").  Fontainebleau alleged, *inter alia*, these Revolver Banks breached the Credit Agreement for failing to fund the revolving loans in March 2009. [Bankruptcy Case No. 09-01621-AJC, ECF No. 5, Amended Complaint].

On June 10, 2009, Fontainebleau filed a Motion for Partial Summary Judgment on Liability with Respect to the March 2 Notice of Borrowing in the adversary proceeding.  Fontainebleau argued the Revolver Banks breached the Credit Agreement by refusing to process the March 2 notice of borrowing (the "March 2 Notice"), which requested revolving loans in excess of $150 million, on the basis that the Total Delay Draw Commitments were not "fully drawn" as required by the terms of section 2.1(c)(iii) of the Credit Agreement.  Fontainebleau argued that the March 2 Notice, which, in addition to revolving loans, requested all funds available under the Delay Draw Term Loan facility, satisfied the "fully drawn" requirement because the Delay Draw Term Loans had been *fully requested* by the time the revolving loans in excess of $150 million were sought.  The Revolver Banks moved to withdraw the reference on July 7, 2009 [Case No. 09-21879, ECF No. 1], and I granted the Motion for Withdrawal of Reference on August 5, 2009 [Case No. 09-21879, ECF No. 23].

On August 26, 2009, I denied Fontainebleau's Motion for Partial Summary Judgment [Case No. 09-21879, ECF No. 62], concluding that (1) the Credit Agreement's (Section 2.1(c)(iii)) requirement that the Total Delay Draw Commitments be "fully drawn"

before disbursement means the Commitments must be "fully funded"; (2) even if this legal conclusion is erroneous, Plaintiff's interpretation of "fully drawn" is reasonable but not conclusive, resulting in an ambiguity that precludes summary judgment; and (3) even if Plaintiff's interpretation of the term "fully drawn" is correct, Fontainebleau's default entitled the Revolver Banks to reject the March 2 Notice.

On September 20, 2010, upon uncontested request of the Trustee, I entered a Final Judgment [Case No. 09-21879, ECF No. 138], dismissing the Fontainebleau Action with prejudice for purposes of facilitating an appeal from my August 26, 2009 Order denying Fontainebleau's Motion for Partial Summary Judgment.  Accordingly, the August 26, 2009 Order is on appeal, and no other matters are pending before me in the Fontainebleau Action.

### B.    The Avenue and Aurelius Actions

The Avenue Action was originally filed in the District Court of Nevada, and was transferred to the Southern District of Florida on December 28, 2009.  [Case No. 09-23835, ECF No. 77].  On January 15, 2010, the Avenue Plaintiffs, each of which is a term lender under the Credit Agreement, filed a Second Amended Complaint (the "Avenue Complaint") [ECF No. 15] against various revolver lenders pursuant to the Credit Agreement, as well as against Bank of America in its capacities as Administrative Agent under the Credit Agreement and as Disbursement Agent under the Disbursement Agreement.   The Avenue Complaint pled the following: Count I - breach of Disbursement Agreement against Bank of America; Count II - breach of the Credit Agreement against all defendants; Count III - breach of the implied duty of good faith and fair dealing against Bank of America; Count IV – breach of the implied duty of good faith and fair dealing against all defendants; Count V – declaratory relief against Bank of

America; and Count VI – declaratory relief against all defendants.  With respect to the counts against the revolver lenders, the Avenue Plaintiffs alleged the revolver lenders should have funded the March 2009 Notices of Borrowing.

The Aurelius Action was originally filed in the Southern District of New York and was transferred to the Southern District of Florida on January 26, 2010.  [Case No. 10-20236, ECF No. 29].  On January 19, 2010, the Aurelius Plaintiffs (together with the Avenue Plaintiffs, the "Term Lenders" or the "Term Lender Plaintiffs"), each of which is a successor-in-interest to a term lender under the Credit Agreement, filed an Amended Complaint (the "Aurelius Complaint") [Case No. 10-20236, ECF No. 27] against various lenders under the Revolving Loan (together with the defendants in the Avenue Action, the "Revolving Lenders" or the "Revolving Lender Defendants"), including Bank of America, under the Credit Agreement.   The Aurelius Complaint pleads the following: Counts I and II - breach of the Credit Agreement against all defendants; and Count III – breach of the Disbursement Agreement against Bank of America.  With respect to the claims against the Revolving Lenders, the Aurelius Plaintiffs argued the Revolving Lenders should have funded the March 2, March 3, and April 21 Notices of Borrowing.

On May 28, 2010, reasoning that the Term Lender Plaintiffs lack standing to pursue claims based on the alleged breaches of the Credit Agreement, I dismissed with prejudice the Term Lenders' claims relating to breach of the Credit Agreement (Count II of the Avenue Complaint and Counts I and II of the Aurelius Complaint).  I further concluded the Term Lenders' claim against Bank of America for breach of the implied covenant of good faith and fair dealing (Count III of the Avenue Complaint) was precluded by their claims for breach of the Disbursement Agreement because the

damages sought in the implied covenant claim were intrinsically tied to those sought in the breach of contract claim.  I dismissed the claim for breach of the implied covenant of good faith and fair dealing accordingly.   I also dismissed the claim against all defendants for breach of the implied covenant of good faith and fair dealing in connection with the Credit Agreement (Count VI of the Avenue Complaint) as moot because the claim sought to impose an obligation that was inconsistent with the terms of the Credit Agreement.  [Amended MDL Order No. 18].  In short, I dismissed all of the Term Lenders' claims against the Revolving Lender Defendants.

On January 18, 2011, I granted the Term Lenders' Joint Motion for Partial Final Judgment, entering partial final judgment pursuant to Federal Rule of Civil Procedure 54(b) so the Term Lenders could seek an appeal of their claims against the Revolving Lender Defendants at the same time as the Trustee's appeal in the Fontainebleau action.  [MDL Order Number 44, ECF No. 201].  Final judgment was therefore entered against the Term Lenders on Counts II, III, and IV of the Avenue Action, and Counts I and II of the Aurelius Action.  [ECF No. 202].  The dismissal of the Term Lenders' claims against the Revolving Lender Defendants is on appeal.  [ECF No. 203, 208].

On April 19, 2011, upon agreement and stipulation by the Avenue and Aurelius Plaintiffs and Bank of America, I dismissed without prejudice Count III of the Aurelius Action.  [MDL Order Number 47, ECF No. 238].  (The Avenue Plaintiffs had purchased the Term Notes previously held by the Aurelius Plaintiffs, and sought to pursue a single action on the Notes they owned.  [ECF No. 212].).  *See also* 11/18/2011 Oral Argument Transcript ("11/18/2011 Tr.") [ECF No. 335] 97:19–98:3.

Therefore, the only claims outstanding are the Term Lenders' claims against Bank of America for breach of the Disbursement Agreement (Count I of the Avenue Action), and the related request for declaratory relief (Count V of the Avenue Action). The Term Lenders allege Bank of America breached its obligations as Bank Agent and Disbursement Agent under the Disbursement Agreement between September 2008 and March 2009 by improperly approving advance requests that failed to meet one or more of the conditions precedent under Section 3.3 of the Disbursement Agreement, improperly issuing Advance Confirmation Notices, improperly failing to issue Stop Funding Notices, and improperly disbursing funds from the Bank Proceeds Account. [ECF No. 15, Count I]. These claims and Bank of America's breach of the Disbursement Agreement are the subject of the parties' summary judgment motions.

## II.     Summary Judgment Motions: The Parties' Positions and Relief Sought

On August 5, 2011, the Term Lender Plaintiffs and Bank of America filed cross-motions for summary judgment and accompanying memoranda of law.  [ECF Nos. 255 ("BofA Memo."), 258 ("TL Memo.")], and subsequently filed related opposition and reply memoranda [ECF No. 269 ("BofA Opp. Memo."), ECF No. 275 ("TL Opp. Memo."), ECF No. 290 ("BofA Reply Memo."), ECF No. 297 ("TL Reply Memo.").  The Term Lenders seek partial summary judgment that Bank of America wrongfully and with gross negligence breached its obligations as Disbursement Agent and Bank Agent under the Disbursement Agreement because Bank of America disbursed funds knowing that Lehman Brothers Holdings, Inc. ("Lehman") had declared bankruptcy, and the bankruptcy and subsequent related events caused multiple conditions precedent to disbursement to fail.  Bank of America, on the other hand, argues that it is entitled to summary judgment dismissing the Term Lenders' breach of contract claim because the

undisputed facts demonstrate that Bank of America performed its duties under the Disbursement Agreement by approving and funding Fontainebleau Advance Requests only after receiving the required certifications, had no duty to investigate the representations in these certifications, and was not grossly negligent.  Bank of America further argues it did not have actual knowledge of the failure of any conditions precedent to disbursement.

I have considered the parties' positions, and after careful review of the pleadings, the case file, and the relevant law, I grant summary judgment in favor of Bank of America for the reasons discussed below.

## III.    Undisputed Facts

Pursuant to Southern District of Florida Local Rule 7.5,[4] the parties filed Statements of Undisputed Material Facts [ECF Nos. 256 ("BofA Statement"), 315 ("TL Statement")] and associated exhibits in support of their respective Motions for Summary Judgment.  The parties filed responses and replies, including additional material facts ("AMA") and associated exhibits, to the Statements of Undisputed Material Facts [ECF Nos. 324 ("BofA Response"; "BofA Response AMA"), 316 ("TL Response"; "TL Response AMA"), 323 ("BofA Reply"; "BofA Reply AMA"), 317 ("TL Reply"; "TL Reply AMA")].  Upon review of the record, including the exhibits submitted, I conclude that the following material facts are undisputed and supported by evidence in the record.

---

[4] In the Southern District of Florida, a party moving for summary judgment must submit a statement of undisputed facts.  *See* S.D. Fla. L.R. 7.5.  If necessary, the non-moving party may file a concise statement of the material facts as to which it is contended there exists a genuine issue to be tried.  *Id.*  Each disputed and undisputed fact must be supported by specific evidence in the record, such as depositions, answers to interrogatories, admissions, or affidavits on file with the Court.  *Id.*  All facts set forth in the movant's statement which are supported by evidence in the record are deemed admitted unless controverted by the non-moving party.  *Id.*

### A.    The Project and the Parties

The Fontainebleau Las Vegas is a partially-completed resort and casino development in Las Vegas (previously defined as the "Project").  (BofA Statement ¶ 8).[5] To finance the Project, Fontainebleau Las Vegas, LLC and Fontainebleau Las Vegas II, LLC (collectively, the "Borrowers" or "Fontainebleau") entered into various financing agreements, including the Master Disbursement Agreement ("Disbursement Agreement"), Credit Agreement, and Retail Agreement, each of which is discussed in more detail below.  (*Id.* ¶¶ 15–16, 22).  The Project's developer was the Borrowers' parent, Fontainebleau Resorts, LLC ("Fontainebleau Resorts" or "FBR").  (*Id.* ¶ 9).  Jeff Soffer was the Chairman of Fontainebleau Resorts, Glenn Schaeffer was the CEO, and Jim Freeman was Senior Vice President and Chief Financial Officer.  (Freeman Dep. 12:10–14; 13:20–24).  Turnberry West Construction ("TWC"), a member of the Turnberry group of companies, was the Project's general contractor.  (BofA Statement ¶ 12).

Bank of America, a nationally chartered bank, held various roles under the financing agreements.  (BofA Response AMA ¶ 1).  It acted as Administrative Agent under the Credit Agreement for the Senior Secured Facility Lenders and Disbursement Agent under the Disbursement Agreement, and was also a lender under the Credit Agreement.  (BofA Statement ¶¶ 2–4; BofA Response AMA ¶ 1).  Bank of America's activities as Administrative and Disbursement Agents for the Project were managed by the same individuals within its Corporate Debt Products Group.  (TL Response AMA ¶

---

[5] Where the fact is not in dispute, I cite only to the statements of material facts, responses, or replies.  Where the fact is in dispute, I cite to the underlying record.

9; 11/18/2011 Tr. 26:23-27:1).  These activities included approving Advance Requests, disbursing funds to Borrowers, and deciding what information to disseminate to lenders. (BofA Response ¶ 9; TL Reply ¶ 9).

Jeff Susman was the Senior Vice President of Corporate Debt Products and had primary management responsibility for Bank of America's agency activities relating to the Project until his departure from Bank of America in February 2009.  (BofA Response ¶ 10; TL Reply ¶ 10; TL Response AMA ¶ 15).  Jean Brown reported to the Corporate Debt Products group and was the lead contact with TriMont Real Estate Advisors, the Servicer of the Retail Facility.  (TL Response AMA ¶10; Rafeedie Dep. Tr. 33:2–23). David Howard was the Managing Director of Syndications of Bank of America Securities until March 31, 2009, and Brett Yunker was the Vice President of the Global Gaming Team at Bank of America Securities.  (TL Response AMA ¶¶ 13–14; BofA Reply AMA ¶¶ 13–14).

Finally, the Term Lender Plaintiffs are a group of sophisticated financial institutions who were lenders—or in many cases, successors-in-interest to lenders—to Fontainebleau under the Credit Agreement.[6]  (BofA Statement ¶ 5; Aurelius Compl.; Avenue Compl.).

B.     The Project's Financing

The Project's initial budget was $2.9 billion, which included approximately $1.7 billion of hard construction costs.   (BofA Statement ¶ 14).  The Project was financed through a combination of debt and equity capital.  The largest financing component for

---

[6] The Term Lenders do not dispute this fact; rather, they contend it is immaterial and irrelevant. (TL Response at 1).

the Project's resort component was a $1.85 billion senior secured debt facility ("Senior Credit Facility"), created by the Credit Agreement.  (*Id.* ¶¶ 15, 17).  The Senior Credit Facility comprised three senior secured loans: (1) a $700 million term loan (the "Initial Term Loan"); (2) a $350 million delay draw term loan (the "Delay Draw Term Loan"); and (3) an $800 million revolving loan (the "Revolver Loan").  (*Id.* ¶ 17).  The Term Lender Plaintiffs own Initial Term Loan and Delay Draw Term Loan notes, and Bank of America was a Revolver Loan lender.  (*Id.* ¶¶ 4, 18).[7]  Additional financing sources for the Project included equity contributions by Fontainebleau and its affiliates, $675 million in Second Mortgage Notes, and a $315 million loan earmarked for the Project's retail space (the "Retail Facility").  (*Id.* ¶ 16).

Pursuant to the agreements governing the various financing sources, Fontainebleau gained access to the financing through a two-step borrowing process. The first step required Fontainebleau to submit to the Administrative Agent a Notice of Borrowing specifying the amount and type of loan to be borrowed and the requested borrowing date.  The Administrative Agent would then notify the lenders of the Notice of Borrowing, and the Lenders would remit funds to the Administrative Agent who, upon satisfaction of certain conditions precedent, would transfer the funds into a Bank Proceeds Account.  (Dep. Exhs. 808 ¶ 6, 1501).  Fontainebleau could not access money in the Bank Proceeds Account; rather, the second step required Fontainebleau to submit an Advance Request to Bank of America as Disbursement Agent under the Disbursement Agreement, a process described in more detail below.  (TL Statement ¶¶

---

[7] The Term Lenders do not dispute this fact; rather, they only contend that it is immaterial and irrelevant.  (TL Response at 1).

14–15; Dep. Exh. 808 ¶ 7).  The $700 Initial Term Loan was funded into the Bank Proceeds Account upon closing of the Credit Agreement in June 2007, and the majority of the $350 million Delay Draw Term Loan was funded into the Bank Proceeds Account in early March 2009.  (Dep. Exh. 644; TL Statement ¶ 13).

### C.   The Retail Facility, Retail Agreement, and Shared Costs

The Project's retail space was to be developed by Fontainebleau Las Vegas Retail, LLC (the "Retail Affiliate"), an FBR subsidiary.  (BofA Statement ¶ 19).  Although the Senior Credit Facility and the Retail Facility were separate lending facilities, the resort budget included $83 million in costs that were to be funded through the Retail Facility ("Shared Costs").   (*Id.* ¶ 24).   These Shared Costs were used to fund construction of portions of the Project's retail space that were structurally inseparable from the resort. (*Id.* ¶ 25).   The Retail Facility was critical to the completion of the Project.  (TL Response AMA ¶ 26).

The Retail Facility was subject to a June 6, 2007 agreement (previously referred to as the "Retail Agreement") between the Retail Affiliate and Lehman Brothers Holdings, Inc. ("Lehman"), which signed the agreement as a lender and as the agent for one or more of the co-lenders.  (BofA Statement ¶¶ 22, 26).  Bank of America was not a Lender under the Retail Agreement or otherwise party to it, but did receive a copy of the Agreement.  (Retail Agreement ("Retail Agmt."); TL Response AMA ¶ 8).  The Retail Agreement permitted Lehman to syndicate some or all of the Retail Facility to other lenders.  (BofA Statement ¶ 27).  On September 24, 2007, pursuant to a Retail Co-Lending Agreement, Lehman syndicated select notes under the Retail Facility to National City Bank, Sumitomo Mitsui Banking Corp., and Union Labor Life Insurance Company ("ULLICO") (together with Lehman, "Retail Co-Lenders" or "Retail Lenders").

(BofA Response ¶ 30; Dep. Ex. 9, Retail Co-Lending Agreement ("Retail Co-Lending Agmt."). Post syndication, Lehman was the largest Retail Lender, responsible for $215 million, or 68.25% of the Retail Facility. (TL Response AMA ¶ 25; BofA Response ¶ 30).

The Retail Agreement further permitted Lehman to delegate any portion of its responsibilities under the Agreement to a servicer. (BofA Statement ¶ 31). Lehman designated TriMont Real Estate Advisors, Inc. ("TriMont") as the servicer for the Retail Facility, delegating the responsibility for collecting the Retail Co-Lenders' respective Shared Cost obligations in response to an Advance Request and transferring those funds to Bank of America, as Disbursement Agent under the Disbursement Agreement. (*Id.* ¶¶ 32–33).

Additionally, the Retail Agreement and Retail Co-Lending Agreement permitted the Retail Co-Lenders to "sell … any or any part of their right … Loan …to one or more additional lenders," and to make payments on behalf of a defaulting Co-Lender, subject to certain terms and conditions. (Retail Co-Lending Agmt. § 5.01(d); Retail Agmt. §§ 9.7.2.9(a) and (b)). Bank of America was not party to, and did not receive a copy of, the Retail Co-Lending Agreement. (Retail Co-Lending Agmt.; BofA Response AMA ¶ 25). To that end, Bank of America did not know the identity of the Retail Co-Lenders until late 2008. (BofA Response AMA ¶ 26; TL Reply AMA ¶ 26).

D.    **The Disbursement Agreement**

Fontainebleau's access to the construction financing was governed by the Disbursement Agreement, which contained a New York choice-of-law provision. (BofA Statement ¶ 34; Disbursement Agreement ("Disb. Agmt.") § 11.6). The Disbursement

13

Agreement contained an integration clause (Section 11.5, entitled "Entire Agreement") that permitted reference to select additional agreements:

> This Agreement and any agreement, document or instrument attached hereto or referred to herein integrate all the terms and conditions mentioned herein or incidental hereto and supersede all oral negotiations and prior writings in respect to the subject matter hereof, all of which negotiations and writings are deemed void and of no force and effect.

(Disb. Agmt. § 11.5).

As described above, the Credit and Disbursement Agreements established a two-step funding process for the Senior Credit Facility. To access funds from the Delay Draw Term Loan and Revolver Loan facilities, Fontainebleau would submit a Notice of Borrowing that, subject to certain procedures and conditions set forth in the Credit and Disbursement Agreements, would cause Lender funds to be transferred into the designated Bank Proceeds Account. (Credit Agmt. §§ 2.1(b), 2.1(c), 2.4; Disb. Agmt. § 2.1.2). Fontainebleau could not withdraw funds directly from the Bank Proceeds Account; rather, it was required to submit a monthly Advance Request, the form and contents of which were prescribed by the Disbursement Agreement. (BofA Statement ¶ 37).

## 1.      The Advance Request, Conditions Precedent, and the Funding Process

The Disbursement Agreement required that each Advance be requested "pursuant to an Advance Request substantially in the form of Exhibit C-1" and provided "[e]ach Advance Request shall be delivered to the Disbursement Agent … not later than the 11th day of each calendar month." (Disb. Agmt. § 2.4.1). Exhibit C-1, in turn, required Fontainebleau to "represent, warrant and certify" that "the conditions set forth in Section 3.3 … of the Disbursement Agreement are satisfied as of the Requested

Advance Date." (BofA Statement ¶ 37; Disb. Agmt. Exh. C-1 at 1, 8). Exhibit C-1 also outlined certain "General Representations" that overlapped with conditions set forth in Section 3.3. (Disb. Agmt. § 3.3, Exh. C-1 at 5–8).

Section 3.3, entitled "Conditions Precedent to Advances by Trustee and the Bank Agent," contained twenty-four separate conditions precedent. (BofA Statement ¶ 41; Disb. Agmt. § 3.3). These conditions precedent included the following:

- "Representations and Warranties. Each representation and warranty of … [e]ach Project Entity set forth in Article 4 … shall be true and correct in all material respects as if made on such date." (Disb. Agmt. § 3.3.2).

- "Default. No Default or Event of Default shall have occurred and be continuing." (*Id.* § 3.3.3). (Article 7, entitled "Events of Default," provided further information on Events of Default. (*Id.* Art. 7).)

- "Advance Request and Advance Confirmation Notice. … [The] Advance Request shall request an Advance in an amount sufficient to pay all amounts due and payable for work performed on the Project through the last day of the period covered by such Advance Request …." (*Id.* § 3.3.4).

- "Consultant Certificates and Reports. Delivery to each of the applicable Funding Agents and the Disbursement Agent of (a) the Constriction Consultant Advance Certificate approving the corresponding Advance Request, and (b) the Architect's Advance Certificate with respect to the Advance, and (c) the General Contractor's Advance Certificate with respect to the Advance." (*Id.* § 3.3.5).

- "In Balance Requirement. The Project Entitles shall have submitted an In Balance Report demonstrating that the In Balance Test is satisfied." (*Id.* § 3.3.8). (The In Balance Test was satisfied when the Available Funds equaled or exceeded the Project's Remaining Costs. (BofA Statement ¶ 41).)

- "Material Adverse Effect. Since the Closing Date, there shall not have occurred any change in the economics or feasibility of constructing and/or operating the Project, or in the financial condition, business or property of the Project Entities, any of which could reasonably be expected to have a Material Adverse Effect." (Disb. Agmt. § 3.3.11).

- "Plans and Specifications. In the case of each Advance from the Bank Proceeds Account … , the Construction Consultant shall to the extent set forth in the Construction Consultant Advance Certificate have approved all

Plans and Specifications which, as of the date of the relevant Advance Request, constitute Final Plans and Specifications to the extent not theretofore approved." (*Id.* § 3.3.19).

- "Adverse Information. In the case of each Advance from the Bank Proceeds Account … , the Bank Agent shall not have become aware after the date hereof of any information or other matter affecting any Loan Party, Turnberry Residential, the Project or the transactions contemplated hereby that taken as a whole is inconsistent in a material and adverse manner with the information or other matter disclosed to them concerning such Persons and the Project, taken as a whole." (*Id.* § 3.3.21).

- "Retail Advances. In the case of each Advance from the Bank Proceeds Account … , the Retail Agent and the Retail Lenders shall, on the date specified in the relevant Advance Request, make any Advances required of them pursuant to the Advance Request." (*Id.* § 3.3.23).

- "Other Documents. In the case of each Advance from the Bank Proceeds Account, the Bank Agent shall have received such other documents and evidence as are customary for transactions of this type as the Bank Agent may reasonably request in order to evidence the satisfaction of the other conditions set forth above." (*Id.* § 3.3.24).

Moreover, each Advance Request included certification from TWC, that, among other things, "[t]he Control Estimate … reflects the costs expected to be incurred by [TWC] to complete the remaining 'Work' … on the Project." (BofA Statement ¶ 44; Disb. Agmt. Exh. C-4 ¶ 4). TWC's certification further specified that the representations contained therein were "true and correct" and were "made for the benefit of the Disbursement Agent, the Funding Agents and the Lenders represented thereby, and may be relied upon for the purposes of making advances pursuant to the … Disbursement Agreement …." (Disb. Agmt. Exh. C-4 at 2). Also included with each Advance Request was certification from the Project's Architect that "[t]he construction performed on the Project … is in general accordance with the 'Drawings and Specifications.'" (*Id.* Exh. C-3).

After submission of an Advance Request, the Disbursement Agreement required Bank of America, as Disbursement Agent, and Inspection and Valuation International, Inc. ("IVI"), who was appointed as Construction Consultant under the Disbursement Agreement, to "review the Advance Request and attachments thereto and determine whether all required documentation has been provided, and [to] use commercially reasonable efforts to notify the Project Entities of any deficiency within three Banking Days ...."  (Disb. Agmt. § 2.4.4(a); BofA Statement ¶ 45).

The Disbursement Agreement further required IVI to deliver to the Disbursement Agent a "Construction Consultant Advance Certificate either approving or disapproving the Advance Request."  (Disb. Agmt. § 2.4.4(b); BofA Statement ¶ 47).  To fulfill these requirements, IVI performed monthly site visits, reviewed information disclosed by Fontainebleau at the site visits, and summarized its findings in Project Status Reports. (BofA Statement ¶ 46).  By signing the Construction Consultant Advance Certificate, IVI certified, based on its on-site observation of construction progress and its review of "the material and data made available" by the Borrowers, Contractor, and others; all relevant invoices, plans and specifications; and all previous Advance Requests, the following:

- "The Project Entities have properly substantiated, in all material respects, the Project Costs for which payment is requested in the Current Advance Request";

- "The Remaining Cost Report attached to the Current Advance Request accurately reflects, in all material aspects, the Remaining Costs required to achieve Final Completion";

- "The Unallocated Contingency Balance set forth in the Remaining Cost Report attached to the Current Advance Request is accurate and equals or exceeds the Required Minimum Contingency";

- "The Opening Date is likely to occur on or before the scheduled Opening Date set forth in the Current Advance Request and the Completion Date if likely to occur within 180 days thereafter";

- "The Advances requested in the Current Advance Request are, in our reasonable judgment, generally appropriate in light of the percentage of construction completed and the amount of Unincorporated Materials"; and

- "The undersigned has not discovered any material error in the matters set forth in the Current Advance Request or Current Supporting Certificates."

(Disb. Agmt. Exh. C-2).  The Disbursement Agent was tasked with using "reasonable diligence" to ensure IVI performed its review and delivered its Construction Consultant Advance Certificate "not less than three Banking Days prior to the Scheduled Advance Date."  (*Id.* § 2.4.4).   In sum, each Advance Request required (and contained) certification from Fontainebleau, TWC, and IVI that the applicable conditions precedent were satisfied.

Further, the Disbursement Agent was permitted to require Fontainebleau to submit a revised Advance Request if it found any "minor or purely mathematical errors." (*Id.*).  Independently, Fontainebleau could, with the approval of the Disbursement Agent and IVI, revise and resubmit its Advance Request if it "obtain[ed] additional information or documentation or discover[ed] any errors in or updates required to be made to any Advance Request prior to the Scheduled Advance Date."  (*Id.* § 2.4.5).   The Disbursement Agent was not obligated to accept any such updates, but was required to "consider their submission in good faith."  (*Id.*).

Once an Advance Request's applicable conditions precedent were satisfied, Bank of America (as Disbursement Agent) and Fontainebleau were required to execute an Advance Confirmation Notice.  (BofA Statement ¶ 51).  By executing the Advance Confirmation   Notice,   Fontainebleau   expressly   confirmed   "that   each   of   the

representations, warranties and certifications made in the Advance Request … are true and correct as of the Requested Advance Date and Disbursement Agent is entitled to rely on the foregoing in making the Advanced herein requested" and "that the [Advance Request] representations, warranties and certifications are correct as of the Requested Advance Date." (BofA Statement ¶ 52, Disb. Agmt. Exh. E).

The Notice "confirm[ed] the amount of the Advances to be made under the Financing Agreements" and "confirm[ed] the amount to be transferred into each Account." (Disb. Agmt. Exh. E). The Disbursement Agreement correspondingly provided, "each of the Funding Agents shall make the Advances contemplated by [the] Advance Confirmation Notice to the relevant Accounts" and "the Disbursement Agent shall make the resulting transfers amongst the Accounts described in the Advance Confirmation Notice." (*Id.* § 2.4.6). Thus, once an Advance Request's conditions precedent were satisfied and the Advance Confirmation Notice issued, Bank of America transferred the requested funds from the Bank Proceeds Account to select payment accounts for further distribution to Fontainebleau. (*Id.* § 2.4.6, Exh. E).

If, on the other hand, the Advance Request's conditions precedent were not satisfied, or the "Controlling Person notifies the Disbursement Agent that a Default or an Event of Default has occurred and is continuing," the Disbursement Agreement required the Disbursement Agent to issue a Stop Funding Notice. (BofA Statement ¶ 54, Disb. Agmt. § 2.5.1). (By virtue of its role as Bank Agent, as of September 2008, Bank of America was the Controlling Person under the Disbursement Agreement. (Disb. Agmt. Exh. A at 10; TL Statement ¶ 26; BofA Response ¶ 26).). A Stop Funding Notice relieved the Lenders of their obligation to fund loans under the Credit Agreement until

the circumstances giving rise to the Stop Funding Notice were resolved or the necessary parties waived the unsatisfied conditions precedent.  (BofA Statement ¶ 54, Disb. Agmt. § 2.5.2).   The Disbursement Agreement specifically provided "[t]he Disbursement Agent shall have no liability … arising from any Stop Funding Notice except to the extent arising out of gross negligence or willful misconduct of the Disbursement Agent."  (Disb. Agmt. § 2.5.1).

## 2.    Defaults and Events of Default

As noted above, one of the conditions precedent to an Advance Request was that "No Default or Event of Default shall have occurred and be continuing."  (Disb. Agmt. § 3.3.3).   "Default" was defined "as any events specific in Article 7" and "the occurrence of any 'Default' under any Facility Agreement," including the Credit Agreement and the Retail Agreement, and "Event of Default" was defined as having "the meaning given in Section 7.1."  (*Id.* Exh. A at 10, 12).  Per Article 7, entitled "Events of Default," the following constituted an "Event of Default":

- "Other Financing Documents.  The occurrence of an 'Event of Default' under and as defined by any one or more of the Facility Agreements …."  (*Id.* § 7.1.1).

- "Representations.  …  Any representation, warranty or certification confirmed or made by any of the Project Entities in this Agreement … (including any Advance Request … ) shall be found to have been incorrect when made or deemed to be made in any material respect."  (*Id.* § 7.1.3(c)).

The Credit Agreement outlined what constituted an "Event of Default" under the Credit Agreement in Section 8, entitled "Events of Default," and the Retail Agreement outlined what constituted an "Event of Default" under the Retail Agreement in Section 8.1, entitled "Event of Default."  (Credit Agreement ("Credit Agmt.") at 11, § 8; Retail Agmt. § 8.1).

Further, the Credit Agreement defined "Lender Default" as "the failure … of a Lender to make available … its portion of any Loan required to be made by such Lender hereunder," and "Defaulting Lender" as "any time … any Lender with respect to which a Lender Default is in effect." (Credit Agmt. 11, 25). However, Section 8 of the Credit Agreement did not include Lender Defaults or Defaulting Lenders as "Events of Default." (Credit Agmt. § 8). The Retail Agreement similarly defined "Lender Default" as "the failure … of a Lender or Co-Lender to make available its portion of any Loan when required to be made by it hereunder," and defined "Defaulting Lender" to include any Lender or Co-Lender that was the subject of bankruptcy, but neither Lender Default nor Defaulting Lender was explicitly included as an Event of Default under Section 8.1 of the Retail Agreement. (Retail Agmt. § 1 at 8, 15, § 8.1).

The Disbursement Agreement imposed on Fontainebleau an obligation "to provide to the Disbursement Agent, the Construction Consultant and the Funding Agents written notice of … [a]ny Default or Event of Default of which the Project Entities have knowledge …." and explicitly stated the Disbursement Agent had "no duty to inquire of any Person whether a Default or an Event of Default has occurred and is continuing;" (Disb. Agmt. §§ 5.4.1, 9.10). The Credit Agreement imposed on Fontainebleau and the Lenders the obligation to provide the Administrative Agent with notice of a default under the Credit Agreement. (Credit Agmt. § 9.3(c)). Neither the Disbursement nor the Credit Agreement imposed on the Disbursement Agent or the Bank Agent a duty to inquire as to the occurrence of a Default or an Event of Default. (Disb. Agmt. § 9.10; Credit Agmt. § 9.3(c)).

### 3.    Article 9: The Disbursement Agent

Article 9 of the Disbursement Agreement, entitled "The Disbursement Agent," set forth certain rights and responsibilities of the Disbursement Agent.  (Disb. Agmt. Art. 9). Section 9.1, entitled "Appointment and Acceptance," provided as follows: "The Disbursement Agent … agrees to exercise commercially reasonable efforts and utilize commercially prudent practices in the performance of its duties hereunder consistent with those of similar institutions holding collateral, administering construction loans and disbursing disbursement control funds."  (*Id.* § 9.1).[8]   Sections 9.2 ("Duties and Liabilities of the Disbursement Agent Generally) and 9.3 ("Particular Duties and Liabilities of the Disbursement Agent"), as indicated by their titles, set forth the duties and liabilities of the Disbursement Agent.

Section 9.2.3 prescribed the action to be taken by the Disbursement Agent should it be notified of an Event of Default or Default:

> Notice of Events of Default.  If the Disbursement Agent is notified that an Event of Default or a Default has occurred and is continuing, the Disbursement Agent shall … exercise such of the rights and powers vested in it by this [Disbursement] Agreement … and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the reasonable administration of its own affairs.

(*Id.* § 9.2.3).

In addition, Section 9.2.5, entitled "No Imputed Knowledge," explicitly provided that no knowledge may be imputed to Bank of America, as Disbursement Agent, from Bank of America in its other agency or lender functions:

---

[8] Section 9.1 referenced certain "Control Agreements."  (Disb. Agmt. § 9.1).  The parties agreed during oral argument that I need not consider the Control Agreements in evaluating Section 9.1 and the Disbursement Agreement.  (11/18/2011 Tr. 12:24–13:8).

> Notwithstanding anything to the contrary in this Agreement, the Disbursement Agent shall not be deemed to have knowledge of any fact known to it in any capacity other than the capacity of Disbursement Agent, or by reason of the fact that the Disbursement Agent is also a Funding Agent or Lender.

(*Id.* § 9.2.5). "Funding Agent" included Bank of America's role as Bank Agent under the Disbursement Agreement, and, in turn, Controlling Person under the Disbursement Agreement and Administrative Agent under the Credit Agreement. (*Id.* Exh. A at 3, 10, 14). Accordingly, Bank of America, as Disbursement Agent, had no imputed knowledge from Bank of America as Bank Agent or Administrative Agent.

Regarding the approval of Advance Requests, Section 9.3.2 expressly authorized the Disbursement Agent to rely on certifications from the Project Entities with respect to the conditions precedent of an Advance Request, and disavowed any duty on the part of the Disbursement Agent to investigate independently the veracity of the statements and information contained in the certifications:

> The Disbursement Agent may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval or other paper document believed by it on reasonable grounds to be genuine and to have been signed or presented by the proper party or parties. Notwithstanding anything else in this Agreement to the contrary, in performing its duties hereunder, including approving any Advance Requests, making any other determinations or taking any other actions hereunder, the Disbursement Agent shall be entitled to rely on certifications from the Project Entities (and, where contemplated herein, certifications from third parties, including the Construction Consultant) as to satisfaction of any requirements and/or conditions imposed by this Agreement. The Disbursement Agent shall not be required to conduct any independent investigation as to the accuracy, veracity or completeness of any such items or to investigate any other facts or circumstances to verify compliance by the Project Entities with their obligations hereunder.

(*Id.* § 9.3.2).

Section 9.10, entitled "Limitation of Liability," also limited the Disbursement Agent's responsibility and liability. (*Id.* § 9.10). Section 9.10 explicitly limited the duties of the Disbursement Agent as follows: (1) the Disbursement Agent has "no duty to inquire of any Person whether a Default or an Event of Default has occurred and is continuing"; (2) "the Disbursement Agent is not obligated to supervise, inspect or inform the Project Entities of any aspect of the development, construction or operation of the Project"; (3) the Disbursement Agent has "no duties or obligations hereunder except as expressly set forth herein, shall be responsible only for the performance of such duties and obligations and shall not be required to take any action otherwise than in accordance with the terms hereof"; and (4) "…nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon the Disbursement Agent any obligations in respect of this Agreement except as expressly set forth herein or therein." (BofA Statement ¶ 61; Disb. Agmt. § 9.10). Section 9.10 also stated, "The Disbursement Agent does not represent, warrant or guaranty to the Funding Agents or the Lenders the performance by any Project Entities, the General Contractor, the Constriction Consultant, the Architect, or any other Contractor …." (Disb. Agmt. § 9.10).

Section 9.10, moreover, limited Bank of America's potential liability to bad faith, fraud, gross negligence, or willful misconduct:

- "[T]he Disbursement Agent shall have no responsibility to the Project Entities, the Funding Agents, or the Lenders as a consequence of performance by the Disbursement Agent hereunder except for any bad faith, fraud, gross negligence or willful misconduct of the Disbursement Agent as finally judicially determined by a court of competent jurisdiction;" and

- "Neither the Disbursement Agent nor any of its officers, directors, employees or agents shall be in any manner liable of responsible for any loss or damage arising by reason of any act or omission to act by it or them hereunder or in connection with any of the transactions contemplated hereby, including, but

not limited to, any loss that may occur by reason of forgery, fraud, gross negligence or willful misconduct as finally judicially determined by a court of competent jurisdiction."

(BofA Statement ¶ 62; Disb. Agmt. § 9.10).  (The Term Lenders do not contend Bank of America engaged in fraud.)

### E.    Bank of America's Role as Bank Agent and the Credit Agreement

Bank of America was not only the Disbursement Agent under the Disbursement Agreement, it was also the Bank Agent.  (Disb. Agmt. Exh. A at 3).  The Disbursement Agreement defined "Bank Agent" as "Bank of America, N.A. in its capacity as Administrative Agent under the Bank Credit Agreement …."  (*Id.*).  Like the Disbursement Agreement, the Credit Agreement was governed by New York law.  (Credit Agmt § 10.11).

Section 9 of the Credit Agreement set forth certain rights and responsibilities of the Administrative Agent.  (Credit Agmt. § 9).  Similar to the exculpatory provisions of the Disbursement Agreement, the Credit Agreement, Section 9.3, entitled "Exculpatory Provisions," specifically provided the Administrative Agent could not be held liable in the absence of "its own gross negligence of willful misconduct."  (*Id.* § 9.3(c)).  Section 9.3 further stated, "The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by Borrowers, a Lender or the Issuing Lender."  (*Id.*).  In the same vein, Section 9.7 of the Credit Agreement, entitled "Non-Reliance on Administrative Agent and Other Lenders," required the Lenders to make their own decisions "independently and without reliance" upon Bank of America as Administrative Agent.  (*Id.* § 9.7).

Section 9 of the Credit Agreement also contained reliance and inquiry provisions similar to those in Article 9 of the Disbursement Agreement.  Section 9.3 stated, "The

Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into … any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document ….”   (*Id.* § 9.3(c)).   Also, Section 9.4 authorized the Administrative Agent to rely on “any notice, request, certificate, consent, statement, instrument, document or other writing … believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.”  (*Id.* § 9.4).

Having set forth the relevant and material provisions of the pertinent Agreements, I turn to the material facts underlying the Term Lenders’ claims.

### F.   September 2008 through March 2009 Advance Requests

For each Advance Request from September 2008 through March 2009, Bank of America received all required certifications from Fontainebleau, IVI, TWC, and the Architect before disbursing funds to Fontainebleau.   (BofA Statement ¶ 57; TL Response ¶ 57; TL Statement ¶ 75).   Fontainebleau certified the satisfaction of all conditions precedent and accuracy of all representations and warranties, including the absence of any defaults under the various loan documents.  (BofA Statement ¶ 57; TL Response ¶ 57).   The Architect certified that the Project’s construction was in accordance with the plans and specifications.  (*Id.*).   TWC certified the Control Estimate reflected the costs it expected to be incurred to complete the Project.  (*Id.*).   And IVI certified the Remaining Cost Report accompanying the Advance Request accurately reflected the remaining costs to complete the Project.  (*Id.*).[9]   It is undisputed that the

---

[9]  The Term Lenders dispute this fact on the basis that IVI rejected the initial March 2009 Advance Request.  (TL Response ¶ 57).  As discussed below, although IVI rejected the initial Request, IVI ultimately signed off on the March 2009 Advance Request before Bank of America disbursed the requested funds to Fontainebleau.

Controlling Person never formally notified the Disbursement Agent that a Default or Event of Default had occurred and was continuing.  (Disb. Agmt. § 2.5.1).

Notwithstanding, the Term Lenders have identified several events underlying their claim that Bank of America breached its obligations under the Disbursement Agreement: the Lehman bankruptcy and the funding of the Retail Facility; Fontainebleau's failure to disclose anticipated Project costs; repudiation by the FDIC of First National Bank of Nevada's commitments; select lenders' failure to fund with respect to the March 2009 Advance; and the "untimely" submission of the March 2009 Advance.  I address each event in turn.

### G.   The Lehman Bankruptcy and Retail Facility Funding

#### 1.   September 2008 Advance Request

On September 11, 2008, Fontainebleau submitted its September Advance Request for $103,771.77, including nearly $3.8 million in Retail Facility funds.  (Dep. Exhs. 237, 331; BofA Statement ¶ 65).  Fontainebleau represented in the Request that all conditions precedent to disbursement had been satisfied.  (TL Statement ¶ 75).

Lehman filed for bankruptcy on September 15, 2008.  (BofA Statement ¶ 64; TL Statement ¶ 33).  In the days following, Bank of America held a series of calls with Fontainebleau to obtain additional information regarding the bankruptcy's implications for the September 2008 Advance Request.  (BofA Statement ¶ 68).  These calls focused on whether Lehman would fund its portion of the Advance Request and on potential alternative financing arrangements if Lehman did not fund, including funding by other Retail Facility Lenders or Fontainebleau.  (BofA Statement ¶ 69; TL Statement ¶ 47).  (As noted above, Lehman was a lender and agent under the Retail Facility, and one of the conditions precedent of an Advance Request was the "Retail Agent and the

Retail Lenders … make any Advances required of them pursuant to the Advance Request." (Disb. Agmt. § 3.3.23)). During the calls, Bank of America did not make any recommendations as to the various financing options; however, it later concluded internally that Fontainebleau funding Lehman's share would not satisfy the Advance Request's condition precedent. (BofA Statement ¶¶ 70–71; TL Statement ¶ 48–49). There is no evidence on summary judgment that Bank of America communicated this conclusion to Fontainebleau.[10]

On September 17, 2008, Bank of America issued an Advance Confirmation Notice confirming the amount of the Advances to be made under the various financing agreements, and on September 22, 2008, Bank of America, as Administrative Agent, requested Fontainebleau schedule a telephone conference with the lenders to discuss the implications of Lehman's bankruptcy on the Project. (Dep. Exh. 901). No call was held in the following days. On September 26, 2008, TriMont sent Bank of America the entire amount of the Retail Shared Costs (or the "Retail Advance"). (BofA Statement ¶ 73; TL Response ¶ 73). After receiving the Retail Advance and before disbursing funds to Fontainebleau, Bank of America sought and received reconfirmation from Fontainebleau CFO Jim Freeman that all conditions precedent to funding had been

---

[10] The Term Lenders' assert "BofA did not discuss with Fontainebleau BofA's conclusion that Fontainebleau's payment of Lehman's commitment would cause condition precedent in Section 3.3.23 to fail." (TL Statement ¶ 50). Bank of America disputes this fact. (BofA Response ¶ 50). Per the testimony cited by Bank of America, neither Mr. Yunker (of Bank of America) nor Mr. Freeman (of Fontainebleau) recalls whether Bank of America communicated its conclusion to Fontainebleau. (Freeman Dep. Tr. 74:12–24; Yunker Dep. Tr. 96:11–98:14). Bank of America has not, however, cited any evidence on summary judgment stating Bank of America communicated its conclusion to Fontainebleau. *See, e.g.*, *Dickey v. Baptist Mem'l Hosp.*, 146 F.3d 262, 266 n.1 (5th Cir. 1998) ("The mere fact that [the deponent] does not remember the alleged phone conversation, however, is not enough, by itself, to create a genuine issue of material fact [as to whether the conversation occurred.]")

satisfied.  (Dep. Exh. 75).  Specifically, Bank of America's Jeff Susman requested Jim Freeman reaffirm "pursuant to Section 11.2 of the Disbursement Agreement … the representations and warranties … made pursuant to the [September] Advance Request and Advance Confirmation Notice."  (*Id.*).  (Section 11.2, entitled "Further Assurances," authorized the Disbursement Agent to seek further assurances in relation to an Advance Request.  (Disb. Agmt. § 11.2).).  Jim Freeman responded, "I affirm."  (Dep. Exh. 75).

As of September 26, 2008, Lehman had not announced that it would reject the Retail Agreement as a result of its bankruptcy, and Bank of America had concluded that the Lehman bankruptcy, in and of itself, did not provide a basis for rejecting Fontainebleau's September 2008 Advance Request.  (BofA Statement ¶ 77; BofA Response AMA ¶ 62).  Bank of America also believed it was required to honor the September 2080 Advance Request if the requested Retail Shared Costs were received in full and the Advance Request certifications remained in effect.  (Howard Dep. Tr. 80:18-81:21).  Accordingly, on September 26, 2008, Bank of America disbursed Fontainebleau's September 2008 Advance Request.

### 2.     Highland's Contentions Regarding the Lehman Bankruptcy

Meanwhile, Highland sent several communications to Bank of America asserting Lehman's bankruptcy caused breaches of the Loan Facility.  On September 26, 2008, Highland Capital Management, one of the original Term Lenders, sent Jeff Susman of Bank of America an e-mail stating, "[a]s a result of [Lehman's] bankruptcy filing, … the financing agreements are no longer in full force and effect, triggering a number of breaches under the Loan Facility – resulting in the following consequences: (i) No disbursements may be made under the Loan facility; and (ii) The Borrower should be

sent a notice of breach immediately to protect the Lenders' rights and ensure that any cure period commence as soon as possible." (Dep. Exh. 455; BofA Response AMA ¶ 106). That same day, Bank of America's counsel Sheppard Mullin Richter & Hampton LLP ("Sheppard Mullin") responded to Highland, stating the Bankruptcy Code "specifically provides that no executor contract may be terminated or modified solely based on the commencement of a Chapter 11 case" and requesting Highland identify "authority or documents supporting a contrary conclusion." (Dep. Exh. 472; BofA Response AMA ¶ 107). Following communications with Highland and further internal analysis, Bank of America concluded that Lehman's bankruptcy filing did not, on its own, provide a basis for rejecting Fontainebleau's September 2008 Advance Request. (BofA Response AMA ¶ 108).

Bank of America provided additional information and analysis to Highland on September 29, 2008 in a Sheppard Mullin email explaining that it was "monitoring all of the [Lehman] court orders" and was "unaware of a restriction on performance of this agreement." (Dep. Exh. 79). Sheppard Mullin also rejected Highland's suggestion that Lehman's bankruptcy was an "anticipatory repudiation of the contract," and affirmed the earlier conclusion that, "under Section 365(e)(1), an executory contract cannot be terminated or modified solely on the basis of [Lehman's] insolvency … or … the commencement of the Chapter 11 case." (*Id.*).

On September 30, 2008, after disbursement of the September 2008 Advance Request, Highland sent Sheppard Mullin another email, this time claiming, "Re Sec 365 – if this contract can be rejected then, at a minimum, there is [a Material Adverse Effect] under the [Credit Agreement]." (*Id.*). Bank of America analyzed Highland's contention

and the pertinent portions of the relevant financing agreements and concluded that Highland's contention was incorrect, as there was no indication that there would be a shortfall in Retail funds or that the Retail Lenders would fail to honor their obligations under the Retail Facility.  (Susman Declaration ("Susman Decl.") ¶ 23).  Through these various communications and correspondence, Highland did not submit a formal Notice of Default, or specify, with reference to a specific portion of the relevant agreements, any "Default" or "Event of Default" under the Disbursement Agreement or other financing documents.  (Susman Decl. ¶ 25; Dep. Exhs. 79, 455).

### 3. Fontainebleau Resorts' Funding of Lehman's Portion of the September 2008 Retail Shared Costs

Lehman's portion of the September 2008 Advance Request was funded by Fontainebleau Resorts, which made a $2,526,184.00 "equity contribution" to "prevent an overall project funding delay and resulting disruption of its Las Vegas project" after Lehman failed to fund its required September 2008 Retail Shared Costs portion.  (BofA Statement ¶ 78).  Although the parties now know that Fontainebleau Resorts funded Lehman's portion of the September 2008 Retail Shared Costs, at the time, Fontainebleau did not disclose (and Bank of America, as Disbursement or Bank Agent, did not know) the source of funding.  (Newby Dep. Tr. 63:22–65:3).  Indeed, internal December 2008 Bank of America correspondence indicates Bank of America believed Lehman funded its September obligation.  (Dep. Exh. 905 (Susman email dated December 30, 2008, "As we understand, each month Lehman has funded its share of the advance.")).

On September 30, 2008, Bank of America, as Administrative Agent, requested a call with Jim Freeman to discuss issues relating to Lehman's bankruptcy, including

whether Lehman funded its portion of the Shared Costs on September 26, 2008, whether its portion was funded by other sources, and the effects of the Lehman bankruptcy on the Project.  (Dep. Exh. 76; TL Statement ¶ 51; BofA Response ¶ 51). More specifically, Bank of America asked "Who are the current lenders under the Retail credit facility?" and "Did Lehman fund its portion of the requested $3,789,276.00 of Shared Costs funded last Friday (9/26/08) or was this made up from other sources?  If Lehman did not fund its portion, what were the other sources?".  (Dep. Exh. 76). Fontainebleau refused to engage in the call requested in the September 30, 2008 letter. (TL Statement ¶ 54).  However, in a separate call regarding the September 2008 Advance, Fontainebleau represented to Bank of America that the retail funds for the September 2008 Retail Advance came from the retail lenders.  (Susman Dep. Tr. 193:18–195:23).

On October 6, 2008, Highland sent Bank of America an e-mail stating there were "public reports" that "equity sponsors" had funded Lehman's portion of the September 2008 Shared Costs.  (TL Statement ¶ 60; BofA Response ¶ 60; Dep. Exh. 81).  The e-mail did not identify the source of the public reports.  (Dep. Exh. 81).  That same day, Jim Freeman told Moody's 2008 that "[r]etail funded its small portion last month."  (BofA Response AMA ¶ 74).

The next day, October 7, 2008, Jim Freeman sent Bank of America and the Lenders a memorandum addressing the Retail Facility's status.  (BofA Statement ¶ 90). The memorandum assured Lenders the August and September portion of the Shared Costs had been funded in full: "The company has received various inquiries concerning the retail facilities for the Fontainebleau Las Vegas project since the unfortunate

bankruptcy filing by Lehman Brothers Holdings, Inc. … In August and September, the retail portion of such shared costs was $5 mm and $3.8 mm, respectively, all of which was funded."  (Dep. Exh. 77).  The memorandum further stated Fontainebleau was "continuing active discussions with Lehman Brothers to ensure that, regardless of the Lehman bankruptcy filing and related acquisition by Barclay's, there is no slowdown in funding of the project.", and Fontainebleau was "actively talking with co-lenders under the retail construction facility."  (*Id.*).  Finally, Fontainebleau stated it "[did] not believe there will be any interruption in the retail funding of the project."  (*Id.*).

The memo did not directly answer the question of whether Lehman funded its portion of the September 2008 Shared Costs.  (*Id.*).  Indeed, Jim Freeman later testified in depositions he did not tell Moody's or the Lenders that FBR had funded for Lehman in September 2008 because counsel had advised him not to disclose the source of funding.  (BofA Response AMA ¶ 75).

On October 13, 2008, Highland forwarded to Bank of America's counsel a Merrill Lynch research analyst e-mail stating, "We understand that the FBLEAU equity sponsors have funded the amount required from Lehman on the retail credit facility due this month ($4 million).  As a result, there are no delays in construction so far."  (Dep. Exh. 459).  Based on this analyst report, Highland stated, "It does not appear that the Retail Lenders made the Sept. payment, but rather equity investors. … This would indicate that the reps the company made for that funding request were false."  (*Id.*). Highland conceded, however, the assertion that Fontainebleau equity sponsors had funded for Lehman was "one of a number of speculations that were out there floating around" and was merely a "rumor[] in the market."  (Rourke Dep. Tr. 104:11–25).

In its October 13, 2008 e-mail, Highland also requested that because of the cited concerns, Bank of America "request the borrower to provide wiring confirmation from the Retail Lenders or funding certificates from the Retail Lenders to confirm that funding is made by the Retail Lenders (rather than other sources)" and the "borrower's legal counsel should provide an opinion that the Lehman funding agreement is in full force and effect." (BofA Response AMA ¶ 115; Dep. Exh. 459). Highland cited no provision of any agreement requiring such information be provided to the agent or the lenders. (BofA Response AMA ¶ 115). Although Highland asked Bank of America to "confirm" the understanding that Lehman had not made any disbursements while in bankruptcy, there is no evidence that Bank of America did confirm this understanding. (Dep. Exh. 459). Though Highland voiced its concerns in the October 13, 2008 correspondence, it did not submit a formal Notice of Default, nor did it specify any "Default" or "Event of Default" under the Disbursement Agreement or other loan documents. (Susman Decl. ¶ 25; Dep. Exh. 459). In fact, Highland funded its share of the Delay Draw Term Loan in response to the March 2009 Notice of Borrowing. (BofA Response ¶ 130). Highland has since sold all of its Term Loan holdings and is no longer a plaintiff. (BofA Response ¶ 125).[11]

On October 22, 2008, Fontainebleau provided the Lenders with another update stating "Lehman Brother's commitment to the facility has not been rejected in bankruptcy and the facility remains in full force and effect." and "Lehman Brothers has indicated to us that it has sought the necessary approvals to fund its commitment this

---

[11] The Term Lenders do not dispute this fact; rather, they contend it is immaterial and irrelevant. (TL Reply at 1).

month." (BofA Statement ¶¶ 94, 95). Fontainebleau further stated, should Lehman not be able to perform, Fontainebleau had "received assurances from the co-lenders to the retail facility that they would fund Lehman's portion of the draw." (BofA Statement ¶ 95).

Even through December, Fontainebleau did not disclose that FBR had funded for Lehman in September. On December 5, 2008, FBR issued third quarter (period ending September 30, 2008) financial statements for both Fontainebleau Las Vegas Holdings, LLC and FBR. (BofA Response AMA ¶ 91). Fontainebleau Las Vegas Holdings, LLC's statement included disclosures regarding the Retail Facility's status, and, more specifically, Lehman's funding. (Dep. Exh. 286 at FBR01280966; BofA Response AMA ¶ 91). The statement noted Lehman filed for bankruptcy on September 16, 2008, stated Fontainebleau Las Vegas Holdings "has been working diligently with Lehman Brothers and the co-lenders to ensure that there is no interruption in funding," and disclosed "[t]here can be no assurances that Lehman Brothers will continue to fund all or any portion of its remaining obligation under the Retail Construction Loan, or that the co-lenders will fund any Lehman Brothers shortfall in funding." (Dep. Exh. 286 at FBR01280966). Additionally, in the section entitled "Equity contributions" of FBR's financial statements, FBR disclosed cash contributions to a Florida project, but made no mention of its September 2008 equity contribution on Lehman's behalf. (BofA Response AMA ¶ 93; Dep. Exh. 286 at FBR01281007).

### 4.    The October 2008 Meeting

On October 23, 2008, a meeting ("October Meeting") was held in Las Vegas among executives of Fontainebleau Resorts and Bank of America, and representatives of Retail Co-Lenders ULLICO, Sumitomo Mitsui Bank, and National City Bank in Las Vegas. (Dep. Exh. 18; TL Statement ¶ 62; BofA Response ¶ 62; BofA Response AMA

¶ 88).   The meeting agenda included an update on the project and the status of the

retail loan, including the effect of the Lehman bankruptcy on the loan.  (Dep. Exh. 18; TL

Statement ¶ 62; BofA Response ¶ 62).   Specifically, it was noted that the Lehman

bankruptcy had a material impact on the leasing and development of the Project, as well

as the continued funding of the Retail Facility.  (Kolben Dep. Tr. 65:7–13). [12]  To that

end, during the meeting, the participants discussed possible replacements for Lehman's

commitment under the Retail Facility.  (*Id.* at 175:18–176:15).  Although the Retail Co-

Lenders did not agree during the meeting to assume Lehman's commitment, ULLICO

and Mitsui Sumitomo expressed the possibility of increasing their respective

commitments to cover a portion of Lehman's commitment, and additional investment

opportunities, including foreign investors, were discussed.  (*Id.*  at 72:17–75:22; 176:4–

9).  There is no evidence of record on summary judgment that Lehman's failure to fund

the September 2008 Retail Advance was discussed at the October Meeting. [13]

Additionally, the Retail Lenders asked Bank of America, as Bank Agent, to take

over Lehman's remaining commitment under the Retail Facility, pursuant to Section 7.1

---

[12]  The parties dispute the admissibility of Deposition Exhibit 19, the National City Special Assets Committee ("SAC") Report.  I need not rule on the parties' hearsay and authentication arguments because Mr. Kolben independently testified to the material facts regarding the retail co-lenders' willingness to fund and discussions at the October Meeting.  These facts do not contradict the information in the SAC Report.

[13]  During his deposition, Herbert Kolben of ULLICO testified initially that it was discussed openly that Lehman had not made the September 2008 payment.  (Kolben Dep. Tr. 16–21).  He later corrected his testimony, stating "I said I didn't recall whether it was openly discussed."  (Kolben Dep. Tr. 11–18).  Upon a direct request for clarification ("Q: Do you … specifically recall any discussion at the October 23rd meeting about whether Lehman had funded its September retail events?"), Mr. Kolben stated, "I don't recall."  (Kolben Dep. Tr. 176:22–177:3).  The inconsistent testimony of a witness, corrected in the same deposition, is not sufficient to create a genuine issue of material fact.  *Horn v. United Parcel Services, Inc.*, 433 F. App'x. 788, 796 (11th Cir. 2011).

of the Intercreditor Agreement, which permitted—but did not require—the Bank Agent to purchase and assume the outstanding obligations of the Retail Agent and Lenders.  (TL Statement ¶ 66; BofA Response ¶ 66; Exh. 884 § 7.1; Howard Dep. Tr. 112:13–113:10). Bank of America did not do so.  (TL Statement ¶ 67).

### 5.   Communications between TriMont and Bank of America Regarding the September 2008 Retail Advance

TriMont was the Servicer of the Retail Facility, with the responsibility of collecting funds from the Retail Co-Lenders and transferring them to Bank of America, as Disbursement Agent under the Disbursement Agreement.  (BofA Statement ¶¶ 32, 33). Each month when Bank of America forwarded to TriMont an Advance Confirmation Notice, TriMont would send a letter to the Retail Co-Lenders requesting their respective portions of the Retail Facility Shared Costs be wired to TriMont's clearing account. (Dep. Exh. 11; Rafeedie Dep. Tr. 37:8–40:21; Brown Dep. Tr. 42:4–8).  Upon receipt of the funds, TriMont would send to Bank of America a wire transfer for the full amount of the Retail Advance that was requested, without identifying the amounts funded by each Retail Co-Lender, and Bank of America would transfer the funds into an account that could be accessed by Fontainebleau.  (TL Statement ¶ 68; Rafeedie Dep. Tr. 40:22– 41:9; Susman Dep. Tr. 204:9–10).  Generally, the funding and distribution occurred on the 25th of each month (though, as discussed above, the September request was disbursed on the 26th).  (Rafeedie Dep. Tr. 39:23–40:4).

By September 26, 2008, TriMont was made aware that Fontainebleau had paid Lehman's share of the September Retail Advance.  (TL Statement ¶ 69; Dep. Exh. 56;

Dep. Exh. 14).[14]  McLendon Rafeedie was the primary contact at TriMont with respect to the funding of the Retail Facility, including Lehman's funding of its obligations and transfer of the funds to Bank of America.  (Rafeedie Dep. Tr. 21:19–25; 62:3–6).  TriMont's lead contact at Bank of America regarding funding of Retail advances was Jean Brown.  (*Id.* at 33:2–23).   Although it was TriMont's "custom and practice" to inform Bank of America (and Jean Brown, more specifically) of significant events with respect to the Retail Facility, there is no evidence that Mr. Rafeedie (or TriMont) actually informed Ms. Brown (or Bank of America) that Lehman did not fund its portion of the September 2008 Retail Advance, or that Fontainebleau Resorts funded for Lehman.[15]

---

[14] The record is not clear as to *when* on September 26 TriMont became aware that FBR was funding Lehman's portion.  On September 26, 2008, Albert Kotite, Executive Vice President of Fontainebleau Resorts, sent the Retail Facility Co-Lenders a letter stating, "Because Lehman … has failed to fund its required share under the Retail Facility, in the amount of $2,526,184 …, Fontainebleau Resorts … is making an equity contribution to fund said amount."  (Dep. Exh. 14).  Mr. Kotite forwarded this letter to Mr. Rafeedie on September 26, 2008 at nearly 6:00 p.m. (*Id.*).  Also on September 26, 2008 at 11:39 a.m., Amit Rustgi from TriMont copied Mr. Rafeedie on an email stating "the borrower has decided to fund Lehman's portion."  (Dep. Exh. 56).  At 1:11 p.m. Yetta Nicholson of TriMont copied Mr. Rafeedie on an email showing the September 26, 2008 wire coming in from Fontainebleau Resorts, LLC.  (*Id.*).

Although Mr. Rafeedie acknowledged he was copied on these emails, he testified he did not know when he opened and read the emails.  (Rafeedie Dep. Tr. 59:14–62:1).  The exact timing of Mr. Rafeedie's knowledge that FBR funded for Lehman is not material, though, as there is no evidence that Mr. Rafeedie communicated to Ms. Brown (or Bank of America) that Lehman did not fund, or that FBR funded for Lehman.

[15] This is a point of much dispute among the parties.  After review of Mr. Rafeedie's and Ms. Brown's deposition transcripts, I conclude that there is no evidence to indicate that Mr. Rafeedie told Ms. Brown that Lehman did not fund its portion of the September 2008 Retail Advance.

While Mr. Rafeedie agreed that it is his "custom and practice" to tell Ms. Brown of "significant events with respect to the retail facility," when asked if, "consistent with that practice," he would have told Ms. Brown "about the fact that Lehman did not fund" and that "Fontainebleau Resorts had paid Lehman's share," he testified that he "could have," but he "couldn't recall  exactly" and "[did not] remember the exact topics of discussion" and the communication "could have been just that Lehman's dollars were funded, not necessarily who funded what."  (Rafeedie Dep. Tr. 57:18–58:19, 63:4–9, 53:17–54:5).   Mr. Rafeedie further explained that he could have spoken

### 6.     Lehman's Portion from December 2008 through March 2009

Lehman funded its share of the Retail Advance in October and November 2008, and, as in prior months, Bank of America received from TriMont the full amount of the October and November Retail Advances.  (BofA Statement ¶¶ 99, 102; Kolben Dep. Tr. 77:11–19, 78:12–21).  As for the December 2008 Advance Request and related Retail Advance, Bank of America became aware in December 2008 that ULLICO, a Retail Co-Lender under the Retail Co-Lending Agreement, would fund Lehman's portion of the December Retail Advance.  (BofA Statement ¶¶ 100, 101; Dep. Exhs. 9, 905).  Bank of America understood that ULLICO would continue to fund for Lehman for a short time thereafter until a more permanent solution could be found, and that ULLICO had not agreed to permanently assume Lehman's commitment.  (BofA Statement ¶¶ 100, 101; Exh. 905).  Each month from December 2008 through March 2009, TriMont wired Bank of America the full Retail Advance, and Bank of America knew that ULLICO funded Lehman's portion of the Retail Advances in these months.  (BofA Statement ¶ 102; TL Statement ¶ 73; BofA Response AMA ¶ 97).

---

with Ms. Brown and told her the Retail Facility had been fully funded, but only later become aware that Fontainebleau Resorts funded for Lehman.  (*Id.* at 57:18–58:19).

Ms. Brown testified that she would communicate with Mr. Rafeedie monthly about the status of the "wire" providing the Retail Advance.  (Brown Dep. Tr. 41:7–9; 58:23–3).   Ms. Brown also testified that, although she was concerned as to whether Lehman would fund its portion of the September 2008 Advance Request, she did not recall Mr. Rafeedie telling her that had not funded.  (*Id.* at 57:1–8; 58:2–4).  Finally, after stating that she "understood Lehman stopped funding the retail facility in September 2008, Ms. Brown clarified that she did not "know" that Lehman was not funding, but "assumed so" because she "knew they were bankrupt."  (*Id.* at 55:6–56:12; 72:9–11).

### 7.      Fontainebleau's Agreement with ULLICO

On December 29, 2008, ULLICO entered into a Guaranty Agreement with FBR, Turnberry Residential Limited Partner, L.P., and Jeffrey Soffer (together, "Guarantors"). (Dep. Exh. 24).  As a condition of ULLICO's funding Lehman's portion of the December 2008 Retail Advance, the Guarantors guaranteed the repayment to ULLICO of Lehman's share of the December 2008 Retail Advance.  (*Id.*).  Subsequently, ULLICO and the Guarantors entered into three monthly Amendments to the Guaranty Agreement, pursuant to which ULLICO would fund Lehman's portion of the January 2009, February 2009, and March 2009 Retail Advances, and the Guarantors would reimburse ULLICO, at least in part.  (Dep. Exhs. 30, 36, 42).  Pursuant to the Guaranty Agreement and Amendments, ULLICO funded over $11 million on behalf of Lehman, some of which was reimbursed by the Guarantors.  (Dep. Exhs. 24, 30, 36, 42).  By March 2009, the amount of outstanding "Guaranteed Obligations" under the Guaranty Agreement and Amendments was $5,704,802.32.   (Dep. Exh. 42).   There is no evidence that Bank of America was aware that ULLICO's payments on behalf of Lehman were effectively made by FBR, Jeff Soffer, and Turnberry Residential Limited Partners.[16]

---

[16] The Term Lenders cite to excerpts from Mr. Rafeedie's deposition transcript to dispute this fact.  (Rafeedie Dep. Tr. 34:19–35:18; 55:16–24).  However, those excerpts speak only to TriMont's general practice of keeping Bank of America informed of issues involving funding, and do not state that Bank of America was aware of the Guaranty Agreement or related Amendments.

Additionally, in response to Bank of America's additional facts (BofA Response ¶ 104), stating "There is no evidence that the guaranties provided by Soffer, FBR and TLRP were ever disclosed to BANA or the Lenders.", the Term Lenders do not cite any evidence rebutting the assertion, but only object that Bank of America did not cite specific evidence, as required by Local Rule 7.5(c)(2).  At trial, the Term Lenders would bear the burden of proving Bank of

8.    **Further Assurances from Fontainebleau Regarding the Retail Facility**

On February 20, 2009, Bank of America, as Administrative Agent under the Credit Agreement, sent Jim Freeman a letter regarding the February 2009 Advance Request.  (Dep. Exhs. 497, 498; TL Statement ¶ 71).  Citing lender concerns that were directed to Bank of America, as Administrative Agent, Bank of America asked Fontainebleau to comment on the status of the Retail Facility and "the commitments of the Retail Lenders to fund under the Retail Facility, in particular, whether you anticipate that Lehman Brothers Holdings, Inc. will fund its share of the requested loans, and whether the other Lenders under the Retail Facility intend to cover any shortfalls." (Dep. Exhs. 497, 498; TL Statement ¶ 71).    Fontainebleau responded on February 23, 2009 ("Fontainebleau's February 23 Letter"):

> As relates to the Retail Facility, we are continuing active discussions with Lehman Brothers and the co-lenders to ensure that funding for the project will continue on a timely basis.  The Retail Facility is in full force and effect, there has not been an interruption in the retail funding of the Project to date.

(Dep. Exh. 811).

---

America knew Fontainebleau effectively made ULLICO's payments on behalf of Lehman.  On summary judgment, then, Bank of America may simply point out that there is an absence of evidence supporting the Term Lenders' case.  *See Fitzpatrick v. City of* Atlanta, 2 F.3d 1112, 1115–16 (11th Cir. 1993) (for issues on which the opposing party bears the burden at trial, the party moving for summary judgment "is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge [its] responsibility.  Instead, the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the non-moving party's case." (internal citations omitted)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

### H.     Project Costs

Also as discussed above, the Disbursement Agreement required IVI to deliver to the Disbursement Agent a Construction Consultant Advance Certificate approving or disapproving each Advance Request.  (Disb. Agmt. § 2.4.4(b); BofA Statement ¶ 47). To inform the Construction Consultant Advance Certificate, the Contractor would provide IVI with an Anticipated Cost Report ("ACR"), which was a projection of the Project's anticipated final cost, including all commitments, pending claims, and pending issues.  (Barone Dep. Tr. 15:6–20).  On January 13, 2009, IVI issued its Construction Consultant Advance Certificate for the January 2009 Advance Request, in which it affirmed, among other things, that it "ha[d] not discovered any material error in the matters set forth in the Current Advance Request or Current Supporting Certificates." (BofA Statement ¶ 132).  On January 30, 2009, IVI issued a Project Status Report ("PSR 21") stating it was concerned that Fontainebleau's cost disclosures might not be accurate because it appeared that work on the Project would need to be accelerated to meet the scheduled opening date and the related costs, such as overtime, were not reflected in the latest Anticipated Cost Report:   "IVI is concerned that all the subcontractor claims have not been fully incorporated into the report and potential acceleration impact to meet the schedule has not been included."  (BofA Statement ¶¶ 133, 134).  PSR 21 also addressed Leadership in Energy and Environmental Design ("LEED") credits, which reduce construction costs through Nevada state sales tax credits on building materials for new construction that meets certain sustainability standards: "[I]t appears that the LEED credits are tracking behind projections and the Developer has begun a detailed audit," and noting that it would "continue to discuss this with the Developer."  (BofA Statement ¶ 136).  Despite the cited concerns, IVI executed

the Construction Consultant Advance Certificate for the February 2009 Advance Request and sent it to Bank of America on February 17, 2009.  (BofA Statement ¶ 146; TL Response ¶ 146; Barone Decl. ¶ 20, Exh. 6).

Meanwhile, on February 12, 2009, JPMorgan Chase, a Revolver Lender, sent Bank of America a letter seeking information on issues raised by IVI in PSR 21, and also asked Bank of America to provide additional information on the status of the Retail Facility.  (BofA Statement ¶ 138).  On February 20, 2009, Bank of America sent Fontainebleau a letter requesting this information.  (BofA Statement ¶ 139). Fontainebleau responded in its February 23 Letter, stating IVI's information was outdated, and "at this point, we are not aware of any cost overruns or acceleration costs that are not reflected in the Anticipated Cost Report."  (Dep. Exh. 811).  Regarding the LEED credits, Fontainebleau stated, "[W]e believe that the full amount of the credits reflected in the Budget will in fact be realized."  (*Id.*).  That same day, in response to lender requests, Bank of America asked Fontainebleau to schedule a lender call to discuss Fontainebleau's February 23 Letter.  (BofA Statement ¶¶ 142–43). But Fontainebleau refused, objecting to having a call on short notice, asserting it was under no contractual obligation to have the call, and raising concerns that sensitive Project-related information may be leaked to the press by lenders.  (*Id.*).

On March 3, 2009, IVI sent Bank of America Project Status Report No. 22 ("PSR 22").  (*Id.* ¶ 144).  Although PSR 22 repeated IVI's previous concern that there were unreported Project cost increases, it also indicated that the Project remained within budget.  (*Id.* ¶ 145).

On March 4, 2009, Bank of America again requested that Fontainebleau arrange a meeting with Lenders and provided Fontainebleau with a list of Lender information requests concerning Project costs.   (*Id.* ¶¶ 147–48).   The next day, IVI asked Fontainebleau for "a submission of the future potential claims being made by the subcontractors against [the Contractor] and any overruns related to the un-bought work," and for an updated Anticipated Cost Report "to show the potential exposures to [Fontainebleau Las Vegas] and a better indication of the current contingency."  (*Id.* ¶ 149).   On March 10, 2009, Bank of America sent Fontainebleau another letter and information request.  (*Id.* ¶ 150).

On March 11, 2009, Fontainebleau submitted its March 2009 Advance Request. (*Id.* ¶ 151).  In the Remaining Cost Report annexed to the March Advance Request, Fontainebleau disclosed that it had increased construction costs by approximately $64.8 million.  (*Id.* ¶ 153).  The next day, IVI's Robert Barone met with Fontainebleau's Deven Kumar in Las Vegas, and Kumar informed Barone that the Project was $35 million over budget.  (*Id.*).   On March 19, 2009, IVI issued a Construction Consultant Advance Certificate that declared IVI had discovered material errors in the Advance Request and supporting documentation; believed the Project would require an additional $50 million for Construction Costs; and the Opening date would be November 1, 2009, rather than October 1, 2009 as originally planned.  (BofA Statement ¶¶ 154–155; TL Response ¶ 154).

A few days later, IVI informed Bank of America that IVI had been "working with the developer to update their most recent anticipated cost report" and that Fontainebleau had "provided an ACR that they state represents their understanding of

the hard cost exposure to the project." (BofA Statement ¶ 156). IVI advised that it had not yet conducted an audit of the information presented by Fontainebleau (an audit would take weeks), but the information appeared reasonable. (*Id.*). IVI further stated it believed the developer credibly projected the potential costs, but it would be prudent to include additional funds for unexpected or known costs. (*Id.*).

On March 20, 2009, Fontainebleau held a Lender meeting in Las Vegas where it delivered a presentation updating the Lenders on the Project's construction budget and other issues relating to the Project's financial condition, representing, among other things, that it had retained KPMG to conduct a LEED credit audit. (*Id.* ¶¶ 157, 159–60). A few days later, on March 23, 2009, Fontainebleau submitted an unsigned draft revised Advance Request reflecting its earlier discussions with IVI. (*Id.* ¶ 161). IVI signed off on Fontainebleau's revisions and issued a Construction Consultant Advance Certificate approving the March 2009 Advance, after which Fontainebleau submitted an executed revised March Advance Request. (*Id.* ¶¶ 162–63).

Bank of America made the revised March Advance Request available to the Lenders the next morning (March 24) along with, among other things, IVI's Certificate and a chart Fontainebleau prepared at the Lenders' request showing the changes to the Remaining Cost Report and the In Balance Report. (*Id.* ¶ 164). The revised Request represented the Project was In Balance by $13,785,184. (*Id.* ¶ 164). On March 25, 2009, the scheduled Advance Date, Fontainebleau further revised the March Advance Request, increasing the margin by which the Project as In Balance to $14,084,071. (*Id.* ¶ 165). No Term (or other) Lenders submitted a Notice of Default or otherwise formally

objected to the March Advance. Bank of America transferred the Advance to Fontainebleau on March 26, 2009. (BofA Statement ¶ 166; TL Response ¶ 166).

**I.      First National Bank of Nevada  Repudiation**

On July 25, 2008, the First National Bank of Nevada (a Delay Draw Term Loam and Revolving Loan Lender) was closed by the Comptroller of the Currency, and the Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver. (BofA Statement ¶¶ 181–82). In late-December 2008, the FDIC formally repudiated First National Bank of Nevada's unfunded Senior Credit Facility commitments, which amounted to $1,666,666 under the Delay Draw Term Loan and $10,000,000 under the Revolver Loan. (*Id.* ¶¶ 183–84). In response to the FDIC's repudiation, Bank of America directed Fontainebleau to remove First National Bank of Nevada's commitments from the In Balance Test's "Available Sources" component. (*Id.* ¶ 185). Even without First National Bank of Nevada's unfunded commitments, though, the Project was "In Balance" by approximately $107.7 million, as reflected in the December 2008 Advance Request. (*Id.* ¶ 186).

**J.      March 2009 Advance Request and Defaulting Lenders**

On March 2, 2009, Fontainebleau submitted a Notice of Borrowing under the Credit Agreement requesting a Delay Draw Term Loan for the entire $350 million facility, and, simultaneously, a $670 million Revolver Loan (which was reduced to $652 million the next day). (*Id.* ¶ 187). Bank of America refused to process the Notice of Borrowing on the grounds that the amounts requested were not permissible under the Credit Agreement, and on March 9, 2009, Fontainebleau submitted a revised Notice of Borrowing seeking only the $350 million Delay Draw Loan. (*Id.* ¶¶ 188–89). Bank of America approved the revised Notice of Borrowing. (*Id.* ¶ 190). All but two of the Delay

Draw Term Lenders—Z Capital and Guggenheim—funded their commitments.  (BofA Statement ¶ 191; TL Response ¶ 191).  Accordingly, $326.7 million of the $350 million was funded.  (*Id.*).  Although Z Capital and Guggenheim did not fund, Bank of America continued to include their commitments as "Available Funds" for In Balance Test purposes.  (BofA Statement ¶ 192; TL Response ¶ 192).  On March 11, 2009, Fontainebleau submitted its March 2009 Advance Request, requesting $137.9 million. (Bolio Decl. ¶ 18 Exh. 16).  Accordingly, there were ample funds to cover the requested amount.

On March 23, 2009, Bank of America, as Disbursement Agent and Administrative Agent, sent the Lenders a letter disclosing Z Capital and Guggenheim had not yet funded their respective Delay Draw Term Loan commitments, and excluding those commitments from the Available Funds would result in a failure to satisfy the In Balance test.  (Dep. Exh. 104).  Bank of America further stated it was willing to include the unfunded commitment in the Available Funds component for the March Advance "pending further information about whether these lenders will fund."  (*Id.*).  Finally, Bank of America invited "any Lender that does not support these interpretations [to] immediately inform us in writing of their specific position."  (*Id.*).

Deutsche Bank and Highland responded to Bank of America's letter, but neither expressed disagreement with Bank of America's position.[17]  Rather, Highland merely stated it was under no obligation to state a position about Bank of America's interpretation of the credit documents and reserved all rights and claims against Bank of

---

[17] Highland conceded that it did not "reach a contrary position" to the March 25th Advance being made available to Fontainebleau.  (Rourke Dep. Tr. 172:18–173:3).

America.  (Dep. Exh. 471).  Deutsche Bank asked Bank of America "[w]hy it [was] appropriate to allow for the inclusion of [the] defaulting lender commitments in the In-Balance Test."  (Dep. Exh. 832).  Bank of America scheduled a lender call to address this inquiry.  (Non-Dep. Exh. 1505).  Ultimately, Bank of America disbursed the March 2009 Advance Request to Fontainebleau.  (BofA Statement ¶ 197; TL Response ¶ 197).

## K.    Termination of Funding

On April 13, 2009, Fontainebleau notified Lenders that one or more events "had occurred which reasonably could be expected to cause the In Balance test to fail to be satisfied" and, further, the "Project Entities have learned that (i) the April Advance Request under the Retail Loan may not be fully funded and (ii) as of today, the Remaining Costs exceed Available Funds."  (BofA Statement ¶ 167).  The next day, April 14, Fontainebleau provided IVI with a schedule of Anticipated Costs dated "as of April 14, 2009" revealing more than $186 million in previously unreported Anticipated Costs.  (*Id.* ¶ 169).

On April 17, 2009, Fontainebleau held a Lender meeting and reported that the Project "may be out-of-balance by approximately $180 million," reflecting a deficit of $186 million in committed construction costs.  (Dep. Exh. 268).  Fontainebleau presented a luxurious "enhanced plan" that would require a further $203 million in spending.  (*Id.* 268).  Fontainebleau also indicated at the meeting that it could not meet its debt obligations as they came due, disclosing that it planned to extinguish the Second Mortgage Notes and ask the Lenders to convert their debt into equity.  (BofA Statement ¶ 172).  Based on the information provided by Fontainebleau at the April 17, 2009 Lender meeting, the Revolver Lenders determined that one or more Events of Default had occurred and terminated the Revolver Loan on April 20, 2009.  (*Id.* ¶ 173).

On April 20, 2009, Bank of America, as Administrative Agent, sent Jim Freeman a letter stating "the Required Facility Lenders under the Revolving Credit Facility have determined that one or more Events of Default have occurred and are continuing to occur and they have requested that the Administrative Agent notify you that the Total Revolving Commitments have been terminated."  (Dep. Exh. 827).  On June 9, 2009, the Borrowers and certain affiliates filed a Chapter 11 Petition in the United States Bankruptcy Court for the Southern District of Florida.  (TL Statement ¶ 79).

In May 2009, Bank of America commissioned IVI to "perform a cost-complete review" of the Project's construction costs based on the "enhanced plan" presented during the April 2009 Lender meeting.  (BofA Statement ¶ 175).  As part of its review, IVI received additional information from Fontainebleau and the Contractor regarding the Project budget, including an April 30, 2009 Anticipated Cost Report, which included almost $300 million in pending charges for additional work by subcontractors.  (*Id.* ¶ 176).  After reviewing the documentation supporting the pending charges, IVI concluded, based on the number and scope of the pending items, that the subcontractors made the claims "some time ago, possibly as far back as a year," but they were never included in the Anticipated Cost Reports Fontainebleau submitted to IVI.  (*Id.* ¶ 177).  It was later determined that, to conceal the Project's cost overruns, Fontainebleau and TWC used two separate sets of books: one for their own internal use, which allowed them to keep track of the *actual* progress, scope, and cost of the Project, and a second set shown to Bank of America and IVI, which disclosed only a subset of the actual costs.  (*Id.* ¶ 178).  Fontainebleau and TWC also kept two sets of

Anticipated Cost Reports: an "internal" Report that included actual costs, and a "bank" Report that was disclosed to Bank of America and IVI and that conformed with the construction budget that had been disclosed to the Lenders.  (*Id.* ¶¶ 179–80).

## IV.   Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A fact is "material" if it hinges on the substantive law at issue and it might affect the outcome of the nonmoving party's claim.  *See id.* ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *Bishop v. Birmingham Police Dep't*, 361 F.3d 607, 609 (11th Cir. 2004).

The moving party bears the initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact.  *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997).  Once the moving party satisfies this burden, the burden shifts to the party opposing the motion to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."  *Celotex v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party.  *Anderson,* 477 U.S. at 248; *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th

Cir. 2001).   Moreover, speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)

In assessing whether the movant has met its burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-moving party. *Denney,* 247 F.3d at 1181; *Am. Bankers Ins. Group v. U.S.*, 408 F.3d 1328, 1331 (11th Cir. 2005) (applying same standard to cross-motions for summary judgment).   In determining whether to grant summary judgment, the court must remember that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.   In determining whether summary judgment is appropriate, the court is required to "draw all *reasonable* inferences in favor of the non-moving party, not all *possible* inferences." *Horn v. United Parcel Services, Inc.*, 433 F. App'x. 788, 796 (11th Cir. 2011) (emphasis added).

## V.   Discussion of Summary Judgment Motions

Upon review of the parties' cross-motions for summary judgment, I grant Bank of America's Motion for Summary Judgment and, correspondingly, deny the Term Lenders' Motion for Partial Summary Judgment.   In reaching this decision, I have carefully examined each cross-motion (and corresponding exhibits) under the proper standard; that is, I have reviewed Bank of America's Motion for Summary Judgment with all inferences in favor of the Term Lenders, and the Term Lenders' Motion for Partial Summary Judgment with all inferences in favor of Bank of America.   I conclude the Term Lenders, with all inferences in their favor, have failed to raise a genuine issue of material fact as to whether Bank of America, as Disbursement Agent or Bank Agent,

breached the Disbursement Agreement, or whether Bank of America acted with bad faith, gross negligence, or willful misconduct.  Accordingly, I enter judgment as a matter of law in favor of Bank of America on both of these issues.

In addressing the legal issues presented, I turn first to Bank of America's duties and responsibilities under the Disbursement Agreement.  Concluding that Bank of America can be held liable under the Disbursement Agreement for only bad faith, gross negligence, or willful misconduct, I explain, with all inferences in favor of the Term Lenders, that the evidence of record on summary judgment does not demonstrate Bank of America acted with bad faith or gross negligence or engaged in willful misconduct in the performance of its duties under the Disbursement Agreement.  Finally, I turn to the specific scenarios underlying the Term Lenders' claims, and conclude, based on the facts not materially in dispute, Bank of America did not breach the Disbursement Agreement, and even if it did, it did not act with gross negligence under New York law.

## A.    Claims at Issue: The Disbursement Agreement

As an initial matter, I reiterate that the only claims outstanding in this case are under the Disbursement Agent, not the Credit Agreement.  *See* 11/18/2011 Tr. 6:5–23; ECF No. 328.  Therefore, the Disbursement Agreement, and Bank of America's roles and responsibilities as Disbursement Agent and Bank Agent under that Agreement, are the focus of this Order.  Pursuant to Section 11.5 of the Disbursement Agreement, however, the Credit Agreement is expressly integrated into the Disbursement Agreement to the extent necessary to define the roles of Bank Agent and Disbursement Agent under the Disbursement Agreement.  In fact, the choice of Agreement does not matter, as under either Agreement, Bank of America is held to the same standard, and

Bank of America, in its roles as both Disbursement Agent and Bank Agent, did not act with gross negligence or engage in willful misconduct.

### B.      Bank of America's Duties Under the Disbursement Agreement

Before addressing the factual circumstances underlying the Term Lenders' breach of contract claims, I turn to Bank of America's duties and responsibilities under the Disbursement Agreement.   Under New York law, a written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms.  *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002). "Whether an agreement is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d 157, 162 (N.Y. 1990).  "Ambiguity is resolved by looking within the four corners of the document, not to outside sources."  *Kass v. Kass*, 91 N.Y.2d 554, 566 (N.Y. 1998); *Jet Acceptance Corp. v. Quest Mexicana S.A. de C.V.*, 929 N.Y.S.2d 206, 211 (N.Y. App. Div. 2011) ("Extrinsic evidence may not be introduced to create an ambiguity in an otherwise clear document.").   In analyzing whether a term is ambiguous, the court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.  *Kass*, 91 N.Y.2d at 566.   The court should further construe such terms in accordance with the parties' intent, which is generally discerned from the four corners of the document itself. *MHR Capital Partners LP v. Presstek, Inc.*, 912 N.E. 2d 43, 47 (N.Y. 2009); *Int'l. Klafter Co., Inc. v. Continental Cas. Co., Inc.*, 869 F.2d 96, 99 (2d Cir. 1989) (applying New York law; "the court is required to discern the intent of the parties to the extent their intent is evidenced by their written agreement.").   Furthermore, "[l]anguage whose meaning is otherwise plain is not ambiguous merely because the parties urge different

interpretations in the litigation." *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d. Cir. 1990) (applying New York law).

Here, the parties agree that the relevant provisions of the Disbursement Agreement are unambiguous. *See, e.g.,* BofA Memo. at 25 ("Here, the relevant Disbursement Agreement … provisions are complete, clear, and ambiguous."); 11/18/2011 Tr. 13:16–17 (Term Lenders counsel stating Term Lenders argued no ambiguity in their briefs). They disagree, however, on the meaning of those provisions and, correspondingly, on the scope of Bank of America's responsibilities under the Disbursement Agreement. I conclude that the Disbursement Agreement limits Bank of America's duties in approving and funding Advance Requests to determining whether Fontainebleau, IVI, the Contractor, and the Architect submitted the required documents, and determining whether the Advance Request conditions precedent were satisfied. In determining whether the conditions precedent were satisfied, Bank of America was entitled to rely on the representations, certifications, and documents it received from Fontainebleau, IVI, the Contractor, and the Architect. Moreover, Bank of America had no duty to investigate the veracity of or facts and circumstances underlying the representations. Nor did Bank of America have any affirmative duty to ensure that the conditions precedent were, in fact, met.

The Disbursement Agreement plainly set forth Bank of America's obligations in approving an Advance Request. Section 2.4.4 required Bank of America to review, in a timely manner, the Advance Request and its attachments to determine whether all required documentation had been provided, and to "use reasonable diligence" to assure that IVI performed its review and delivered its Construction Consultant Advance

Certificate in a timely manner.  *See* Disb. Agmt. § 2.4.4.  Section 2.4.6 required Bank of America to execute and deliver an Advance Confirmation Notice "[w]hen the applicable conditions precedent set forth in Article 3 have been satisfied."  *See id.* § 2.4.6.  To the contrary, "[i]n the event … (1) the conditions precedent to an Advance have not been satisfied, or (ii) the Controlling Person notifies the Disbursement Agent that a Default or Event of Default has occurred and is continuing," Bank of America was required to issue a Stop Funding Notice.  *See id.* § 2.5.1.

In determining whether the conditions precedent to an Advance Request were satisfied, Bank of America was explicitly authorized to rely on Fontainebleau's certifications and representations as to, among other things, the satisfaction of Article 3's conditions precedent, and was explicitly *not* required to conduct "*any* independent investigation as to the accuracy, veracity, or completeness" of those certifications, or to "investigate *any* other facts or circumstances to verify compliance by [Fontainebleau] with [its] obligations hereunder."  *See id.* § 9.3.2 (emphasis added).  Furthermore, the Disbursement Agreement was clear that Bank of America had "no duty to inquire of any Person whether a Default or an Event of Default has occurred and is continuing."  *See id.* § 9.10.

Even if Bank of America failed to fulfill its obligations under the Disbursement Agreement, the Disbursement Agreement contained a broad exculpatory provision under which Bank of America's liability was limited to its own bad faith, gross negligence, or willful misconduct.  *See id.* § 9.10; *Metropolitan Life Ins. Co. v. Noble Lowndes Intern., Inc.*, 643 N.E.2d 504, 506–7 (N.Y. 1994) (enforcing contract provision "limiting defendant's liability for consequential damages to injuries to plaintiff caused by

intentional misrepresentations, willful acts and gross negligence" because it represented parties' agreement on allocation of risk).  Section 9.10 stated the Disbursement Agent shall not be "in any manner liable or responsible" for any loss or damage "except as a result of [its] bad faith, … gross negligence or willful misconduct."  *See* Disb. Agmt. § 9.10.  In sum, even if Bank of America approved an Advance Request or failed to issue a Stop Funding Notice in violation of the Disbursement Agreement, it could be held liable only if it acted with malice, reckless disregard, or the intent to harm.

  **C.**  **The Term Lenders' Interpretation of Section 9.3.2**

  The Term Lenders urge a different interpretation of the Disbursement Agreement, and, in particular, of Bank of America's reliance on and duty to investigate Fontainebleau's representations, as reflected in Section 9.3.2.  The Term Lenders argue Bank of America could not rely on Fontainebleau's certificates if Bank of America "had reason to believe that they were false."  Term Lenders Opp. at 6.  The Term Lenders further argue Bank of America places "unsustainable weight" on Section 9.3.2, which entitles Bank of America to rely on Fontainebleau's certificates, and contend the Disbursement Agreement imposed upon Bank of America an obligation to "determine the satisfaction of conditions precedent not covered by certificates" and a duty to investigate to "resolve[] known inconsistencies."  *Id.*  While I—and Bank of America— agree that the Disbursement Agreement imposed on Bank of America a duty to issue a Stop Funding Notice when it has *actual knowledge* of the failure of a condition precedent to disbursement or the occurrence of a Default or Event of Default, *see* Nov. 18, 2011 Tr. 37:1–5, I disagree with the Term Lenders that the Disbursement Agreement imposes a duty to investigate *possible* inconsistencies, and address each of the Term Lenders' arguments regarding the interpretation of the Agreement below.

As an initial matter, though, I note the Term Lenders' interpretation of the Disbursement Agreement contradicts the plain language of Section 9.3.2.   Imposing upon Bank of America a duty to resolve inconsistencies or investigate the veracity of Fontainebleau's representations directly contradicts Section 9.3.2's provision that Bank of America "shall not be required to conduct *any* independent investigation" as to the accuracy of the representations.  *See* Disb. Agmt. § 9.3.2 (emphasis added).  Similarly, the Term Lenders' argument that Bank of America could not rely on certificates it had "reason to believe" are false contradicts the plain language of Section 9.3.2, which, without qualification, entitled Bank of America to rely on Fontainebleau's representations as to the satisfaction of the conditions precedent to disbursement.  *See id.*

The cases cited by the Term Lenders do not dictate otherwise.   *See* TL Opposition at 9–10.  In *Bank Brussels Lambert v. Chase Manhattan Bank*, the district court for the Southern District of New York analyzed a revolving credit agreement under which Chase was the agent bank.  No. 93 Civ. 5298, 1996 WL 609439 (S.D.N.Y. Oct. 23, 1996).  After the borrower filed for bankruptcy, the lender banks sued Chase for breach of the credit agreement, claiming Chase relied on materially inaccurate financial statements and certificates.  The revolving credit agreement required Chase to find the documents and documents "satisfactory … in form *and substance*."  *Id.* at *6 (emphasis added).  The court held, "if Chase knew, or was grossly negligent in not knowing, that the materials it delivered prior to and at closing were materially inaccurate, it cannot argue that those materials were satisfactory in 'substance.'"   *Id.* at *7.   As the

Disbursement Agreement contains no requirement that Bank of America evaluate the certificates for their *substance*, *Bank Brussels Lambert* is readily distinguishable.

*Chase Manhattan Bank v. Motorola, Inc.* is similarly distinguishable, as it pertains to a guarantor's right to rely on a borrower's false certificate to terminate its guarantee obligation.  184 F.Supp.2d 384 (S.D.N.Y. 2002).  The court held the guarantor could not rely on a false certificate to terminate its obligation.  Notably, the guaranty agreement at issue did not contain any provision entitling the guarantor to rely on certificates from the borrower in terminating its obligations.  Moreover, in response to Motorola's argument that Chase approved the "form and substance" of the false certificate and therefore cannot challenge its validity, the *Motorola* court cited to language stating Chase had no duty to ascertain or inquire into any statement, warranty or representation, and concluded Chase had the right to rely on the representations in the certificate. Therefore, the case law cited by the Term Lenders does not alter Section 9.3.2's reliance provision.  I turn next to the Term Lenders' textual arguments.

### 1.    "Commercially Reasonable" and "Commercially Prudent"

The Term Lenders first argue that Section 9.1's "commercially reasonable" language controls Bank of America's duties under the Disbursement Agreement and cite to parol evidence, including expert reports from Shepherd Pryor and Daniel Lupiani and a treatise, to argue that it would have been commercially unreasonable for Bank of America to disburse funds from September 2008 through March 2009.  Section 9.1, the introductory paragraph of Article 9, entitled "Disbursement Agreement," stated that, by accepting appointment as Disbursement Agent, Bank of America agreed to "exercise commercially reasonable efforts and utilize commercially prudent practices" in the performance of its duties hereunder consistent with those of similar institutions holding

collateral, administering construction loans and disbursing control funds."   *See* Disb. Agmt. § 9.1.  The subsequent sections of Article 9 set forth, *inter alia*, the "Duties and Liabilities of the Disbursement Agent Generally" (§ 9.2); "Particular Duties and Liabilities of the Disbursement Agent" (§ 9.3, including § 9.3.2); and "Limitation of Liability" (§ 9.10).  Structurally, then, Section 9.1 contained general standards, and the subsequent sections of Article 9 provided more specificity on Bank of America's duties and liabilities.

The Term Lenders appear to argue that Section 9.1 trumps Sections 9.3.2 and 9.10, and, under Section 9.1, it would be commercially unreasonable for Bank of America to rely on representations that *could be* false, and commercially reasonable for Bank of America to investigate possible inaccuracies.  I disagree.

Reading Article 9 and the Disbursement Agreement in their entirety, I conclude Section 9.1 is not inconsistent with the reliance and investigation provisions of Section 9.3.2, or the exculpatory provision of Section 9.10.  Section 9.1 required Bank of America to use commercially reasonable efforts and commercially prudent practices in the general performance of its duties, but the Disbursement Agreement still entitled Bank of America to rely on Fontainebleau's certifications without independent investigation (Section 9.3.2) and absolved Bank of America for liability for conduct outside of bad faith, willful misconduct, or gross negligence (Section 9.10).  Indeed, to conclude otherwise would render the reliance, investigation, and exculpatory provisions meaningless, in contravention of the basic tenet of contract interpretation that a contract should be read to give all provisions meaning and effect.  *See Excess Ins. Co. Ltd. v. Factory Mut. Ins.*, 822 N.E.2d 768, 770–71 (N.Y. 2004) (in interpreting contracts, "the intention of the parties should control. To discern the parties' intentions, the court should

construe the agreements so as to give full meaning and effect to the material provisions."). Even if I were to conclude Section 9.1's "commercially reasonable" and "commercially prudent" standards are inconsistent with Sections 9.3.2 and 9.10, the latter sections would control, as, in the face of an inconsistency between a general provision and specific provisions, the specific provisions prevail. *See Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956); *John B. Stetson Co. v. Joh. A. Benckiser GmbH*, 917 N.Y.S.2d 189 (N.Y. App. Div. 2011) (interpreting contract and concluding more specific articulation of duty controlled over general articulation of duty).

As I have concluded that "commercial reasonableness" and "commercially prudent" do not control or affect Bank of America's entitlement to rely on Fontainebleau's representations or Bank of America's duty to investigate those representations, I need not determine the meaning of these terms. If I were to determine their meaning, though, I would not consider the expert reports and treatise cited by the Term Lenders because, as the Term Lenders and Bank of America agree, "commercial reasonableness" and "commercially prudent" in the Disbursement Agreement are unambiguous terms and, under New York law, parol evidence may not be admitted to interpret unambiguous contract terms. *See R/S Associates v. New York Job Development Authority*, 771 N.E.2d 240, 242 (N.Y. 2002) ("[W]hen interpreting an unambiguous contract term, evidence outside the four corners of the document is generally inadmissible to add to or vary the writing."); TL Memo. Reply at 6 (conceding expert reports and treatise are inadmissible if contract terms are unambiguous, and arguing Disbursement Agreement is unambiguous). Accordingly, Section 9.1 does not

alter the duties, responsibilities, and protections clearly set forth in Sections 9.3.2 and 9.10.

### 2.    The Meaning of "Genuine"

The Term Lenders next argue that Section 9.3.2's provision that Bank of America may rely only on certificates it believes to be "genuine" imposes a duty on Bank of America to determine whether the representations in the certificate are truthful.  The Term Lenders reason that a document containing a misrepresentation is not genuine, and Bank of America therefore had a duty to determine if the certificates contained any misrepresentations before relying on them.  While the first sentence of Section 9.3.2 does state Bank of America may rely on any document or certificate believed by it on reasonable grounds to be "genuine," the very next sentence of Section 9.3.2 authorizes Bank of America, specifically in conjunction with the approval of an Advance Request, to "*[n]otwithstanding anything else in this Agreement to the contrary*" "rely on Fontainebleau's certifications … as to the satisfaction of any requirements and/or conditions imposed by this Agreement."  *See* Disb. Agmt. § 9.3.2.  Moreover, the final sentence of Section 9.3.2 specifically rejects any duty of the Disbursement Agent to conduct an independent investigation of the accuracy or veracity of the certificates.  *See id.* § 9.3.2 ("The Disbursement Agent shall not be required to conduct any independent investigation as to the accuracy, veracity or completeness of any such items or to investigate any other facts or circumstances …．").  Reading Section 9.3.2 in its entirety, I conclude that "genuine" in Section 9.3.2 means authentic or not fake.[18]  The

---

[18] In support of their contention that "genuine" means "truthful", the Term Lenders cite to only one case, *Stanford Seed Co. v. Balfour, Guthrie & Co.*, 27 Misc. 2d 147 (N.Y. Sup. Ct. 1960),

interpretation advanced by the Term Lenders—suggesting Bank of America may only rely on a certificate it deems truthful—renders the reliance and investigation provisions of the rest of Section 9.3.2 meaningless and is therefore not an interpretation supported by New York law.

Lastly, I disagree with the Term Lenders' argument that "[t]he fact that Bank of America could be liable for 'false representations' under Section 9.10 "establishes that it could not blindly rely on false certificates." *See* TL Opposition at 9.  Bank of America's liability for Bank of America *itself* making a false representation has no bearing on its reliance on the possibly-false representation of another party.  Furthermore, the Term Lenders' reliance on Section 7.1.3(c) is misplaced, as a prohibition on acting on a known, material falsity in a certification does not translate into a duty to investigate any possibly falsity.  Therefore, I conclude 9.3.2 did not impose any obligation to investigate the accuracy of a representation.

### 3.    Sections 3.3.21 and 3.3.24

In further support of their contention that Bank of America could rely only on truthful certificates, the Term Lenders cite Sections 3.3.21 and 3.3.24.  Section 3.3.21, stated, as a condition precedent to disbursement, "the Bank Agent shall not have become aware … of any information … that taken as a whole is inconsistent in a

---

which I find readily distinguishable.  In *Stanford Seed*, the trial court addressed what constituted a genuine receipt under the Uniform Warehouses Receipts Act and held that a document was a not a "genuine" receipt because it was not signed by a warehouseman under Oregon law.

Moreover, even if "genuine" means truthful, Bank of America, in approving an Advance Request, was protected by the specific provision of the second sentence of Section 9.3.2 entitling it, *notwithstanding anything in the Agreement to the contrary*, to rely on Fontainebleau's representations.  *See John B. Stetson Co. v. Joh. A. Benckiser GmbH*, 917 N.Y.S.2d 189 (N.Y. App. Div.).

material and adverse matter with the information … disclosed to them concerning … the Project," and Section 3.3.24 similarly stated "the Bank Agent shall have received such other documents and evidence as are customary for transactions of this type as the Bank Agent may reasonably request in order to evidence the satisfaction of the other conditions set forth above." *See* Disb. Agmt. §§ 3.3.21 and 3.3.24 (emphasis added). Although Bank of America was the Bank Agent (as well as the Disbursement Agent), Bank of America, as Disbursement Agent, cannot be held liable for information it knew as Bank Agent.  Indeed, the parties contemplated Bank of America's multiple roles and agreed, "Notwithstanding anything to the contrary in this Agreement, the Disbursement Agent shall not be deemed to have knowledge of any fact known to it in any capacity other than the capacity of Disbursement Agent." *See id.* § 9.2.5 ("No Imputed Knowledge").  Accordingly, Bank of America, as Disbursement Agent, cannot be held to any duties imposed by the Disbursement Agreement on the Bank Agent, and, in the context of Bank of America's duties as Disbursement Agent, the Term Lenders' emphasis on Sections 3.3.21 and 3.3.24 is misplaced.  Having explained the duties and liability of Bank of America under the Disbursement Agreement, I turn to the facts underlying the Term Lenders' claim.

### D.    Bank of America was Not Grossly Negligent

As explained above, pursuant to the exculpatory provision of the Disbursement Agreement, Bank of America could be held liable for breach of the Disbursement Agreement only if it acted with gross negligence in the performance of its duties under the Disbursement Agreement.  Under New York law, gross negligence is "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *Curley v. AMR Corp.*, 153 F.3d 5, 12–13 (2d Cir. 1998) (applying New

York law); *see also Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 611 N.E.2d 282, 284 (N.Y. 1993) (gross negligence is "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing" (internal citation omitted)); *Travelers Indem. Co. of Connecticut v. Losco Group, Inc.*, 204 F. Supp. 2d 639, 644–45 (S.D.N.Y. 2002) ("Under New York law, a mistake or series of mistakes alone, without a showing of recklessness, is insufficient for a finding of gross negligence."; gross negligence requires that the defendant "not only acted carelessly in making a mistake, but that it was so extremely careless that it was equivalent to recklessness."); *DRS Optronics, Inc. v. North Fork Bank*, 843 N.Y.S.2d 124, 127–28 (N.Y. App. Div. 2007) (holding defendant exhibited gross negligence where it failed to exercise "slight care" or "slight diligence"); New York Patten Jury Instructions, PJI 2:10A ("Gross negligence means a failure to use even slight care, or conduct that is so careless as to show complete disregard for the rights and safety of others.").

The standard for willful misconduct is similarly high. Under New York law, willful misconduct is "conduct which is tortious in nature, *i.e.*, wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract between the parties." *Metro. Life*, 643 N.E.2d at 508; *see also In re CCT Communications, Inc.*, --- B.R. ----, 2011 WL 3023501, at *5, 13 (Bankr. S.D.N.Y. July 22, 2011) (interpreting contract under New York law and concluding willful misconduct "does not include the voluntary and intentional failure or refusal to perform a contract for economic reasons," but requires malice or acting with the purpose of inflicting harm).

The Term Lenders argue that Bank of America was grossly negligent because it disbursed funds in the known failure of conditions precedent.  *See* TL Motion at 27–28; TL Opposition at 37–39.  Putting aside, for the moment, whether Bank of America had actual knowledge of the failures of any conditions precedent, the Term Lenders' argument is fundamentally flawed because it equates breach of the Disbursement Agreement with gross negligence.  As discussed above, the exculpatory provision of the Disbursement Agreement requires more than mere breach of the Disbursement Agreement to hold Bank of America liable.  *See* Disb. Agmt. § 9.10 (limiting Disbursement Agent's liability to bad faith, gross negligence, or willful misconduct).

Upon review of the facts, I conclude Bank of America, as Disbursement Agent, did not act in bad faith or with gross negligence or willful misconduct in performing its duties under the Disbursement Agreement.  *See David Gutter Furs v. Jewelers Protection Services, Ltd.*, 594 N.E.2d 924 (N.Y. 1992) (granting summary judgment in favor of defendant because allegations did not raise an issue of fact whether defendant performed its duties with reckless indifference to plaintiff's rights);[19] *Gold v. Park Ave. Extended Care Center Corp.*, 935 N.Y.S.2d 597, 599 (N.Y. App. Div. 2011) (affirming trial court's granting of summary judgment in favor of hospital and holding hospital was not grossly negligent where evidence showed absence of any conduct that could be

---

[19] During oral argument, counsel for the Term Lenders argued that in the case of contracts that provide for the protection of property, such as alarm companies, courts have routinely held that gross negligence is a triable fact.  (11/18/2011 Tr. 103:13-19).  In *David Gutter Furs*, a case involving defendant's design, installation, and monitoring  of a burglar alarm system, the New York Court of Appeals reversed the appellate court's denial of summary judgment on the grounds there was no issue of fact whether defendant performed its duties with reckless indifference to plaintiff's rights.  594 N.E.2d 924 (N.Y. 1992).  It follows that summary judgment may be granted on the issue of gross negligence in the case of contracts that provide for the protection of property.

viewed as so reckless or wantonly negligent as to be the equivalent of a conscious disregard for the rights of others); *see also Net2Globe Intern., Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436 (S.D.N.Y. 2003) ("While issues of malice, willfulness, and gross negligence often present questions of fact, courts have sustained limitation of liability provisions in the context of a summary judgment motion when the surrounding facts compel such a result.").  Indeed, there is no evidence of record on summary judgment that Bank of America intended to harm the Term Lenders, or that it recklessly disregarded their rights.

To the contrary, Bank of America gave consideration to the Term Lenders' rights and interests.  From September 2008 through April 2009, Bank of America was responsive to Lenders' questions, tried to get information from Fontainebleau, and facilitated communications between the Lenders and Fontainebleau.  For example, when Bank of America became aware that there may be an issue with Lehman funding its portion of the Retail Advance, Bank of America consulted internally and with counsel. *See CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 474 n.27 (S.D.N.Y. 2010) (concluding bank did not act in bad faith and stating bank's consultation with counsel demonstrated good faith).  Bank of America also repeatedly conferred with Fontainebleau, and requested Fontainebleau provide the Lenders with information regarding both Lehman and the Project.  Bank of America further responded thoroughly and promptly to Highland's inquiries regarding the Lehman bankruptcy and its implications for the Senior Credit Facility.  Finally, before disbursing funds to Fontainebleau, Bank of America sought reaffirmation from Fontainebleau that all conditions precedent to funding had been satisfied.

In addressing First National Bank of Nevada's repudiation, which represented only 0.6% of the Senior Credit Facility, Bank of America proposed a solution that would permit funding to occur.  This solution gave consideration to the Lenders' interests, as neither the Lenders nor Fontainebleau would have expected funding to cease based on the repudiation of such a small commitment.

In the same vein, Bank of America consulted with the Lenders regarding Guggenheim and Z Capital's failure to fund the March 2009 Advance Request.  Bank of America informed the Lenders that Guggenheim and Z Capital had not funded, and suggested it would still include their commitment in the Available Funds component, so that funding could occur.  Bank of America invited any Lender to comment on the intended solution, and no Lender protested.  In performing its duties under the Disbursement Agreement, Bank of America consistently communicated with the Lenders, provided them with pertinent information, and invited comment.

Indeed, Bank of America's conduct, even when viewed in the light most favorable to the Term Lenders, is vastly distinct from the conduct of the defendant in *DRS Optronics, Inc. v. North Fork Bank*, the case cited by the Term Lenders in support of their gross negligence argument.  *See* 843 N.Y.S.2d 124 (N.Y. App. Div. 2007).  In *DRS Optronics*, the defendant entered into a custodial agreement with two parties under which it was required to ensure that no payments were made without joint written instructions of the two parties.  *Id.* at 126.  The court held the defendant was grossly negligent because it made no effort to implement any procedure to ensure the two-signature requirement would be enforced, and instead established a system that allowed one party to unilaterally transfer funds.  *Id.*  at 128.  Moreover, the court noted

the defendant "failed to submit any evidence … as to whether it exercised even the slightest care in performing its obligations."  *Id.*  In contrast, Bank of America made significant efforts to comply with the requirements of the Disbursement Agreement, and, as evidenced by meetings, calls, and communications with key parties, exercised well more than the slightest care in performing its obligations.

It bears noting the Term Lenders (or their successors in interest) were aware of the chief "risk"—namely the Lehman bankruptcy—they claim should have prompted Bank of America to investigate Fontainebleau's representations.  Yet, not a single Term Lender demanded that Bank of America take any action relating to the allegations presented in this case, nor did any of the Term Lenders file a Notice of Default to compel the issuance of a Stop Funding Notice.  It could hardly follow that Bank of America recklessly disregarded the Term Lenders' rights when the Term Lenders themselves did not seek to enforce those rights.[20]  Based on these facts, it cannot be said that Bank of America acted with bad faith, gross negligence, or willful misconduct.

### E.    Bank of America's Knowledge of Failures of Conditions Precedent

Nor can it be said that Bank of America breached the Disbursement Agreement by disbursing funds in the *known* failures of conditions precedent.  The Term Lenders argue that Bank of America disbursed funds despite known failures of conditions precedent relating to (1) Lehman's bankruptcy; (2) the Project's cost overruns; (3) the

---

[20]  To the extent the Term Lenders rely on Highland's communications with Bank of America regarding the Lehman bankruptcy as an assertion of the Term Lenders' rights, counsel for the Term Lenders conceded that "[t]here is no protocol for [the Term Lenders] to do that." (11/18/2011 Tr. 79:2-8).

First National Bank of Nevada repudiation; (4) select lenders' failure to fund the March 2009 Advance Request; and (5) the timing of the March 2009 Advance Request. However, as explained below, with respect to each of these situations, there is no evidence on summary judgment that Bank of America actually knew that a condition precedent was not met. Before discussing each scenario, it bears repeating that for all Advance Requests from September 2008 through March 2009, Fontainebleau submitted documentation certifying *all* conditions precedent to disbursement had been met. *See, e.g.* TL Motion at 21 ("In connection with each Advance Request, the Borrowers were required to and did represent and warrant that all conditions precedent to disbursement, including Lehman's funding of its commitments under the Retail Facility had been satisfied.").

### 1.    The Lehman Bankruptcy and Lehman's Failure to Fund

The Term Lenders argue the Lehman bankruptcy, and its aftermath, some of which was known to Bank of America, caused numerous conditions precedent to fail. Specifically, the Term Lenders argue the Lehman bankruptcy was a material adverse effect on the Project; Bank of America knew that Lehman did not fund the September 2008 advance; and ULLICO funding for Lehman was impermissible. Before addressing each of these arguments, I note that, even if the Term Lenders' contentions regarding the Lehman bankruptcy and effects on the Retail Facility were true, it was not grossly negligent for Bank of America to disburse funds when, each month, the Retail Facility was fully funded. Indeed, if commercially reasonable were the applicable standard under the Disbursement Agreement, it would have been commercially *unreasonable* for Bank of America, as Disbursement Agent and Bank Agent, to halt construction of a the multi-billion dollar Fontainebleau Project when Retail funded its September Shared

Costs in full, and when Lehman's portion of the September Shared Costs was a small portion of the total September Advance Request.

<strong>a)      The Lehman Bankruptcy</strong>

The Term Lenders first argue the Lehman bankruptcy alone had a Material Adverse Effect on the Project, and Bank of America therefore should have issued a Stop Funding Notice.  *See* TL Opposition at 11.  The Term Lenders reason that Lehman was the largest Retail Lender, the Retail Facility was critical to the completion of the Project, and Lehman bankruptcy rendered uncertain the availability of Lehman's committed funds.  *See id.* at 11–12.

First, the Disbursement Agreement requires Bank of America as Disbursement Agent to issue a Stop Funding Notice only in the event that (1) the Controlling Person notifies Bank of America, as Disbursement Agent, that a Default or Event of Default has occurred, or (2) conditions precedent to an Advance have not been satisfied.  *See* Disb. Agmt. § 2.5.1.  There is no evidence on summary judgment that Bank of America, as Disbursement Agent, was notified that the Lehman bankruptcy was a Default or Event of Default, and the Term Lenders have not pointed to any provision of the Disbursement Agreement requiring Bank of America, as Disbursement Agent or Bank Agent, to make that determination on its own.  To the extent the Term Lenders suggest Highland's emails to Bank of America regarding the Lehman bankruptcy constituted notice of default, as required by Section 2.5.1, I conclude the emails were not notices of default upon which Bank of America could issue stop funding notices, as they did not state that a Default or Event of Default had taken place or identify the Default or Event of Default.

To the Term Lenders' suggestion that Bank of America should be deemed to have knowledge of defaults irrespective of the role (Controlling Person versus

70

Disbursement Agent) in which it came across that information, the "no imputed knowledge" provision of the Section 9.2.5 of the Disbursement Agreement expressly defeats the Term Lenders' suggestion.  Regardless, there is no evidence of record on summary judgment that Bank of America, as Controlling Person/Bank Agent/Administrative Agent, was notified of a Default or Event of Default, and like the Disbursement Agent, the Credit Agreement, Section 9.3, imposed no duty on Bank of America as Administrative Agent to inquire about defaults.

As for satisfaction of the conditions precedent to disbursement, Fontainebleau expressly certified that the conditions precedent to the September 2008 Advance Request, including there being no Material Adverse Effects on the Project, had been satisfied, a certification upon which Bank of America was entitled to rely in approving an Advance Request and disbursing funds.  Accordingly, Bank of America did not breach the Disbursement Agreement by disbursing funds in the face of Lehman's bankruptcy filing.

Even if the Disbursement Agreement imposed on Bank of America as Disbursement Agent or Bank Agent a duty to determine whether the Lehman bankruptcy had a Material Adverse Effect on the Project, under Section 3.3.21 or otherwise, I would conclude that Bank of America did not breach the Disbursement or Credit Agreements by determining there was no Material Adverse Effect.  Although Bank of America stated immediately after the Lehman bankruptcy that "Lehman may be the death nail for [the Project]," *see* Dep. Exh. 67, as of the disbursement of the September 2008 Advance Request, there was no indication that there would be a shortfall in Retail Funds or that the Retail Lenders would fail to honor their obligations

under the Retail Facility.  Indeed, although it was later discovered that Lehman did not fund its portion of the September 2008 Shared Costs, Lehman did fund its portion in October and November 2008, demonstrating Lehman's bankruptcy filing itself did not make Lehman's funds unavailable or necessarily compromise the Project.  Moreover, every month from September 2008 through March 2009, TriMont wired to Bank of America the full amount of the requested Retail Shared Costs, indicating there was no funding gap on the Retail end of the Project.  At a minimum, Bank of America did not act with bad faith, gross negligence, or willful misconduct by disbursing funds in the face of the full monthly funding of the Retail Advance.

### b)   Bank of America's Knowledge that Lehman Failed to Make the September 2008 Retail Advance

The Term Lenders next argue that Bank of America knew that Fontainebleau funded Lehman's share of the September 2008 Retail Advance, but the evidence of record on summary judgment, with all inferences in favor of the Term Lenders, demonstrates otherwise.  Bank of America did not have actual knowledge that Fontainebleau funded for Lehman.  Nor did it have actual knowledge that Lehman did not fund its share of the September 2008 Retail Advance.  Immediately before disbursing the September 2008 Advance Request to Fontainebleau, Bank of America sought and received oral and written confirmation from Jim Freeman that, even though Lehman had filed for bankruptcy, all conditions precedent to funding were satisfied and all prior representation, warranties, and certifications remained correct.  McLendon Rafeedie's deposition testimony, the Highland emails, and communications from Fontainebleau did not provide Bank of America with actual knowledge of who funded

the September 2008 Retail Advance such that it could deem Fontainebleau's representations false.

First, contrary to the Term Lenders' assertion, there is no evidence that TriMont told Bank of America that Lehman did not fund its portion of the September 2008 Retail Advance. As explained above, TriMont's McLendon Rafeedie testified that he could not recall the specific communications regarding Lehman's funding with Bank of America's Jean Brown, and stated he "could have" told Ms. Brown that Fontainebleau funded for Lehman, not that he "did" tell Ms. Brown. Similarly, Ms. Brown stated she did not know that Lehman did not fund its portion of the September 2008 Retail Advance. Lack of recollection does not create a genuine issue of material fact. *See, e.g.*, *Brown v. St. Paul Travelers Companies*, 331 F. App'x. 68, 70 (2nd Cir. 2009) ("We agree with the District Court that '[p]laintiff's statement, that she has no recollection or record of receiving the employee handbook and arbitration policy, despite the fact that it was distributed on at least six occasions during her employment, is ... not sufficient to raise a genuine issue of material fact.' "); *Tinder v. Pinkerton Sec'y*, 305 F.3d 728, 735–36 (7th Cir.2002) (plaintiff's testimony that she did not recall seeing or reviewing a brochure did not create a genuine issue of material fact in light of affidavits that the brochure was sent to her); *Dickey v. Baptist Mem'l Hosp.*, 146 F.3d 262, 266 n.1 (5th Cir. 1998) ("The mere fact that [the deponent] does not remember the alleged phone conversation, however, is not enough, by itself, to create a genuine issue of material fact [as to whether the conversation occurred.]"). Moreover, based on the testimony from Mr. Rafeedie and Ms. Brown, a fact finder could only speculate as to whether Bank of America knew Fontainebleau funded for Lehman, and speculation does not create a

genuine issue of material fact.  *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (stating speculation does not create a genuine issue of material face); *see also Hughes v. Stryker Corp.*, 423 F. App'x. 878, 882 (11th Cir. 2011) (affirming district court's award of summary judgment in favor of defendant in negligence action because, based on factual record, a jury could only speculate as to causation, and speculation does not create a genuine issue of material fact).  The testimony from Mr. Rafeedie and Ms. Brown therefore does not create a genuine issue of material fact as to whether Bank of America knew that Fontainebleau funded Lehman's portion of the September 2008 Advance Request, and there is no other evidence of record on summary judgment that TriMont told Bank of America that Lehman did not fund.

Second, Highland's October 6 and 13 emails (sent after the disbursement date of the September 2008 Advance Request) do not establish that Bank of America had knowledge that Fontainebleau funded for Lehman.  The October 6, 2008 email alleged "public reports" that "equity sponsors" had funded for Lehman, but did not identify the source of the public reports.  Additionally, the October 13 email, forwarding a Merrill Lynch analyst report, only stated the analyst "underst[ood]" Fontainebleau equity sponsors had funded for Lehman.  Most importantly, Highland acknowledged that, at the time of these emails, the assertion that Fontainebleau equity sponsors had funded for Lehman was one of a number of rumors or speculations in the market.  Although the Lehman bankruptcy and possible replacements for Lehman were discussed at the October 23, 2008 Retail meeting (at which Bank of America was present), there is no evidence of record that Lehman's failure to fund the September 2008 Retail Advance was discussed at the October Meeting.

Finally, I do not find compelling the Term Lenders' argument that Bank of America's "cryptic" communications, Fontainebleau's refusal to meet with Lenders to discuss the Lehman bankruptcy, Fontainebleau's "shift to the passive voice," Bank of America internal emails, and Mr. Bolio's handwritten notes create a reasonable inference (much less "the only reasonable inference") that Bank of America knew Fontainebleau paid Lehman' share of the September 2008 Retail Advance.  *See* TL Opposition at 13, 15–16.  First, Bank of America's September 26, 2008 request for confirmation of fulfillment of conditions precedent after Lehman's bankruptcy was reasonable and prudent, as the Lehman bankruptcy caused substantial concern in the market.   Second, Fontainebleau's silence and refusal to meet with Lenders in September and October 2008 do not equate to an admission that Fontainebleau funded for Lehman.   Third, Fontainebleau's October 7, 2008 Memorandum, in which Fontainebleau craftily avoided answering who funded for Lehman by using the passive voice, did not provide Bank of America with notice that Fontainebleau funded for Lehman, or that Lehman did not fund.  Nor did the Memorandum cause Section 3.3.24 to fail, as Section 3.3.24, by its plain language, applies only to "documents and evidence," not information in general, and, moreover, the Memorandum adequately answered the questions asked by Bank of America and fulfilled Section 3.3.24.  Notably, the Memorandum was sent to the Lenders, as well as Bank of America.  Yet no Term Lender submitted a Notice of Default based on the (now alleged-to-be) insufficient information contained therein.

Next, the internal emails cited by Term Lenders reflect Bank of America's initial understanding from the mid-September 2008 conference calls that Fontainebleau may

fund for Lehman, but not an actual understanding that Lehman did not fund its share of the September 2008 Retail Advance, or that Fontainebleau funded Lehman's share. *See, e.g.*, Dep. Exh. 73 (dated September 19, 2008), Dep. Exh. 204 (dated September 19, 2008).   The Term Lenders have presented no evidence to contradict Bank of America's emails showing, as of December 2008, Bank of America thought Lehman funded the September 2008 Retail Advance.   Moreover, the January 2009 Bank of America emails cited by the Term Lenders, *see* Dep. Exhs. 1513, 1514, 1515, and 1516, were from the Commercial Real Estate Banking group, a group which had no involvement in Bank of America's roles as Disbursement Agent and Bank Agent and whose knowledge cannot be imputed to Bank of America as Disbursement Agent or Bank Agent.

Finally, the Term Lenders have not pointed to any testimony tying Brandon Bolio's handwritten notes, which state Lehman did not fund, to the September 2008 Advance Request.   Indeed, the notes reflect dollar amounts that do not correspond to the September 2008 Advance and ask whether Fontainebleau could permissibly fund for Lehman, a question which Bank of America had answered in the negative by the time Bank of America disbursed the September 2008 Advance Request.  *See* Dep. Exh. 475 at BANA_FB00846432–33; Bolio Dep. Tr. 58:7–60:25).   In sum, on summary judgment, the Term Lenders have not presented evidence from which it could reasonably be inferred that Bank of America actually knew Fontainebleau funded Lehman's portion of the September 2008 Retail Advance, or Lehman did not fund its portion of the Advance.

### c)   ULLICO Funding for Lehman

Turning next to the funding of Lehman's portion of the Retail Advance from December 2008 through March 2009, it is undisputed that ULLICO, a Retail Co-Lender, funded Lehman's portion of the Retail Shared Costs, and Fontainebleau (Fontainebleau Resorts, Jeff Soffer, and Turnberry Residential Limited Partners, to be more precise) reimbursed ULLICO for at least a portion of those payments through a Guaranty Agreement and a series of Amendments thereto.  It is further undisputed that Bank of America knew that ULLICO was funding Lehman's portion of the Retail Shared Costs from December 2008 through March 2009, and it was impermissible under the Disbursement Agreement for Fontainebleau to reimburse ULLICO and, in effect, make the Retail Advance.  The parties disagree, however, on whether it was permissible under Section 3.3.23 of the Disbursement Agreement for ULLICO to fund for Lehman, and whether Bank of America knew of Fontainebleau's guaranty arrangement with ULLICO.

Section 3.3.23 states "the Retail Agent and the Retail Lenders shall, on the date specified in the relevant Advance Request, make any Advances required of them pursuant to the Advance Request."  Disb. Agmt. § 3.3.23.  The Term Lenders argue the advances made by the Retail Lenders were several, not joint, and therefore Lehman had to fund its respective share of the Retail Advance.  Bank of America, on the other hand, argues Section 3.3.23 requires the Retail Agent and Retail Lenders to collectively make their Advances, but does not require each Retail Lender to fund a specific amount.

Reading the Disbursement Agreement in its entirety, I conclude Section 3.3.23 mandates only that the Retail Shared Costs be funded collectively by the Retail

Lenders, not that each Retail Co-Lender funds its respective portion, therefore permitting ULLICO to fund for Lehman.  In reaching this conclusion, I rely not only on the plain language of Section 3.3.23, but also Section 2.6.3, which states the Disbursement Agent shall not release Advances until "the Retail Lenders have made any requested Loans under the Retail Facility."  *Id.* § 2.6.3.  Like Section 3.3.23, Section 2.6.3, by its plain language, does not require *each* Retail Lender to fund its respective portion, but rather requires the "Retail Lenders" to fund their collective "Loans."

To the Term Lenders' reference to Section 9.7.2 of the Retail Agreement, *see* TL Motion at 20, which provides that the liabilities of the Retail Co-Lenders "shall be several not joint," Section 9.7.2 provides that the Retail Co-Lenders are under no *obligation* to fund for each other.  However, this provision does not control whether, to satisfy Section 3.3.23 of the Disbursement Agreement, the Retail Co-Lenders *may* fund for each other.  Further, Section 9.7.2(a) permits each Retail Co-Lender to assume the obligations of any other Co-Lender, supporting an interpretation of Section 3.3.23 which permits Retail Co-Lenders to fund for each other.

To the extent the parties' intent when drafting Section 3.3.23 can be discerned from the four corners of the relevant agreements, Bank of America was not a party to or provided a copy of the Retail Co-Lending Agreement.  Accordingly, the parties could not have intended Bank of America, as Disbursement Agent or Bank Agent, to evaluate whether each Retail Co-Lender made its respective contribution pursuant to the Retail Agreement and Retail Co-Lending Agreement.

Finally, I conclude Bank of America did not have actual knowledge that Fontainebleau reimbursed ULLICO for any portion of the December 2008 through

March 2009 Retail Advances, as the Term Lenders, who would bear the burden at trial, have pointed to no evidence in the record suggesting that Bank of America knew of the guaranty arrangement.  *See Fitzpatrick v. City of* Atlanta, 2 F.3d 1112, 1115–16 (11th Cir. 1993) (for issues on which the non-moving party bears the burden at trial, to meet its burden on summary judgment, the moving party may point the district court to the absence of evidence to support the non-moving party's position).  Thus, Bank of America, as Disbursement Agent, did not breach the Disbursement Agreement with respect to ULLICO's funding of Lehman's portion of the Retail Shared Costs.

Even if it were determined that ULLICO funding for Lehman was impermissible and therefore caused the condition precedent in Section 3.3.23 to fail, or that ULLICO funding for Lehman constituted a "default" of the Retail Agreement and therefore caused the failure of the condition precedent set forth in Section 3.3.3, Bank of America did not act with bad faith, gross negligence, or willful misconduct in permitting a Retail Co-Lender to fund Lehman's commitment when Fontainebleau certified that all conditions precedent had been met, the Co-Lender funding resulted in full funding of the Retail Shared Costs, and Bank of America believed Section 3.3.23 was satisfied by the Retail Co-Lenders, collectively, funding the Retail Shared Costs.

### 2.      Project Cost Overruns

The Term Lenders next argue that Bank of America knew that Fontainebleau was falsifying (and underreporting) the anticipated cost to complete the Project, this misstatement of Project costs caused numerous conditions precedent to fail, and Bank of America disbursed funds in the face of the failures of these conditions precedent. *See* TL Opposition 23–29.  More specifically, the Term Lenders appear to argue that Bank of America knew, as early as May 2008, that Fontainebleau was substantially

underreporting costs, and Bank of America knew this cost underreporting would continue into the future (as, in fact, it did). But the evidence cited by the Term Lenders, with all inference in favor of the Term Lenders, does not support its factual argument or conclusion.

First, the Term Lenders do not dispute that, Fontainebleau and TWC actively concealed the Project's cost overruns from Bank of America and IVI by maintaining two sets of books and Anticipated Cost Reports: an internal set that reflected the actual costs, and an external set disclosed to Bank of America and IVI which contained only a subset of the actual costs. Given this evidence, the Term Lenders' argument that Bank of America was aware of Fontainebleau's inaccurate cost reporting lacks merit.

Notwithstanding, the evidence cited by the Term Lenders does not support the conclusion that Bank of America was actually aware of any cost concealment. The Term Lenders cite documents and testimony demonstrating that, in May 2008, Fontainebleau presented Bank of America with $201 million in change orders. As an initial matter, I concur with Bank of America that the May 23, 2008 Owner Change Order is inadmissible under Federal Rules of Evidence 801, 802, and 901 as an unauthenticated document, the contents of which are hearsay. Even if the Change Order were admissible, though, the information contained therein does not indicate that Fontainebleau was concealing cost overruns. Although the documents accompanying the May 2008 Change Order indicated Fontainebleau knew about select change orders (amounting to about $41.5 million) for some time, the documents also demonstrated that, as of May 2008, these change orders were still being negotiated and had not been finalized. Accordingly, it cannot be said from this evidence that Fontainebleau was

concealing cost overruns, or that Bank of America knew that Fontainebleau was concealing cost overruns.

Second, the evidence on summary judgment does not support the Term Lenders suggestion that Bank of America knew the cost underreporting would continue into the future.  The June 10, 2008 email cited by the Term Lenders indicates that, as of that date, IVI believed the $210 million in cost increases was not all inclusive.  *See* Dep. Exh. 217.  However, the email also indicates that Bank of America and IVI contacted Jim Freeman to express their concerns, and Mr. Freeman would ensure IVI was provided with all necessary information.  IVI promptly investigated the additional costs, *see* Dep. Exh. 892, and included its assessment in the June Project Status Report, *see* Dep. Exh. 868.  More specifically, the June PSR stated the March 27, 2008 Anticipated Cost Report confirmed additional change orders and potential extra cost exposure, and concluded the March ACR would increase the final budget.  *See* Dep. Exh. 868 at 14.  Thus, the record indicates Bank of America addressed any concerns about cost overruns with IVI in June 2008, and does not indicate that Bank of America knew that Fontainebleau concealed those pre-June 2008 overruns.  Indeed, it is undisputed that, for the April, May, and June 2008 Advance Requests, IVI issued Construction Consultant Advance Certificates, upon which the Disbursement Agreement authorized Bank of America to rely.

Regarding cost overruns in late 2008 and early 2009, IVI's January 30, 2009 Project Status Report, PSR 21, indicated it had concerns that Fontainebleau's cost disclosures were not accurate and the LEED credits, which reduce construction costs through tax credits, were lagging.  Despite these concerns, IVI executed the

Construction Consultant Certificate for the February 2009 Advance Request.  Similarly, although IVI's March 19, 2009 Construction Consultant Advance Certificate stated it had declared material errors in the Advance Request and supporting documentation, after IVI consulted with Fontainebleau and Fontainebleau revised the March request, IVI issued a Construction Consultant Advance Certificate approving the request.   The Disbursement Agreement specifically authorized Bank of America to rely on IVI's Certificate, and Bank of America had no obligation to independently investigate whether the concerns expressed in the Project Status Reports had been adequately resolved. Had the parties wanted to vest Bank of America with such an obligation, they could have included the "reasonable diligence" language employed in Section 2.4.4 with respect to Bank of America's obligation to ensure IVI performed its review and delivered the Certificate in a timely manner.  *See* Disb. Agmt. § 2.4.4.   As a result, and especially in light of IVI's Certificates, on which Bank of America was expressly authorized to rely, Bank of America did not have actual knowledge of any cost overruns that would have caused a condition precedent to fail or otherwise require the issuance of a Stop Funding Notice.

Moreover, as Bank of America became aware of potential cost overruns, it communicated with, and facilitated communications between, the Lenders and Fontainebleau.  For example, in February 2009, when JPMorgan Chase requested from Bank of America information regarding the issues raised in PSR 21, Bank of America promptly requested the information from Fontainebleau.   After Fontainebleau responded, Bank of America asked Fontainebleau to schedule a lender call to discuss its response.  Fontainebleau initially refused, and in early March, Bank of America again

requested Fontainebleau meet with the Lenders and again requested information regarding Project costs.  Upon Bank of America's requests, Fontainebleau finally held a Lender meeting in Las Vegas on March 21, 2009.

Similarly, after Fontainebleau submitted its revised March 2009 Advance Request, and IVI issued the necessary Construction Consultant Advance Certificate, Bank of America promptly made the revised Request and Certificate available to the Lenders.  It cannot be said, based on these facts and with all inferences in favor of the Term Lenders, that Bank of America acted in bad faith, with reckless disregard for the Term Lenders' rights, or the intent to harm the Term Lenders, or even knew of the failure of any conditions precedent related to the actively-concealed Project cost overruns.

### 3.    First National Bank of Nevada Repudiation

In July 2008, the Comptroller of Currency closed the First National Bank of Nevada ("FNBN") and appointed the FDIC as receiver.  In late December, the FDIC formally repudiated FNBN's unfunded Senior Credit Facility commitments, which amounted to less than 0.6 percent of the $1.85 billion Senior Credit Facility.  The Term Lenders argue that, once the FDIC repudiated FNBN's commitment, FNBN was in Lender Default under the Credit Agreement, causing several conditions precedent (Sections 3.3.2, 3.3.3, 3.3.21, and 3.3.11) to fail, and Bank of America disbursed funds in the known failure of condition precedents.  Bank of America argues the default was not material, and therefore was not a condition precedent failure.

Although materiality is generally for the finder of fact, "where the evidence concerning the materiality is clear and substantially uncontradicted, the question is a matter of law for the court to decide."  *Wiljeff, LLC v. United Realty Mgmt. Corp.*, 920

N.Y.S.2d 495, 497 (N.Y. App. Div. 2011) (granting partial summary judgment on issue of materiality).   Here, with all inferences in favor of the Term Lenders, including consideration of the Lehman bankruptcy and other criteria in the market, I conclude the FNBN repudiation was not material, as reasonable lenders and borrowers would not expect a $1.85 billion loan facility to fail due to a repudiation of less than $12 million, especially when the Project remained In Budget by over $100 million.   *See Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540–41 (2d Cir. 1996) (affirming district court judgment, in proxy rules context, that misstatements were immaterial as a matter of law).   If the sophisticated parties to the Credit and Disbursement Agreements had intended *any* Lender Default to constitute a Default of the Credit Agreement, they would have included it as a specifically-delineated Event of Default in the Credit Agreement, Section 7 or Disbursement Agreement, Section 8.

Even if the FNBN repudiation caused numerous conditions precedent to fail, Bank of America did not act with gross negligence or exhibit willful misconduct in approving Advance Requests in the face of the repudiation.   FNBN's commitment was only 0.6 percent of the Senior Credit Facility, and, according to the December 2008 Advance Request, the Project was significantly In Balance.   Accordingly, even if the FNBN repudiation caused numerous conditions precedent to fail and Bank of America knew of this failure, viewing the evidence will all inferences in favor of the Term Lenders, no reasonable fact finder could conclude that Bank of America acted in bad faith or with disregard for the Term Lenders' rights in disbursing funds in the face of a repudiation of such a minimal amount and allowing the Project to continue.

### 4.      March 2009 Advance Request and Defaulting Lenders

On March 9, 2009, Fontainebleau submitted a revised Notice of Borrowing, requesting $350 million in Delay Draw funds.  Two of the Delay Draw Term Lenders—Z Capital and Guggenheim—did not fund their commitments.   Z Capital and Guggenheim's share was less than $23 million of the $350 million draw (roughly 1 percent of the Senior Credit Facility, and 6 percent of the March 2009 draw).   Similar to the arguments raised with respect to the First National Bank of Nevada repudiation, the Term Lenders argue these lenders' failure to fund was a default, caused numerous conditions precedent to fail, and Bank of America disbursed funds in the face of the known failure of conditions precedent.  Further, the Term Lenders argue that these Lenders' commitments were material, as excluding these commitments caused the In Balance test to fail.

As with the FNBN repudiation, I conclude the Z Capital and Guggenheim's failure to fund was not material, as, even though the failure caused the In Balance Test to fail, the commitment was minimal in the context of the Senior Credit Facility, had no immediate impact on the loan facility because $327 million in Delay Draw Term Loans had been funded, while only $138 million was requested, and no reasonable investor or borrower would expect—or, as discussed below, would request—the loan facility to fail under these circumstances.

Furthermore, even if the failure of Z Capital and Guggenheim caused conditions precedent to fail, Bank of America did not act with gross negligence in disbursing the March 2009 Advance Request.  Before disbursing the funds, on March 23, 2009, Bank of America sent the Lenders a letter disclosing Z Capital and Guggenheim's failure to fund.   Bank of America advised that excluding Z Capital and Guggenheim's

commitments from the Available Funds would cause the In Balance test to fail, stated it was willing to include the unfunded commitment in the Available Funds component of the March 2009 Advance, and invited any lender who disagreed to inform Bank of America. Although two Lenders replied to the correspondence, no Lender disagreed with Bank of America's position regarding the March 2009 Advance. Accordingly, Bank of America was not grossly negligent or exhibiting willful misconduct—*i.e.*, it was not indifferent to the Term Lenders' rights or intentionally trying to harm them—in disbursing the March 2009 funds.

### 5. Timing of the March 2009 Advance Request

I turn finally to the timing of the March 2009 Advance Request. On March 11, 2009, Fontainebleau submitted an Advance Request with an Advance Date of March 25, 2009. Approximately one week later, on March 19, 2009, IVI issued a Construction Consultant Advance Certificate declaring it had discovered material errors in the Advance Request and supporting documentation and was concerned about the Project costs. Fontainebleau worked with IVI to address IVI's concerns, and Fontainebleau submitted a revised Advance Request on March 23, 2009, and another revised Request on March 25, 2009. The Term Lenders contend Bank of America should have rejected the revised Requests as untimely under Section 2.4 of the Disbursement Agreement, and Bank of America could not in good faith have approved the Requests.

Regarding the timing of the revised Requests, the Term Lenders argue that, pursuant to Section 2.4.1 of the Disbursement Agreement, Fontainebleau had to submit its March Advance Request by March 11; Section 2.4 allows resubmission of a Request only in the case of minor or purely mathematical errors, not where the Construction Consultant rejected the Request for material misstatements; and Section 2.4.4(b)

requires delivery of the Advance Request no later than four Banking Days prior to the requested Advance Date.   Contrary to the Term Lenders' interpretation of the Disbursement Agreement, Section 2.4 does not restrict Fontainebleau's right to supplement its Advance request to correct minor or mathematical errors, it merely permits the Disbursement Agent to require Fontainebleau to resubmit the Advance Request in these circumstances.   *See* Disb. Agmt. § 2.4.4 ("In the event … the Disbursement Agent finds any minor or purely mathematical errors or inaccuracies in the Advance Request or supporting materials, the Disbursement Agent may require the Project Entities to revise and resubmit the same.")   Indeed, Section 2.4.5, entitled "Supplementation of Advance Requests," specifically permits Fontainebleau to revise an Advance request in the event it discovers any updates required to be made "prior to the Scheduled Advance Date" and is not limited to mathematical errors.

Regarding the timing of Bank of America's approval of an Advance Request, Section 2.4.5's provision that the Disbursement Agent use "reasonable diligence to review and approve such supplemental Advance Request and to cause the Construction Consultant to review and approve the same not less than three Banking Days prior to the Scheduled Advance date," requires only that Bank of America make reasonable efforts under the circumstances.   It does not state—or mean—that Bank of America cannot review and approve a supplemental Advance Request less than three Banking Days before the Scheduled Advance Date, especially when that supplemental Request is submitted less than three Days before the Scheduled Advance Date.

Moreover, Section 2.4.4's requirement that IVI submit a Construction Consultant Advance Certificate not later than four Banking Days prior to the requested Advance

Date applies to Fontainebleau's original request.  IVI fulfilled this requirement, as it submitted its initial Construction Consultant Advance Certificate on March 19, 2009. The four Banking Days requirement does not apply to IVI's approval of a supplemental request, as Section 2.4.5 controls IVI's approval of a supplemental request.

The Term Lenders next argue that Bank of America could not, in good faith, have approved the revised March 2009 Request in the face of the "funding crunch" (as evidenced, according to the Term Lenders, by the Lehman bankruptcy, FNBN repudiation, and Guggenheim/Z Capital defaults) and cost overruns.  In further support of this argument, the Term Lenders cite to Bank of America's internal risk classifications, downgrading the risk rating of the Project.  These internal risk ratings are irrelevant to my analysis, as they were conducted by Bank of America, as a Lender, and Section 9.2.5 does not permit the imputation of knowledge from Bank of America as Lender to Bank of America as Disbursement Agent.  Moreover, Section 2.4.5 requires Bank of America, as Disbursement Agent to consider the submission of a revised Advance Request "in good faith."   Fontainebleau's supplemental March Advance Requests showed the Project In Balance by almost $14 million, and over $14 million. Given this representation and IVI's certifications, Bank of America, as Disbursement Agent, did not act in bad faith in approving the March 2009 Request.

## VI.     Requests for Judicial Notice

In conjunction with the motions for summary judgment, the Term Lenders filed a Request for Judicial Notice [ECF No. 261 and September 9, 2011 Declaration of Robert Mockler and Request for Judicial Notice], requesting I take judicial notice, pursuant to Federal Rule of Evidence 201, of a Proof of Claim submitted by Fontainebleau Las Vegas Retail, LLC in the Lehman bankruptcy [Non-Dep. Exh. 1504].  The Term Lenders

request judicial notice of the Proof of Claim to "evidence that Fontainebleau filed the Proof of Claim and alleged that Lehman's failure to pay its portion of Advance Requests beginning in September 2008 and on four occasions thereafter were defaults under the Retail Facility, and not for the truth of the matters asserted therein."  *See* Term Lenders' Reply in Support of Judicial Notice [ECF No. 286] at 1.  "A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but to establish the fact of such litigation and related filings."  *Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1310 (S.D. Fla. 2004) (citing *U.S. v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)).  Bank of America does not oppose the taking of judicial notice of the Proof of Claim solely for the fact of the document's existence, and not for the truth of the matters contained therein.  *See* Bank of America Opposition to Plaintiff's Request for Judicial Notice [ECF Nos. 271 and 292].  Here, however, the fact of Fontainebleau's filing of a Proof of Claim alleging there were defaults under the Retail Agreement is not material to the pending summary judgment motions.  Bank of America does not dispute that Lehman did not fund its portion of the September 2008, December 2008, January 2009, and February 2009 Retail Advances.  Whether this failure to fund constituted a default under the Retail Agreement and the failure of a condition precedent under the Disbursement Agreement as a matter of law is for the Court, not Fontainebleau, to determine.  Accordingly, I deny the Term Lenders' Request for Judicial Notice.

Bank of America filed a Request for Judicial Notice [ECF No. 272], requesting I take judicial notice of (1) an article by Pierre Paulden entitled *Highland Shuts Funds Amid 'Unprecedented' Disruption* [ECF No. 272, Exh. 28] ("Paulden Article") and (2) the

March 25, 2011 Complaint in *Brigade Leveraged Capital Structures Fund, Ltd. v. Fontainebleau Resorts, LLC*, filed in District Court in Clark County, Nevada [ECF No. 272, Exh. 101] ("Brigade Complaint").  Bank of America seeks to use the fact of the Paulden Article, not its contents, to support its proposition that, "[i]n September 2008, numerous credible publications reported that certain Highland finds had suffered losses and faced a liquidity crunch.", and to justify its response to Highland's September 2008 claims regarding the Lehman bankruptcy and its funding of the September 2008 Retail Advance.  *See* BofA Response AMA ¶ 118, BofA Opp. Memo. at 16.  But the Paulden Article, dated October 16, 2008, does not demonstrate reports of Highland's losses in *September* 2008.  Further, Bank of America has cited no evidence to indicate any of the Bank of America individuals who evaluated Highland's claims actually read the Paulden Article, and therefore cannot establish that the Paulden Article was relevant to Bank of America's assessment of Highland's claims.  Finally, the communications between Highland and Bank of America regarding the Lehman bankruptcy and Lehman's failure to fund the September 2008 Retail Advance occurred between from late September 2008 through October 13, 2008, before the Paulden Article was published.  I conclude, therefore, the fact of the Paulden Article is not relevant to the resolution of the pending summary judgment motions and deny Bank of America's request for judicial notice.  *See Cravens v. Smith*, 610 F.3d 1019, 1029 (8th Cir. 2010) ("[A] court may properly decline to take judicial notice of documents that are irrelevant to the resolution of a case."); *Am. Prairie Const. Co. v. Hoich*, 560 F.3d 780 (8th Cir. 2009) ("Caution must also be taken to avoid admitting evidence, through the use of judicial notice, in contravention of the relevancy, foundation, and hearsay rules."); *see also Shahar v. Bowers*, 120 F.3d 211,

214 (11th Cir. 1997) (noting the taking of judicial notice is, "as a matter of evidence law, a highly limited process" because "the taking of judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence …."). 

Turning to the Brigade Complaint, Bank of America seeks admission of the Brigade Complaint not only for the fact that it was filed, but also for the content therein, arguing the Complaint's allegations are relevant to the instant action and constitute a party admission and are therefore an exception to the hearsay rule.  The *Brigade* plaintiffs, some of whom are Term Lenders, allege, *inter alia*, that Fontainebleau executives and affiliates made material misrepresentations in the Advance Requests, hid cost overruns, and concealed adverse information regarding the Lehman bankruptcy's implications for the Project.  Bank of America argues these allegations are relevant to the Term Lenders' claim that Bank of America breached its duties as Disbursement Agent and Bank Agent, and, more specifically, had knowledge of "Fontainebleau's Lehman-related machinations."  [ECF No. 301 at 3].  As set forth above, independent of the Brigade Complaint, I have concluded the evidence of record on summary judgment, with all inferences in favor of the Term Lenders, does not demonstrate that Bank of America had knowledge of Fontainebleau's "Lehman-related machinations" or cost overruns.  Accordingly, I deny Bank of America's request for judicial notice of the Brigade Complaint as moot.

## VII.    Conclusion

For reasons discussed, I conclude Bank of America, as Disbursement Agent or Bank Agent, did not breach the Disbursement Agreement, nor did it act with bad faith, gross negligence, or willful misconduct in the performance of its duties under the Disbursement Agreement.  The Disbursement Agreement imposed on Bank of America

no duty to inquire or investigate whether Fontainebleau's representations that all conditions precedent had been met were accurate, and, with all inferences in favor of the Term Lenders, the Term Lenders have failed to present a genuine issue of material fact as to whether Bank of America, as Disbursement Agent or Bank Agent, had actual knowledge of the failure of any conditions precedent to disbursement, including, but not limited to, Fontainebleau funding Lehman's portion of the September 2008 Retail Advance, Fontainebleau reimbursing ULLICO for a portion of the December 2008 through March 2009 Retail Advances, and the Project's cost overruns.

Although not germane to my analysis, I would be remiss by not observing that, while the Term Lenders argue on summary judgment that Bank of America should have pulled the plug on the Project as early as September 2008, they argued in their complaints and on motion to dismiss that the Revolving Lenders should have funded the Project as late as March and April 2009.  Further, while the Term Lenders argue on summary judgment that Bank of America should have been aware of issues with the Retail Facility and Project costs, they allege in other actions that Fontainebleau perpetrated a fraud against the Lenders and Bank of America in actively concealing cost overruns and misleading interested parties about the status and potential success of the Project.  That said, having reviewed the motions for summary judgment and related requested for judicial notice and being otherwise duly advised, it is HEREBY ORDERED and ADJUDGED as follows:

1.  Bank of America's Motion for Summary Judgment [ECF No. 255] is **GRANTED**.

2.      The Term Lenders' Motion for Partial Summary Judgment [ECF No. 258] is

**DENIED**.

3.      The parties' Requests for Judicial Notice [ECF No. 261 and 272] are **DENIED**.

4.      All pending motions are **DENIED as MOOT** and all hearings are

**CANCELLED**.

5.      The Clerk of the Court is instructed to **CLOSE** this case.

6.      Final judgment will be entered by separate court order pursuant to Federal

Rule of Civil Procedure 58.


        DONE AND ORDERED in Chambers at Miami, Florida, this 19th day of March,

2012.


                                        _____
                                        THE HONORABLE ALAN S. GOLD
                                        UNITED STATES DISTRICT COURT JUDGE


cc:     Clerk of the United States Court of Appeals for the Eleventh Circuit
            (related to your Case No. 11-10740)
        Clerk of the United States Judicial Panel on Multidistrict Litigation
        Magistrate Judge Jonathan Goodman
        All Counsel of Record